Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br>CARLOS E. INFANTE ROSA<br><br>Apelante | KLAN202101076 | *APELACION* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Casos núms.:<br>A SC2020G0020 al 29<br>A LA2020G0012 al 16<br>A DC2020G0002<br>A LA2020M0002<br><br>Sobre:<br>Art. 401 S.C. (7)<br>Art. 412 S.C. (3)<br>Art. 6.01 Armas (3)<br>Art. 5.07 Armas (1)<br>Art. 5.06 Armas (2)<br>Art. 157 C.P. |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br>HÉCTOR EMMANUEL FONTÁNEZ CARBALLO<br><br>Apelante | KLAN202300098 | *APELACION* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Casos núms.:<br>A SC2020G0010 al 19<br>A LA2020G0007 al 11<br>A DC2020G0001<br>A LA2020M0001<br><br>Sobre:<br>Art. 401 S.C. (7)<br>Art. 412 S.C. (3)<br>Art. 6.01 Armas (3)<br>Art. 5.07 Armas (1)<br>Art. 5.06 Armas (2)<br>Art. 157 C.P. |

Panel especial integrado por su presidente, el juez Sánchez Ramos, el juez Marrero Guerrero y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparece ante nos la parte apelante, Carlos E. Infante Rosa

y Héctor E. Fontánez Carballo, mediante sus respectivos recursos

de apelación,[1] y nos solicita que revoquemos las sentencias dictadas en su contra, el 29 de noviembre de 2021 y el 15 de diciembre del mismo año, por el Tribunal de Primera Instancia, Sala Superior de Aguadilla.

Por los fundamentos que exponemos a continuación, se confirman las *Sentencias* apeladas. Veamos.

**I**

Por hechos ocurridos el 6 de noviembre de 2019, se presentaron acusaciones en contra de Carlos E. Infante Rosa (Infante Rosa) y Héctor E. Fontánez Carballo (Fontánez Carballo) (apelantes) por alegadas infracciones a los Artículos 401 y 412 de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 de 23 de junio de 1971, según enmendada, 24 LPRA secs. 2401 y 2412 (Ley de Sustancias Controladas); Artículos 5.06, 5.07 y 6.01 de la Ley de Armas de Puerto Rico, Ley Núm. 404-2000, según enmendada, 25 LPRA secs. 458e, 458f y 459 (derogada) (Ley de Armas); Artículo 157 del Código Penal de Puerto Rico de 2012, Ley Núm. 146-2012, según enmendada, 33 LPRA sec. 5223.

Celebrada la vista preliminar correspondiente el 6 y 14 de febrero de 2020, el Tribunal de Primera Instancia encontró causa para juicio en contra de los apelantes, quienes ejercieron su derecho a un juicio por jurado. Posteriormente, el 19 de agosto de 2021, se celebró una vista argumentativa sobre la Regla 109 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 109. Surge de la transcripción de la prueba oral que las partes estipularon que el testigo del Ministerio Público Peter Rodríguez Vélez (Rodríguez Vélez) falleció y, por consiguiente, no estaba disponible para testificar en el juicio.[2] En virtud de ello, el Ministerio Público solicitó presentar el testimonio

---

[1] Mediante *Resolución* del 21 de febrero de 2023, el Tribunal de Apelaciones consolidó los recursos de apelación KLAN202101076 y KLAN202300098 por estos estar estrechamente relacionados.
[2] Transcripción de la prueba oral (TPO), págs. 150-151.

anterior vertido en la vista preliminar por dicho testigo, a lo cual se opuso la defensa.

En particular, la representación legal de Infante Rosa sostuvo que en la vista preliminar no hubo un contrainterrogatorio completo y efectivo.[3] Especificó que se le entregó una *Declaración Jurada* del 13 de abril de 2021,[4] suscrita con posterioridad a la vista preliminar, mediante la cual el testigo Rodríguez Vélez presuntamente contradice su propio testimonio en dicha vista.[5] Enfatizó que, por tal razón, el contrainterrogatorio no fue efectivo, toda vez que no se le dio la oportunidad de confrontar ese testimonio.[6] Aclaró que la *Declaración Jurada* que se le entregó en la vista preliminar fue la del 14 de noviembre de 2019.[7] Argumentó que, con relación al delito de secuestro, hubo información que no tuvo disponible en la vista preliminar y no podía confrontar al testigo cuyo testimonio se iba a presentar en el juicio ante Jurado mediante una grabación.[8] Por ello, solicitó que se excluyera dicho testimonio emitido en la vista preliminar.[9]

Al entender sobre los planteamientos de la defensa de Infante Rosa, el tribunal expresó que estos iban dirigidos al valor probatorio, lo cual sería la función del Jurado aquilatar.[10] Indicó que se encontraban ante un asunto de admisibilidad del testimonio de un testigo que había fallecido y no estaba disponible, lo cual constituía prueba de referencia.[11] Reiteró que la defensa estaba argumentando aspectos que iban dirigidos al valor probatorio, por lo que el Jurado, posiblemente, debía tener ese testimonio declarado en la vista preliminar, así como la declaración jurada que prestó el testigo, para

---

[3] TPO, pág. 154.
[4] Anejo I del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 1-4.
[5] TPO, págs. 154-155.
[6] Íd., págs. 155-156, 159.
[7] Íd., pág. 156. Véase, Anejo II del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 5-9.
[8] Íd., pág. 162.
[9] Íd., pág. 166.
[10] Íd., pág. 157.
[11] Íd.

que pudieran determinar el valor probatorio que le darían.[12] Por otro lado, instruyó que no es hasta que se hace la lectura de la acusación que se activa la Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, R. 95, sobre el descubrimiento de prueba, por lo que no iba a tener acceso a la *Declaración Jurada* del 13 de abril de 2021 y debía contrainterrogar basado en la prueba que tuvo en ese momento en la vista preliminar.[13]

Por su parte, la representación legal de Fontánez Carballo sostuvo que el testimonio de Rodríguez Vélez en la vista preliminar no debía ser admitido, toda vez que violaba el debido proceso de ley.[14] Argumentó que toda persona acusada tenía derecho a confrontar a las personas y a los testigos de cargo, pero, en este caso, no se le permitiría porque se pretendía llevar el testimonio al Jurado mediante una reproducción de la vista preliminar.[15] Abundó que el requerimiento de prueba en ese tipo de vista era distinto al requerido en un juicio, lo cual redundaba en que el testimonio no fuera uno amplio que abarcara todo lo necesario para probar un caso en sus méritos.[16] Planteó que, en cuanto al testimonio del mencionado testigo sobre su presunto secuestro, el Jurado no iba a tener la oportunidad de poder observar las características físicas de este, ni su comportamiento al declarar lo sucedido, los que constituían elementos necesarios para que el Jurado pudiera evaluar la credibilidad de su testimonio.[17] Arguyó que no iba a poder impugnar al mencionado testigo porque no estaba disponible para contestar las preguntas; que tendría que traer una prueba aparte para intentar impugnar.[18] En vista de ello, expresó tener reparo en

---

[12] TPO, pág. 158.
[13] Íd., págs. 163 y 165.
[14] Íd., pág. 166.
[15] Íd.
[16] Íd., págs. 166-167.
[17] Íd., pág. 167.
[18] Íd., págs. 167-168.

que el testimonio de Rodríguez Vélez en la vista preliminar fuera admitido.[19]

En respuesta a los planteamientos antes esbozados por la defensa de Fontánez Carballo, el tribunal apelado indicó que la Regla 808 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 808, proveía la oportunidad de impugnar la declaración del testimonio en cuestión.[20] Explicó que, según la norma establecida jurisprudencialmente, este tipo de declaraciones era menos confiable, razón por la cual era prueba excepcional, y que la credibilidad de ese testigo podía ser impugnada mediante la precitada Regla.[21]

De otro lado, el Ministerio Público sostuvo que todas las alegaciones presentadas por la defensa eran sobre el valor probatorio del testimonio de Rodríguez Vélez en la vista preliminar.[22] Arguyó que las declaraciones juradas suscritas por dicho testigo no eran contradictorias y que la *Declaración Jurada* del 13 de abril de 2021 fue con relación a una investigación sobre un asesinato que nada tenía que ver con la celebración de la vista preliminar de los casos de epígrafe.[23] Adujo que la prueba se podía confrontar porque en el juicio estarían los demás testigos que declararon en la vista preliminar.[24] Sobre lo relacionado al valor probatorio, indicó que pretendía solicitar en el juicio que, en adición a la grabación de la vista preliminar, se admitieran las declaraciones juradas como testimonio anterior emitido por el testigo no disponible, toda vez que la defensa tuvo oportunidad para contrainterrogarlo sobre ello.[25]

Culminadas las argumentaciones, y luego de un turno posterior, la representación legal de Infante Rosa indicó que, luego

---

[19] TPO, pág. 166.
[20] Íd., pág. 167.
[21] Íd., págs. 168-169.
[22] Íd., pág. 169.
[23] Íd., págs. 169-170.
[24] Íd., pág. 170.
[25] Íd.

de reunirse con su representado, retiraba su oposición a la reproducción íntegra del testimonio de Rodríguez Vélez y señaló que se allanaba a que, de admitirse el mismo, se reprodujera la totalidad de la grabación.[26] Dicha postura fue reiterada en varias ocasiones por este al final de la vista argumentativa.[27] No obstante, el foro *a quo* concedió un término a las partes para que presentaran por escrito cualquier objeción al respecto que entendieran necesaria.[28]

Al día siguiente de celebrada la vista argumentativa, Infante Rosa instó una *Moción para Admisibilidad Limitada.*[29] En esencia, sostuvo que la admisibilidad de lo declarado por el testigo Rodríguez Vélez en la vista preliminar debía circunscribirse únicamente para el caso de secuestro y no para los casos de armas de fuego y sustancias controladas. Citó extractos de lo vertido en la vista preliminar que, según alegó, evidenciaban que, desde el inicio de la vista, los interrogatorios y contrainterrogatorios que se hicieron a varios testigos, incluyendo al testigo Rodríguez Vélez, fueron limitados al delito de secuestro, según instruido por el propio tribunal de instancia. Reiteró que la defensa se limitó a contrainterrogar al mencionado testigo sobre el secuestro, mas no sobre los casos de armas de fuego y sustancias controladas. Argumentó que la Regla 806 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 806, permitía, como excepción a la norma de prueba de referencia, el testimonio dado en otra vista si la parte contra quien se ofrecía el testimonio tuvo la oportunidad y motivo similar para desarrollar el testimonio en directo, contrainterrogatorio o en redirecto, lo cual no había ocurrido en este caso. En vista de ello, solicitó que se excluyera el referido testimonio en los casos de armas de fuego y sustancias controladas, pues no tuvo la oportunidad para

---

[26] TPO, págs. 179-183.
[27] Íd.
[28] Íd.
[29] Anejo III del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 10-12.

desarrollar un contrainterrogatorio del testigo Rodríguez Vélez sobre los mencionados casos.

En desacuerdo, el mismo día, el Ministerio Público se opuso.[30] Admitió que la vista preliminar se comenzó por el delito de secuestro, en el cual el perjudicado era Rodríguez Vélez. Explicó que el testimonio de dicho testigo se trajo para probar, no solamente los hechos del delito de secuestro, sino también para solicitar unas órdenes de registro y allanamiento de los lugares descritos por este, donde se almacenaban las drogas, así como contra las personas que cometieron los delitos de epígrafe. Planteó que dicha información fue declarada por el mencionado testigo y la defensa hizo las preguntas que estimó necesarias. Asimismo, señaló que se le entregó oportunamente a la defensa las declaraciones juradas y las órdenes de registro y allanamiento pertinentes. Sobre ese particular, indicó que el testimonio detallado y descriptivo del testigo Rodríguez Vélez sobre lo que había en esos lugares mientras estaba secuestrado, no solo servía para solicitar las órdenes de registro y allanamiento con el propósito de ocupar lo narrado, sino también para corroborar su versión de los hechos y darle más credibilidad a su testimonio.

El Ministerio Público arguyó que omitir los detalles de las armas de fuego del testimonio brindado por el testigo Rodríguez Vélez impediría que el Jurado corroborara el testimonio de este y laceraría la credibilidad de un testigo no disponible. Aclaró que cuando mencionó que el interrogatorio se comenzó con el delito de secuestro en la etapa de vista preliminar era a los fines de sentar al perjudicado de dicho delito a testificar. Sin embargo, argumentó que el Juez nunca limitó el interrogatorio directo y mucho menos el contrainterrogatorio de la defensa; es decir, que se le permitió a la defensa hacer todas las preguntas que entendió pertinentes. Adujo

---

[30] Anejo IV del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 13-16.

que el testimonio de Rodríguez Vélez no se circunscribió al delito de secuestro, sino que este declaró sobre todo lo que tenía conocimiento, incluyendo lo que sirvió para la obtención de las órdenes de registro y allanamiento que, posteriormente, motivaron la radicación de los cargos. En vista de lo anterior, solicitó que la moción de la defensa para limitar la admisibilidad del testimonio de Rodríguez Vélez en la vista preliminar se declarara No Ha Lugar.

Evaluadas las posturas de las partes, el 23 de agosto de 2021, el Tribunal de Primera Instancia emitió una *Resolución* mediante la cual declaró Ha Lugar la solicitud del Ministerio Público para presentar completamente el testimonio de Rodríguez Vélez vertido en la vista preliminar.[31] Concluyó que la Regla 806 de Evidencia de Puerto Rico, *supra*, era aplicable a la controversia ante sí y permitía la admisibilidad del testimonio anterior, según propuesto por el Ministerio Público. Resolvió que, lo relacionado a las declaraciones juradas y documentos que surgieron durante el descubrimiento de prueba posterior a la vista preliminar, era un asunto de impugnación de credibilidad del testimonio que iba dirigido al valor probatorio y no a la admisibilidad del testimonio. Expresó que la defensa tenía disponible la Regla 808 de Evidencia de Puerto Rico, *supra*, la cual permitía impugnar la credibilidad de la prueba que se admitía bajo la precitada Regla 806.

Por otro lado, el foro *a quo* enfatizó que en la vista preliminar había determinado causa para juicio, no solo por el delito de secuestro, sino también por los delitos de sustancias controladas y posesión de armas de fuego. Indicó que en dicha vista se desfiló prueba en torno a los mencionados delitos y, a su juicio, la defensa tuvo oportunidad para contrainterrogar al testigo en cuestión, no solamente en torno al secuestro, sino también sobre los demás

---

[31] Anejo III del *Alegato del Pueblo de Puerto Rico*, págs. 33-38.

delitos. Por tal razón, el foro apelado no entendió procedente limitar el testimonio anterior de Rodríguez Vélez al delito de secuestro, ya que la defensa, en aquel momento, "dentro de su criterio, determinó limitar su contrainterrogatorio a dicho delito".[32]

Culminados los trámites procesales de rigor, el juicio fue celebrado por jurado los días 24, 25 y 26 de agosto de 2021; 14, 16, 27, 28 y 29 de septiembre de 2021; 5 y 6 de octubre de 2021. En lo pertinente, surge de la transcripción de la prueba oral, así como de la *Minuta* del 6 de octubre de 2021 que obra en los autos originales, que el Ministerio Público quería conocer sobre la manera en la que se le iba a presentar al Jurado la *Declaración Jurada* suscrita por el testigo Rodríguez Vélez el 14 de noviembre de 2019, estipulada por las partes y marcada como Exhibit #2 de la Defensa.[33] Indicó que, por ser esta una prueba sustantiva, le interesaba que se le diera lectura al Jurado.[34] Por su parte, la representación legal de Infante Rosa objetó la lectura en corte abierta, pero expresó no tener reparo en que se le entregara dicho documento al Jurado para que este lo leyera.[35] Escuchados los argumentos de las partes, el Tribunal de Primera Instancia determinó que, habiéndose sometido la *Declaración Jurada* como exhibit, esta se le entregaría al Jurado como cualquier otro exhibit.[36]

A continuación, exponemos un resumen del testimonio más relevante de cada uno de los testigos, según fue vertido durante el juicio.

### Sargento Armando González Collazo

El desfile de prueba comenzó con el testimonio del sargento Armando González Collazo (González Collazo), quien indicó que dirigía la Unidad de Inteligencia del área de Aguadilla y llevaba

---

[32] TPO, pág. 38.
[33] Íd., págs. 1421-1422.
[34] Íd., pág. 1422.
[35] Íd., págs. 1422-1423.
[36] Íd., pág. 1423.

veinticuatro (24) años en función en el Negociado de la Policía de Puerto Rico (Policía).[37] Declaró que, el 17 de octubre de 2019, durante el turno de 9:00am a 5:00pm, acompañó a otro agente, Joel Soto Feliciano (Soto Feliciano),[38] a diligenciar una orden de arresto en el área de la Loma en el sector Pueblo Nuevo ubicado en San Sebastián.[39] Indicó que utilizaron vestimenta de civil y manejaron un vehículo confidencial marca Toyota, modelo Corolla.[40] Describió que, mientras subía la cuesta que daba al área del punto de drogas, se percató de dos individuos que tenían una conversación y estaban haciendo movimientos con la mano, lo cual, basado en su experiencia, se trataba de una venta de sustancias controladas.[41] Explicó que, cuando los individuos se percataron de su presencia, estos optaron por detener lo que estaban haciendo y correr hacia un callejón aledaño.[42] Expresó que, cuando llegó a dicho callejón, se bajó del vehículo, junto a su compañero, y procedieron a estar pendientes al área por protección y seguridad.[43] Aclaró que no persiguió a los individuos, toda vez que estos no presentaban las características de la persona a la que buscaban para diligenciar la orden de arresto.[44] Indicó que procedieron a montarse en el vehículo y dar vueltas por el lugar para ver si podían encontrar a la persona contra quien había una orden de arresto, la cual después identificó como Andy Torres Negrón.[45]

El sargento González Collazo narró que, luego de retirarse del mencionado lugar, recibió una llamada en la cual le indicaron que en el cuartel de San Sebastián se encontraba una persona que alegaba haber sido secuestrada.[46] Afirmó que llegó al referido

---

[37] TPO, pág. 206.
[38] Íd., pág. 219.
[39] Íd., págs. 210-211.
[40] Íd., pág. 211.
[41] Íd., págs. 212-214.
[42] Íd., pág. 214.
[43] Íd.
[44] Íd.
[45] Íd., págs. 215, 223-224.
[46] Íd., pág. 224.

cuartel y se encontró con un joven de nombre Peter, quien sostuvo que fue secuestrado, pero que se había podido escapar del lugar donde se encontraba.[47] Según le narró el joven, mientras unos agentes se encontraban interviniendo en el punto de drogas ubicado en la Loma en el área de Pueblo Nuevo, él aprovechó esa oportunidad para escaparse.[48] El joven le explicó que las personas que lo tenían secuestrado se encontraban vendiendo drogas en el punto y se fueron corriendo cuando se percataron de la presencia de la Policía en el área, por lo que procedió a caminar y correr hasta llegar al cuartel de San Sebastián.[49] El sargento González Collazo afirmó que, al escuchar la versión del joven, le sorprendió que lo narrado por este fue lo mismo que había sucedido cuando el agente Soto Feliciano y él se encontraban diligenciado la orden de arresto en el referido lugar.[50] Además, indicó que el joven identificó el vehículo confidencial marca Toyota, modelo Corolla, que utilizaron los agentes para llegar al mencionado punto de drogas.[51] Una vez el joven culminó su relato, el sargento González Collazo se comunicó con la Unidad de Homicidios para que se personaran al cuartel de San Sebastián, entrevistaran al joven y continuaran con la investigación.[52]

Por otro lado, el sargento González Collazo describió al joven como desnutrido, en condiciones que coincidían con la versión de los hechos que este le había descrito, pues parecía que no se había bañado, su vestimenta aparentaba estar sucia y estaba "pel[ú]".[53] A su vez, identificó al joven Peter en una fotografía presentada por el Ministerio Público, la cual fue marcada como Exhibit #3.[54] De igual

---

[47] TPO, pág. 224.
[48] Íd., págs. 224-225.
[49] Íd.
[50] Íd., pág. 225.
[51] Íd.
[52] Íd., pág. 226.
[53] Íd., págs. 225-226.
[54] Íd., págs. 227-228.

forma, expresó que fue el supervisor del diligenciamiento de una orden de allanamiento, liderada por el agente Edgardo Jusino Hilero (Jusino Hilero), en el punto de drogas ubicado en el área de la Loma en la Calle Pou.[55] Sobre ese particular, indicó que, en el proceso de diligenciamiento, pudo identificar a quien conoce como Flanero y lo identificó en sala como uno de los coacusados, aquí apelante.[56]

En el contrainterrogatorio, el sargento González Collazo admitió que, cuando estaba diligenciando la orden de arresto, en ningún momento antes de la transacción vio al joven Peter, ni lo vio corriendo por esas calles, pues la primera vez que lo vio fue en el cuartel de San Sebastián.[57] Aclaró que solo dejó que Peter hablara y no le pidió información adicional.[58] Expresó, además, que Peter mencionó el nombre de Marcos, quien, según alegó el joven, era el que tiraba las drogas en el punto.[59] Por otro lado, explicó que Peter le había narrado lo que le había pasado mientras estaba secuestrado en una casa; que lo tenían amarrado con una cadena; que lo movían de una casa a otra; que lo obligaban a proteger y velar las drogas.[60] Expresó que el joven Peter insinuó otros asuntos relacionados a unas casas en específico donde guardaban material y armas de fuego, así como quiénes eran las personas que lo tenían en esas condiciones.[61]

### Peter Rodríguez Vélez

El testigo Peter Rodríguez Vélez (Rodríguez Vélez) no estuvo disponible durante el juicio por jurado para prestar su testimonio de los hechos, ya que había fallecido previo al inicio de este.[62] No obstante, el Jurado tuvo la oportunidad de escuchar la grabación

---

[55] TPO, págs. 228-231.
[56] Íd., pág. 230.
[57] Íd., págs. 226-227.
[58] Íd., pág. 261.
[59] Íd., pág. 262.
[60] Íd., págs. 265-266.
[61] Íd., pág. 266.
[62] Íd., pág. 273.

del testimonio vertido por Rodríguez Vélez en la vista preliminar de los casos de epígrafe celebrada el 6 de febrero de 2020.[63] Surge de la transcripción de la prueba oral que el Tribunal de Primera Instancia expresó que la oportunidad de escuchar dicho testimonio se hizo mediante "una determinación con vía de excepción".[64] De la transcripción de la mencionada vista preliminar surge el siguiente testimonio:[65]

Rodríguez Vélez declaró que, el 17 de octubre de 2019, se encontraba en el sector Pueblo Nuevo de San Sebastián.[66] Alegó que se encontraba secuestrado en la casa del punto, la cual describió como de cemento, con dos pisos, dos balcones, color verde azul con franjas color quenepa.[67] Indicó que, aun cuando era natural de Cabo Rojo, llegó a Pueblo Nuevo porque era usuario de drogas y, cuando llegó al área, "el negro de Caguas" le dio trabajo vendiendo drogas en el punto ubicado en un sector llamado la Loma en Pueblo Nuevo.[68] Especificó que, al obtener el referido trabajo, se fue de su hogar y se quedó estable en el punto, por lo que cogió sus pertenencias y las dejó en el cuarto del medio de la casa del punto.[69] Por otro lado, identificó al "negro de Caguas" como uno de los imputados presentes en sala, aquí apelante.[70] Asimismo, indicó conocer a una persona que le llamaban Carlos Flanero y lo identificó en sala como otro de los imputados, aquí apelante.[71]

Durante su testimonio, Rodríguez Vélez narró que, el 17 de octubre de 2019, se encontraba en la casa donde se guardaban las armas de fuego y las drogas.[72] Planteó que fue llevado de ese lugar a la casa del punto a punta de pistola y lo dejaron trancado, pero

---

[63] TPO, pág. 273.
[64] Íd., pág. 274.
[65] Íd., págs. 1-147.
[66] Íd., pág. 13.
[67] Íd., págs. 13-14.
[68] Íd., págs. 14-15.
[69] Íd.
[70] Íd., pág. 14.
[71] Íd., pág. 15.
[72] Íd., págs. 15-16.

ese día llegaron unos agentes del orden público al área para intervenir con una persona.[73] Indicó que, en ese momento, una persona que identificó como Marcos salió corriendo y dejó la puerta de la casa abierta, por lo que logró salir por la parte de atrás con la ayuda de uno de los tiradores.[74] Describió que salió corriendo hacia el cuartel de la Policía para dejarles saber que se encontraba secuestrado y necesitaba ayuda.[75] Explicó que, cuando llegó al cuartel, se entrevistó con un agente calvito, cuyo nombre no sabía, y le narró su situación: que se encontraba secuestrado hacía tres semanas; que lo encadenaban de una ventana en la casa donde se guardaban las drogas y las armas de fuego.[76] Señaló que en el cuartel mandaron a buscar a los agentes de la División de Homicidios, razón por la cual lo pasaron al segundo piso del edificio y personal de dicha división lo entrevistaron.[77]

El testigo Rodríguez Vélez abundó que lo secuestraron como para el 18 o a mediados de julio, debido a que los secuestradores querían que fuera el chofer del carro que utilizarían en la comisión de un asesinato en el residencial público San Andrés, a lo cual se opuso en dos ocasiones.[78] Reiteró que, al negarse a cometer el mencionado delito, tomaron la decisión de secuestrarlo porque este tenía mucha información.[79] Manifestó que los secuestradores se tardaron un mes y dos semanas en secuestrarlo porque lo estaban obligando a cometer el referido delito y, como tenía cierta información, pues lo retuvieron.[80] A preguntas del Ministerio Público, Rodríguez Vélez declaró que los secuestradores asesinaron a la persona que no era.[81] Particularizó que ellos le peticionaron

---

[73] TPO, pág. 16.
[74] Íd.
[75] Íd.
[76] Íd., págs. 16-17.
[77] Íd., pág. 17.
[78] Íd.
[79] Íd., págs. 18-19.
[80] Íd., pág. 19.
[81] Íd., págs. 19-20.

nuevamente que los asistiera en ejecutar a la persona correcta que tenían que asesinar.[82]

Rodríguez Vélez relató que, durante el día hasta las doce de la noche, lo tenían en la casa del punto, previamente descrita como de cemento de dos pisos, color verde azul, con una franja color quenepa.[83] Añadió que, a las doce de la noche, a punta de pistola, lo pasaban a la casa de madera color crema, con franjas "chinitas" y un toldo color azul de la Agencia Federal para el Manejo de Emergencias (FEMA) en el techo.[84] Expresó que lo tenían en aquel lugar hasta las seis de la mañana con una de sus piernas encadenada a la ventana.[85] Narró que, durante el día, se dedicaba a vender drogas porque los secuestradores lo obligaban.[86] Declaró que, en ningún momento en las tres semanas que estuvo secuestrado, hasta el día que llegaron los agentes, no tuvo la oportunidad de salir ni de tener contacto con alguna otra persona que lo ayudara.[87] Explicó que, si bien tenía acceso a un teléfono del "negro de Caguas", era solo para hacer llamadas cuando hacía falta drogas; no podía utilizarlo para más.[88] Planteó que dentro de la casa donde se encontraba no había nadie, pero en la parte de afuera habían personas que lo estaban vigilando.[89] Describió que, durante el tiempo que estuvo secuestrado, se sentía nervioso, preocupado y asustado, porque, según indicó: "lo que venía para [sí] no era nada bueno".[90]

En el testimonio de Rodríguez Vélez, este indicó que, luego de la entrevista en el cuartel, lo trasladaron a un Hogar Crea y después lo llevaron a un albergue de testigos.[91] Narró que estuvo

---

[82] TPO, pág. 20.
[83] Íd.
[84] Íd., págs. 20 y 29.
[85] Íd.
[86] Íd.
[87] Íd., pág. 21.
[88] Íd.
[89] Íd.
[90] Íd.
[91] Íd., pág. 22.

hospitalizado y tuvieron que ponerle un suero para hidratarlo porque tenía unas ulceras en el estómago y en el intestino a causa de la falta de alimentación, además del consumo de tantas sustancias controladas.[92] Relató que, desde el primer momento en que logró salir de la residencia en la que se encontraba, le dio la información a un agente de San Sebastián, el cual pensaba que era de la División de Homicidios.[93] Particularizó que, después de ser rehabilitado y salir del hospital, lo llevaron a Fiscalía y, posteriormente, fue entrevistado por una jueza con el propósito de expedir unas órdenes de registro y allanamiento en cuanto a las armas de fuego y drogas.[94] Especificó que le dio información a la magistrada sobre la localidad de las drogas, las cuales indicó que se encontraban en la casa de madera, color crema con franjas "chinitas", con un toldo color azul en el techo; la residencia donde lo dejaban desde las doce de la noche a las seis de la mañana, velando las armas de fuego y las drogas.[95]

De otro lado, el testigo Rodríguez Vélez describió la "casa del punto" como de color verde azul, con franjas color quenepa, mientras que la casa donde se "endecaban" las drogas, donde residía el "negro de Caguas" con Magda,[96] era de cemento, color crema claro con las franjas en la verja color marrón claro y rejas blancas.[97] Explicó que en la casa con las franjas color quenepa se vendían drogas y dentro de esta no había nada, con excepción de unos sillones y sus pertenencias en el cuarto del medio.[98] Añadió que dicha residencia se encontraba ubicada al lado de un almacén de ropa de niño, el cual pertenecía a una iglesia.[99] Indicó que, al otro

---

[92] TPO, pág. 22.
[93] Íd.
[94] Íd., pág. 23.
[95] Íd., págs. 23-24.
[96] Cabe destacar que el testigo Rodríguez Vélez identificó en corte abierta a Magda. Véase, TPO, pág. 25.
[97] TPO, págs. 24-26, 31.
[98] Íd., pág. 26.
[99] Íd.

lado, se encontraba una estructura derrumbada y, al otro extremo, había un callejón donde era el antiguo punto de drogas.[100] Explicó que quienes tenían acceso a esa casa era "Carlos Flanero" y "el negro de Caguas".[101] Relató que estos mantenían la residencia cerrada con cadena y candado, por lo que este vendía drogas desde el balcón.[102] Asimismo, describió en detalle cómo llegar a la casa del punto y cómo era la residencia en su interior.[103] Durante esa descripción, declaró que, en el cuarto donde lo ubicaron, también habían armas de fuego, como una R15 que guardaban en una maleta de guitarra color negra.[104] Añadió que también había un "peine tambor de 100", conocido como "Mickey Mouse", y dos peines de 30 pegados uno del otro con una cinta adhesiva color negra (*tape*), así como municiones dentro de un bulto.[105] Detalló que sus pertenencias las había dejado en la casa del punto antes descrita.[106] Especificó que dichas pertenencias se componían de una maleta con ropa y un álbum familiar.[107]

El testigo Rodríguez Vélez declaró que la casa donde vivía Magda con "el negro de Caguas", donde "endecaban", se encontraba ubicada al lado de la casa crema con franjas "chinitas", donde se guardaban las drogas y las armas de fuego.[108] Explicó que las tres residencias antes descritas estaban pegadas, como en forma de un triángulo.[109] Describió que le tenían el pie izquierdo amarrado con una cadena a una ventana; que la cadena no estaba tan apretada, pero su pie no salía; que lo encadenaban desde las doce de la noche y, por el día, lo pasaban a la casa del punto, pero la cadena se

---

[100] TPO, pág. 27.
[101] Íd.
[102] Íd.
[103] Íd., págs. 28-29.
[104] Íd., págs. 29-30.
[105] Íd., pág. 30.
[106] Íd.
[107] Íd.
[108] Íd., págs. 30-31.
[109] Íd., pág. 31.

quedaba en la otra residencia.[110] Por otro lado, manifestó que no le pidió ayuda a los agentes del orden público que llegaron al lugar donde se encontraba porque, cuando estos llegaron, todo el mundo comenzó a gritar "AGUA" y ellos salieron corriendo detrás del tirador, por lo que, cuando pudo salir de la casa, no había nadie, así que optó por salir corriendo directo para el cuartel de la Policía.[111] Particularizó que tardó como tres minutos en llegar al cuartel.[112] Cuando llegó al cuartel, relató que se sentía asustado, débil y con mucho miedo de que lo estuvieran siguiendo porque habían personas que estaban vigilándolo.[113] Explicó que decidió querellarse en contra de los acusados porque temía por su vida.[114]

En el contrainterrogatorio dirigido por la representación legal de Fontánez Carballo, el testigo Rodríguez Vélez indicó que: tenía cuarenta y tres años; cursó estudios hasta noveno grado; pesaba ciento noventa libras; y medía seis pies con una pulgada.[115] Reiteró que, cuando llegó al cuartel el día en cuestión, estaba bajo los efectos de sustancias controladas ("endrogado").[116] Puntualizó que la alimentación que tenía constaba únicamente de refrescos y galletas.[117] Afirmó que, mientras estaba secuestrado, lo tenían vendiendo drogas y que, durante ese tiempo, estuvo bajo los efectos de sustancias controladas.[118]

Por su parte, la representación legal de Infante Rosa contrainterrogó al testigo Rodríguez Vélez y este declaró que vivía en San Sebastián hacía siete años, pero que llegó a Pueblo Nuevo en verano del año 2019 porque consumía y compraba heroína.[119] Explicó que, unos meses antes, llegó al área en búsqueda de empleo

---

[110] TPO, págs. 32-33.
[111] Íd., pág. 31.
[112] Íd.
[113] Íd.
[114] Íd., pág. 32.
[115] Íd., pág. 33.
[116] Íd.
[117] Íd., pág. 34.
[118] Íd.
[119] Íd., págs. 34-35.

y consiguió trabajo vendiendo drogas desde junio de 2019.[120] Afirmó que lo secuestraron a principios de agosto de 2019, específicamente cuando lo cogieron a punta de pistola y lo llevaron a una casa, donde lo encadenaron de los pies a una ventana.[121] Añadió que "ellos" también se lo dijeron, que estaba siendo secuestrado, pero admitió que esos detalles no los expresó en su declaración jurada.[122]

Durante el contrainterrogatorio, el testigo Rodríguez Vélez manifestó que, si bien a principios de agosto lo tenían secuestrado, para septiembre y octubre no seguía secuestrado.[123] Ahora bien, especificó que estuvo secuestrado en agosto y octubre, particularmente tres semanas, pero que estaba confundido con las fechas y los meses.[124] Negó que lo dejaran de secuestrar en septiembre, pues aclaró que lo había explicado mal.[125] Por otro lado, aceptó haber estado vendiendo drogas durante los meses de septiembre y octubre.[126] Relató que, el 17 de octubre de 2019, pudo ver el vehículo de la Policía cuando intervinieron en el punto de drogas, pero no vio directamente a los agentes del orden público.[127] Reiteró que no salió corriendo hacia el vehículo de los agentes de la Policía que llegaron a Pueblo Nuevo, pero afirmó que no había nada que le impidiera llegar hasta el carro de estos.[128]

De otro lado, el testigo Rodríguez Vélez explicó que si bien habían vecinos en el área, estaban apartados al lugar donde se encontraba.[129] Expresó que no estaba encadenado en la casa del punto.[130] Detalló que vendía drogas durante el día, solo, pero que no podía irse de allí en cualquier momento dado.[131] Admitió que,

---

[120] TPO, pág. 35.
[121] Íd., págs. 36-37.
[122] Íd.
[123] Íd., págs. 37-38.
[124] Íd., págs. 38-39.
[125] Íd.
[126] Íd., pág. 39.
[127] Íd., págs. 39-40.
[128] Íd., págs. 41-42.
[129] Íd., págs. 42-43.
[130] Íd., pág. 43.
[131] Íd., págs. 43-44.

mientras se encontraba vendiendo drogas, los secuestradores no lo estaban amenazando con un arma de fuego, ni se encontraba encadenado en ese momento, pero los portones de la propiedad sí estaban encadenados.[132] Describió que, en la propiedad donde se operaba el punto de drogas, habían unas rejas y un portón, cerrado con cadena, en la parte de atrás; que era la única persona que se encontraba dentro de la casa; y que las personas compraban drogas por el balcón.[133] Indicó que, a la medianoche, lo sacaban de la casa del punto de drogas y lo llevaban a punta de pistola a la otra propiedad, lo cual podía ser visto por los vecinos; pero enfatizó que una cosa era que los vecinos vieran lo que estaba pasando y otra era que hablaran sobre ello.[134]

### Agente Eladio Salcedo Acevedo

El desfile de prueba continuó con el testimonio del agente Eladio Salcedo Acevedo (Salcedo Acevedo), quien declaró que, el 17 de octubre de 2019, mientras trabajaba el turno de 4:00am a 12:00pm en el cuartel de la Policía de San Sebastián, Rodríguez Vélez se personó aproximadamente a las 10:00am, con una apariencia temerosa y estaba sudado.[135] Describió a Rodríguez Vélez como un caballero de tes trigueña, delgado, agitado, sudoroso y nervioso.[136] Indicó que este le expresó que necesitaba ayuda porque lo habían secuestrado.[137] Al escuchar esto, el agente Salcedo Acevedo lo dirigió a su oficina para entrevistarlo a esos efectos.[138] Según relató, Rodríguez Vélez le comentó que estaba secuestrado en la Loma de Stalingrado, en una residencia de dos niveles, en el Pueblo Nuevo, a siete minutos de distancia del cuartel de la Policía

---

[132] TPO, pág. 44.
[133] Íd.
[134] Íd., págs. 45-46.
[135] Íd., pág. 285.
[136] Íd.
[137] Íd., pág. 286.
[138] Íd.

de San Sebastián.[139] Dicho lugar fue descrito por el agente Salcedo Acevedo como uno de alta incidencia criminal porque habían ventas de sustancias controladas y, en ocasiones, se escuchaban detonaciones en horas de la noche.[140]

Según el testimonio del agente Salcedo Acevedo, Rodríguez Vélez le relató que lo tenían narcotizado; es decir, lo obligaban a utilizar sustancias controladas, toda vez que se había rehusado a participar como chofer en un asesinato, durante el verano.[141] Rodríguez Vélez le narró que, además de ser secuestrado y narcotizado, fue golpeado y lo obligaron a vender drogas.[142] Según el agente Salcedo Acevedo, Rodríguez Vélez le indicó que en el lugar donde se encontraba habían sustancias controladas y armas de fuego.[143] Sobre ello, Rodríguez Vélez le especificó que, durante el día, lo tenían en esa residencia de dos pisos, pero en la noche lo transportaban a otro inmueble.[144] Declaró que, según lo narrado por Rodríguez Vélez, había una patrulla en el lugar donde este se encontraba; quienes lo secuestraron pensaban que iban a intervenir con ellos; así que se fueron asustados y dejaron la puerta de la residencia abierta; por lo que Rodríguez Vélez logró escapar y, acto seguido, fue al cuartel de la Policía.[145] El agente Salcedo Acevedo testificó que quienes lo tenían secuestrado eran Infante Rosa y Fontánez Carballo.[146]

Del contrainterrogatorio surge que Rodríguez Vélez le manifestó al agente Salcedo Acevedo que estuvo secuestrado durante tres a cuatro semanas, pero no especificó la fecha en la que fue secuestrado.[147] Dicho agente afirmó que lo que sí le dijo

---

[139] TPO, págs. 286-287.
[140] Íd., pág. 287.
[141] Íd., pág. 288.
[142] Íd.
[143] Íd.
[144] Íd.
[145] Íd., pág. 292.
[146] Íd., pág. 297.
[147] Íd., págs. 300-301.

Rodríguez Vélez fue que se liberó el 17 de octubre de 2019.[148] Admitió que Rodríguez Vélez le había expresado que las personas que le privaron de la libertad, a quienes había identificado como Infante Rosa y Fontánez Carballo, habían salido corriendo ese día y que, por ello, se había logrado escapar.[149] Al ser confrontado con que, en la vista preliminar celebrada el 6 de febrero de 2019, había testificado que Rodríguez Vélez le manifestó que había estado secuestrado por dos semanas y no tres o cuatro, el agente Salcedo Acevedo dijo que no recordaba.[150] Por otro lado, aceptó que Rodríguez Vélez le dijo que era usuario de drogas, específicamente de marihuana.[151] También admitió que Rodríguez Vélez no le mencionó nada sobre alguien llamado Marcos.[152] Además, indicó que, al momento de la entrevista, no lo notó bajo los efectos de sustancias controladas.[153] Por último, afirmó que no observó marcas de secuestro o cadenas en las manos de Rodríguez Vélez.[154]

### Agente Israel Colón Mercado

El agente Israel Colón Mercado (Colón Mercado) declaró que, en los casos de autos, emitió unas certificaciones sobre ciudadano y armas de fuego, las cuales, posteriormente, se marcaron como Exhibits #6A al #6F del Ministerio Público.[155] Explicó que dichos documentos surgieron luego de una investigación que este hizo en el *Portal del Ciudadano REAL* de la Policía (REAL), creado por la Ley Núm. 168-2019, según enmendada, conocida como la *Ley de Armas de Puerto Rico de 2020*, 25 LPRA sec. 461 *et seq.*, en el cual se puede constatar si una persona tiene una licencia de armas de fuego, ya sea bajo el citado estatuto o bajo la ahora derogada Ley de Armas,

---

[148] TPO, pág. 301.
[149] Íd.
[150] Íd., pág. 303.
[151] Íd., págs. 303-304, 310.
[152] Íd., pág. 307.
[153] Íd., págs. 300 y 309.
[154] Íd., pág. 309.
[155] Íd., págs. 328-329, 333.

*supra*.[156] Sobre la certificación marcada como Exhibit #6A, testificó que de esta surgía que Infante Rosa no poseía una licencia de armas de fuego, ni como adulto ni como menor de edad, según la investigación realizada en REAL el 7 de noviembre de 2019.[157] Por otro lado, certificó en el Exhibit #6B, emitido el 7 de noviembre de 2019, que Fontánez Carballo tampoco poseía una licencia de armas de fuego.[158] Declaró que el Exhibit #6C era una certificación emitida en igual fecha que las demás, en la cual se certificó que Magdalys Rollet Rivera no poseía una licencia de armas de fuego.[159]

En cuanto al Exhibit #6D, el agente Colón Mercado especificó que esta certificación fue basada en una búsqueda de un arma de fuego en particular: un rifle marca *Aero Precision*, modelo X15, calibre 223, con número de serie CNX007335.[160] Particularizó que dicha búsqueda fue a petición de la agente Frances Carlo Rodríguez.[161] Sostuvo que en el sistema REAL no figuraba nombre de ninguna persona que poseyera esa arma de fuego; es decir, que dicha arma era ilegal o nunca la inscribieron a nombre de alguien.[162] Sobre el Exhibit #6E, manifestó que se trataba de una certificación emitida el 7 de noviembre de 2019 con relación a otra búsqueda de un arma de fuego en específico: un revolver marca *Charter Arms*, modelo SLP, calibre 38, con el número de serie 68622.[163] Indicó que, al igual que la arma anterior, esta no figuraba registrada a nombre de ninguna persona en el sistema REAL.[164] Aclaró que toda arma de fuego debe estar registrada a nombre de la persona que la porte o la transporte, a menos que no tenga licencia para ello.[165]

---

[156] TPO, págs. 329-330.
[157] Íd., págs. 333-334.
[158] Íd., pág. 335.
[159] Íd., págs. 335-336.
[160] Íd., pág. 336.
[161] Íd.
[162] Íd., pág. 337.
[163] Íd., págs. 337-338.
[164] Íd., pág. 338.
[165] Íd.

**Agente Melvin Rosa Cortés**

El agente Melvin Rosa Cortés (Rosa Cortés), adscrito a la Unidad de Drogas y Narcóticos de Aguadilla, declaró que, el 7 de noviembre de 2019, realizó unas pruebas de campo que luego fueron entregadas al señor Pellot, técnico del Instituto de Ciencias Forenses de Mayagüez, para certificar si las sustancias ocupadas eran drogas.[166] Explicó que, luego de realizar dichas pruebas, llenó un documento intitulado PR122.1, el cual se identificó como Exhibit #7 del Ministerio Público. [167] Añadió que en dicho documento se describía la cantidad, el color, el tipo de droga que se ocupó, a quién se le ocupó, quién realizó el arresto y quién trajo la sustancia.[168] Testificó que, según surgía del documento, las sustancias se le ocuparon a Infante Rosa y Fontánez Carballo. [169] Indicó que la persona que le entregó las sustancias para hacer las pruebas correspondientes fue la agente Frances Carlo Rodríguez.[170]

Sobre el referido Exhibit #7, el agente Rosa Cortés declaró que la prueba de campo de las sustancias en cuestión resultaron ser marihuana.[171] En dicho documento describió el material recibido, el cual catalogó como Exhibit #1 al #6, especificando lo siguiente:[172]

Exhibit #1: una bolsa plástica transparente con cierre a presión y líneas en el cierre de color azul, verde y azul, la cual contenía en su interior picadura de marihuana.

Exhibit #2: una bolsa plástica transparente con cierre a presión, con contenido de picadura de marihuana.

Exhibit #3: una bolsa plástica transparente con letras de color azul que lee el nombre del supermercado *Mister Special,* con contenido de picadura de marihuana.

Exhibit #4: una bolsa plástica transparente con cierre a presión de color rosa y azul, marca

---

[166] TPO, págs. 347-348, 350, 353, 359.
[167] Íd., págs. 350-351.
[168] Íd., pág. 351.
[169] Íd., pág. 352.
[170] Íd., pág. 353.
[171] Íd.
[172] Íd., págs. 354-355, 364-365.

*Zipploc*, con picadura de marihuana en su interior.

Exhibit #5:   una bolsa plástica transparente con cierre a presión, marca *Ten*, con picadura de marihuana en su interior.

Exhibit #6:   una bolsa plástica transparente con cierre a presión, marca *Ten*, la cual contenía en su interior picadura de marihuana.

Durante el contrainterrogatorio, el agente Rosa Cortés admitió que no le constaba de personal conocimiento a quién se le ocuparon las mencionadas sustancias.[173]

### Químico José Joel Mercado Velázquez

El químico forense José Joel Mercado Velázquez (Mercado Velázquez) declaró que, el 10 de diciembre de 2019, cuando trabajaba en el Instituto de Ciencias Forenses de Mayagüez, el agente Rosa Cortés le entregó al receptor del laboratorio de dicha entidad, Héctor Pellot Cruz (Pellot Cruz), una evidencia a ser analizada.[174] A preguntas del Ministerio Público, identificó el Exhibit #10A como la *Solicitud de Servicios Forenses*, la cual le fue asignada por Pellot Cruz para realizar los análisis correspondientes a las seis piezas de evidencia recibidas.[175] Especificó que comenzó a realizar los referidos análisis el 4 de agosto de 2020 y que el resultado de las seis sustancias analizadas arrojaron positivo a marihuana.[176] Por otro lado, expresó que del certificado de análisis químico, marcado como Exhibit #11 del Ministerio Público, surgía que las piezas de evidencia le fueron ocupadas a Infante Rosa y a Fontánez Carballo.[177]

En el contrainterrogatorio, el químico forense Mercado Velázquez admitió que no le constaba de personal conocimiento a quién se le ocuparon las referidas sustancias.[178]

---

[173] TPO, pág. 366.
[174] Íd., págs. 385-386, 394.
[175] Íd., págs. 393, 397-398.
[176] Íd., págs. 398, 405-406.
[177] Íd., págs. 404, 406-407.
[178] Íd., pág. 408.

### Química Damaris Colón Vélez

La química forense Damaris Colón Vélez (Colón Vélez) declaró que era supervisora de análisis químico del laboratorio del Instituto de Ciencias Forenses de Mayagüez.[179] Le presentaron el Exhibit #12A del Ministerio Público, el cual identificó como una solicitud de servicios forenses que se generó en el momento en que se recibieron los presentes casos en el laboratorio.[180] Explicó que de dicho documento surgía, entre otras cosas, la descripción de la evidencia que fue sometida al laboratorio por el agente Pedro López Molinari, así como los nombres de los imputados, Infante Rosa y Fontánez Carballo, al igual que Magdalys Rollet Rivera.[181] Aclaró que dicha entrega se hizo directamente a ella.[182] Afirmó que, el 26 de noviembre de 2019, recibió el sobre de evidencia, marcado como Exhibit #13 del Ministerio Público, para realizar los análisis correspondientes a la prueba que contenía.[183] Describió el contenido de dicho sobre como sigue: una envoltura de aluminio color rojo y gris con polvo; una envoltura de plástico transparente amarrada con nudos con material sólido; un envase de plástico con picadura; una caja de cartón con picadura.[184] Señaló que los análisis realizados arrojaron positivo a fentanilo, cocaína y marihuana.[185]

Durante el contrainterrogatorio, la química forense Colón Vélez admitió no tener conocimiento personal sobre dónde o a quién se le ocuparon las sustancias controladas.[186]

### Química Yolanda Crespo Méndez

La química forense Yolanda Crespo Méndez (Crespo Méndez) del Instituto de Ciencias Forenses de Mayagüez declaró que, el 13

---

[179] TPO, págs. 413-414.
[180] Íd., pág. 419.
[181] Íd., págs. 419-420.
[182] Íd., pág. 420.
[183] Íd., págs. 421 y 424.
[184] Íd., pág. 420.
[185] Íd., pág. 428.
[186] Íd., págs. 431-432, 434-435.

de noviembre de 2020, la química Colón Vélez le asignó la solicitud de servicios forenses en cuestión, generada cuando un agente de la Policía lleva la evidencia al laboratorio de la mencionada institución.[187] Explicó que dicha solicitud, marcada como Exhibit #13A del Ministerio Público, se generó por una evidencia entregada a dicho laboratorio por el agente Jusino Hilero, el 2 de diciembre de 2019.[188] Especificó que la evidencia entregada fue la siguiente: una primera pieza con dieciséis bolsas plásticas transparentes con cierre a presión, con picadura en su interior; una segunda pieza con veintidós bolsas plásticas con cierre a presión y calor, con material granulado en su interior; una tercera pieza con treinta y tres envolturas color rojas y plateadas, con un contenido de polvo.[189] Particularizó, además, que cada una de las piezas descritas se encontraba dentro de otra bolsita plástica transparente con cierre a presión y grapas, con polvo en su interior.[190] La química forense Crespo Méndez testificó que, luego del análisis químico correspondiente, en cuanto a las muestras de las dieciséis bolsitas con picadura en su interior, dio positivo a marihuana.[191] Sobre la segunda pieza de evidencia, indicó que el material granulado en el interior de las veintidós bolsitas dio positivo a cocaína, mientras que la tercera pieza de evidencia contenida en las treinta y tres envolturas de aluminio color rojas y plateadas dio positivo a fentanilo.[192]

En el contrainterrogatorio, sobre el Exhibit #15 del Ministerio Público, la química forense Crespo Méndez afirmó que dicho documento no fue preparado por personal del Instituto de Ciencias Forenses de Mayagüez, sino por un agente externo.[193] Asimismo,

---

[187] TPO, págs. 446, 448, 455.
[188] Íd., págs. 454-455.
[189] Íd., pág. 454.
[190] Íd.
[191] Íd., págs. 458-459.
[192] Íd.
[193] Íd., págs. 466-469, 472.

aceptó que dicho exhibit identificaba como imputados a Infante Rosa y a Fontánez Carballo, pero esta no podía decir a ciencia cierta dónde o a quién se le ocuparon las piezas de evidencia analizadas.[194]

### Técnico Héctor Pellot Cruz

El técnico en control y custodia del Instituto de Ciencias Forenses de Mayagüez, Héctor Pellot Cruz (Pellot Cruz) declaró que, el 2 de diciembre de 2019, el agente Jusino Hilero le entregó una solicitud de servicios forenses de lo siguiente: (1) un pote plástico cilíndrico color anaranjado con una tapa color blanca, la cual contenía en su interior dieciséis bolsitas plásticas transparentes con cierre a presión, con picadura de marihuana en su interior; (2) una bolsa plástica transparente con cierre a presión, la cual contenía veintidós bolsitas plásticas transparentes con cierre a calor y polvo granulado de cocaína en forma de *crack* en su interior; (3) dos bolsas plásticas transparentes con cierre a presión, aproximadamente 6x3, con treinta y tres bolsitas plásticas en su interior con cierre a presión, las cuales contenían una envoltura de aluminio en tonalidad roja en forma de pastel con polvo de heroína.[195]

Por otro lado, el técnico Pellot Cruz testificó que, el 10 de diciembre de 2019, el agente Rosa Cortés le entregó un sobre que contenía seis piezas de evidencia, marcado como Exhibit #11 del Ministerio Público. Describió las referidas piezas de evidencia de la siguiente manera: (1) una bolsa plástica transparente con cierre a presión, color azul y verde, con picadura en su interior; (2) una bolsa plástica transparente con cierre a presión; (3) una envoltura plástica transparente con letras y diseños, con picadura en su interior; (4) una bolsa plástica transparente con cierre a presión color azul y rosa con franjas blancas y letras, con picadura en su interior; (5) una bolsa plástica transparente con franjas, letras y diseño color blanco,

---

[194] TPO, págs. 466-469, 472.
[195] Íd., págs. 473-482.

con cierre a presión plástico color blanco, con picadura en su interior; (6) una bolsa plástica transparente con franjas, letras y diseños, con una cerradura a presión de color blanca y picadura en su interior.[196]

El técnico Pellot Cruz indicó que en el Exhibit #11 hizo constar los nombres de las personas a quienes se les ocuparon las piezas de evidencia que aparecían en el primer encasillado del sobre que le entregaron, pero que no tenía conocimiento sobre esas personas.[197]

Durante el contrainterrogatorio, el técnico Pellot Cruz admitió que pasaron seis meses desde que se entregó la evidencia del caso al químico forense Mercado Velázquez para análisis.[198] Asimismo, afirmó que no estuvo presente ni vio dónde o a quién se le ocupó la evidencia en cuestión.[199]

### Agente Richard Ramírez Medina

El agente Richard Ramírez Medina (Ramírez Medina) declaró que, el 17 de octubre de 2019, su supervisor, el sargento Luis Acevedo Valentín (Acevedo Valentín), le indicó que pasara por Fiscalía debido a que una persona que se presentó a la Unidad de Homicidios de la Policía solicitó hablar con unos agentes de la Unidad de Drogas de dicha agencia.[200] Relató que, al llegar a Fiscalía, le presentaron a Rodríguez Vélez, a quien describió como alto, de pelo negro, trigueño, joven y bastante delgado, al nivel de que su caja toráxica no tenía mucha grasa.[201] Añadió que lo percibió "sudoroso y temblusco".[202] Narró que Rodríguez Vélez le indicó que, el mismo día, en horas de la mañana, llegaron unos agentes de la Policía al área de Pueblo Nuevo en San Sebastián, y que él estaba

---

[196] TPO, págs. 483-484.
[197] Íd., págs. 484-485.
[198] Íd., págs. 491 y 499.
[199] Íd., págs. 493-495, 498.
[200] Íd., pág. 530. Cabe destacar que, previo al testimonio de Ramírez Medina, el Ministerio Público le solicitó al foro primario que tomara conocimiento judicial de las órdenes de registro y allanamiento que obran en el expediente. Véase, TPO, págs. 512-513.
[201] TPO, pág. 531.
[202] Íd., pág. 532.

dentro de una residencia que era utilizada para distribuir sustancias controladas.[203] Indicó que Rodríguez Vélez expresó que logró fugarse gracias a que dichos agentes del orden público llegaron e intervinieron en el punto de drogas. [204] Conforme le explicó Rodríguez Vélez, una vez logró fugarse, llegó hasta el cuartel de San Sebastián.[205]

Según relató el agente Ramírez Medina, Rodríguez Vélez le manifestó que había llegado al área de Pueblo Nuevo para el verano, donde comenzó a vender sustancias controladas. [206] Además, aseguró que Rodríguez Vélez identificó a "el negro de Caguas" como el dueño del punto de sustancias controladas de Pueblo Nuevo, a quien describió como un hombre trigueño, alto, grueso, con estómago pronunciado y de 23 años aproximadamente.[207] Comentó, a su vez, que Rodríguez Vélez describió a "Carlos Flanero" o Infante Rosa, de apodo "gordo Flanero", quien también corría el punto de drogas, como de 34 años, gordo, de algunas 240-250 libras, con llagas en los brazos y manos.[208] Sostuvo que Rodríguez Vélez le dijo que, tanto "el negro de Caguas" como "Carlos Flanero", lo tenían secuestrado porque se negó a participar como chofer en un asesinato.[209]

El agente Ramírez Medina expresó que, el 18 de octubre de 2019, tuvo la oportunidad de entrevistar a Rodríguez Vélez y que su declaración fue exacta a la ofrecida originalmente.[210] En cuanto al proceso del secuestro, manifestó que Rodríguez Vélez relató que lo tenían en contra de su voluntad en la casa del punto de 6:00 de la mañana a 12:00 de la noche, horario en que el punto de drogas se

---

[203] TPO, pág. 533.
[204] Íd.
[205] Íd.
[206] Íd., pág. 534.
[207] Íd., pág. 535.
[208] Íd., págs. 535-536.
[209] Íd., pág. 536.
[210] Íd., pág. 537.

dejaba de trabajar, para luego llevarlo a pie y a punta de pistola a otra casa cercana.[211] Declaró que Rodríguez Vélez aseguró que, en la casa del punto, se distribuía cocaína, marihuana y heroína.[212] Asimismo, sostuvo que la casa fue descrita por Rodríguez Vélez como una de color melocotón con un verdecito o un azulito verdoso, de dos niveles, con balcón arriba y abajo; que el balcón de abajo tenía un portón de rejas que lo trancaban con cadena y que la planta baja era la que se usaba para la distribución de las drogas.[213] Además, mencionó que Rodríguez Vélez le explicó que, al lado de la casa había una estructura rota y abandonada, así como un callejón.[214] Relató que Rodríguez Vélez detalló que, a la derecha de la residencia, había otra estructura que era como un tipo de almacén que tenía una iglesia para distribuir ropa para los niños.[215]

Conforme narró el agente Ramírez Medina, Rodríguez Vélez detalló que, una vez daban las 12:00 de la noche, lo pasaban a una casa que describió como de madera, pintada de crema y china, techada en zinc, con un toldo azul de FEMA.[216] Expresó que Rodríguez Vélez añadió que dicha propiedad tenía una verja de ciclón al frente con cortinas de baño guindando y un portón color negro.[217] Comentó que Rodríguez Vélez, a su vez, indicó que la sala tenía muebles con colores claros y forrados con plástico, así como un sillón con un espejo, y que había una estufa blanca de cuatro hornillas en la cocina.[218] Explicó que Rodríguez Vélez le detalló que había un cuarto donde no se le permitía entrar, en el cual había una cama con aire acondicionado y un peluche de un perrito.[219]

Por otro lado, el agente Ramírez Medina expuso que Rodríguez

---

[211] TPO, págs. 539-540.
[212] Íd., pág. 538.
[213] Íd.
[214] Íd., pág. 539.
[215] Íd.
[216] Íd., pág. 540.
[217] Íd., págs. 540-541.
[218] Íd., pág. 541.
[219] Íd.

Vélez le informó que pernoctaba amarrado "de una pierna de los tobillos" con una cadena que pasaron por una hoja de la ventana del cuarto; que dormía en un caucho; y que en el cuarto había una mesita de noche de *Spiderman*.[220] Según le mencionó Rodríguez Vélez, en ese cuarto era donde se guardaba la mayoría de las drogas y las armas de fuego; en específico, un rifle R15, una pistola 9mm color gris y negra, y un revólver 38mm color negro.[221] A su vez, expresó que Rodríguez Vélez le dijo que en el cuarto había una caja color verde donde se guardaban las sustancias controladas y que la amarraban con una cadena.[222] Relató que Rodríguez Vélez le describió que el mencionado rifle tenía un tambor *Mickey Mouse* y que lo guardaban en un estuche de guitarra color negro.[223]

El testimonio del agente Ramírez Medina continuó con la descripción provista por Rodríguez Vélez de una tercera residencia donde pernoctaba "el negro de Caguas" con su esposa, la cual se utilizaba para "endecar" las sustancias controladas.[224] Según le describió Rodríguez Vélez, las tres residencias mencionadas se encontraban sumamente cerca.[225]

El agente Ramírez Medina declaró que tanto la entrevista como la investigación las realizó junto al agente Aurelio Jiménez Román.[226] Relató que ambos pasaron por las casas descritas para corroborar el testimonio de Rodríguez Vélez y, luego de identificarlas, le tomaron fotos.[227] Indicó que las fotografías fueron marcadas como Exhibit #18A-D del Ministerio Público.[228] Añadió que las referidas fotos le fueron presentadas a Rodríguez Vélez el 18 de octubre de 2019 y este las identificó.[229] Señaló que, ese mismo

---

[220] TPO, págs. 541-542.
[221] Íd.
[222] Íd., pág. 542.
[223] Íd., págs. 542-543.
[224] Íd., pág. 544.
[225] Íd., págs. 550-551.
[226] Íd., pág. 545.
[227] Íd., págs. 559-560.
[228] Íd., págs. 571-575.
[229] Íd., pág. 576.

día, prestó su declaración jurada.[230] Expresó que, por motivos de salud, no fue hasta el 5 de noviembre de 2019 que Rodríguez Vélez prestó su declaración jurada.[231]

Posteriormente, el agente Ramírez Medina manifestó que, el 6 de noviembre de 2019, solicitó la orden judicial de registro y allanamiento ante el Tribunal de Primera Instancia, quien, ese mismo día, expidió la orden en contra de la primera estructura mencionada, descrita como la casa donde se distribuían las drogas.[232] Aseveró que el foro primario autorizó allanar dicha propiedad en busca de marihuana, cocaína y heroína, y que esta orden, además, iba dirigida a Infante Rosa y a Fontánez Carballo, conocido como "el negro de Caguas", ambos identificados en sala.[233] Testificó que la segunda orden de registro y allanamiento que se obtuvo fue contra la residencia #2, descrita como construida en madera, color crema y chinita, con un toldo azul en el techo de zinc.[234]

Cuando el Exhibit #16 del Ministerio Público le fue mostrado al agente Ramírez Medina, este identificó que contenía el diligenciamiento e inventario de la orden dirigida contra la primera residencia, así como contra Infante Rosa y Fontánez Carballo.[235] Agregó que también se incluyó, como parte del mencionado exhibit, su declaración jurada,[236] y la autorización para solicitar que se expidiera la orden de registro y allanamiento.[237] Luego, le fue entregado el Exhibit #17 el Ministerio Público, sobre el cual afirmó que contenía la hoja del diligenciamiento del inventario de la residencia #2, la orden de registro y allanamiento dirigida a las

---

[230] TPO, pág. 578.
[231] Íd., pág. 580.
[232] Íd., págs. 588 y 591.
[233] Íd., págs. 591-592.
[234] Íd., pág. 592.
[235] Íd., págs. 593-594.
[236] Íd., pág. 595.
[237] Íd., pág. 596.

mismas personas que la anterior, su declaración jurada y la de Rodríguez Vélez, así como la autorización para solicitar que se expidiera la orden de registro y allanamiento.[238] Declaró que la segunda orden autorizó a buscar sustancias controladas, parafernalia y armas de fuego.[239]

Además, le fueron presentados los Exhibits #19 y #20 del Ministerio Público que eran los planes de trabajo para el diligenciamiento simultáneo de las órdenes de registro y allanamiento expedidas.[240] A preguntas del Ministerio Público, el agente Ramírez Medina expuso que su función en ese plan de trabajo era intervenir como agente identificador de las residencias y de las personas a ser registradas, así como dirigirse a la segunda residencia para ubicar a su equipo de trabajo debido al difícil acceso.[241] Expuso que no participó del diligenciamiento de la orden y que se mantuvo fuera de la residencia mientras el equipo de trabajo lo diligenciaba.[242] Respecto a lo ocupado tras diligenciar las órdenes, observó que en la residencia #1 se ocuparon sustancias controladas, como marihuana y cocaína.[243] Sobre la segunda residencia, declaró que, una vez en la División, observó que se ocupó un rifle R15 *Sport Pistol,* un cargador tipo tambor, municiones, una pistola que no era 9mm, pero sí de color gris y negro, cargadores, un bulto de guitarra color negro y marihuana.[244]

En el contrainterrogatorio, el agente Ramírez Medina relató que no participó de la búsqueda,[245] y que le ordenó al agente Jusino Hilero a ocupar una maleta y "una foto de álbum".[246] Asimismo, admitió que no corroboró que la residencia #2 estuviese bajo el

---

[238] TPO, págs. 597-598.
[239] Íd., pág. 600.
[240] Íd., pág. 607.
[241] Íd., pág. 608.
[242] Íd., págs. 611-612.
[243] Íd., pág. 612.
[244] Íd., págs. 613-614.
[245] Íd., pág. 616.
[246] Íd., págs. 618-619.

control de Infante Rosa y que tampoco lo vio en esa casa.[247] Sostuvo que no hizo ninguna gestión para verificar quién estaba pagando las cuentas de agua y luz de la residencia #2.[248] Similarmente, expuso que no revisó la titularidad de la residencia en el Registro de la Propiedad, o quién figuraba como dueño en el Centro de Recaudaciones de Ingresos Municipales (CRIM).[249] Respondió que tampoco verificó esa información con Fontánez Carballo.[250] Aseveró que, el 17 de octubre de 2019, Rodríguez Vélez le manifestó que un tirador le dejó la puerta abierta para que se fuera del lugar donde lo tenían secuestrado.[251] Declaró que no hubo ningún tipo de información de un agente encubierto que sostuviera que Infante Rosa tuviese control y dominio de las residencias que se registraron.[252] Contestó que utilizó la información que Rodríguez Vélez le suministró, así como su propia corroboración, para solicitar la orden de registro y allanamiento.[253]

Durante el contrainterrogatorio, el agente Ramírez Medina admitió que, de la primera residencia, se ocupó un álbum de fotografías de Rodríguez Vélez con su familia y que no vio que se ocupara ninguna foto de Infante Rosa.[254] Expuso que Rodríguez Vélez no fue específico sobre el tiempo que llevaba secuestrado.[255] Aceptó que Rodríguez Vélez no le dio ningún detalle sobre el primer día del secuestro y que continuó vendiendo sustancias controladas en contra de su voluntad.[256] Manifestó que Rodríguez Vélez le dijo que le dieron un teléfono para llamar cuando se acababan las sustancias controladas.[257] Según afirmó, Rodríguez Vélez no le

---

[247] TPO, págs. 620-621.
[248] Íd., pág. 620.
[249] Íd.
[250] Íd., pág. 622.
[251] Íd., pág. 628-630.
[252] Íd., pág. 632-633.
[253] Íd., pág. 634.
[254] Íd., págs. 645-646.
[255] Íd., pág. 648.
[256] Íd., págs. 649-650.
[257] Íd., pág. 651.

indicó si estaba o no bajos los efectos de sustancias controladas cuando llegó al cuartel de la Policía el 17 de octubre de 2019.[258] Admitió que, al momento de solicitar la orden de registro y allanamiento, la única prueba que tenía para vincular a Infante Rosa con la residencia #1 y #2 era el testimonio de Rodríguez Vélez.[259]

A preguntas de la defensa, el agente Ramírez Medina testificó que no supo el nombre completo de Fontánez Carballo hasta el 6 de noviembre de 2019, antes de diligenciar las órdenes de registro y allanamiento.[260] Además, sostuvo que no vio a Fontánez Carballo en Pueblo Nuevo, San Sebastián, el 18 de noviembre de 2019.[261] Agregó que Rodríguez Vélez le indicó que llegó a Pueblo Nuevo libremente, pero que, posteriormente, fue retenido en contra de su voluntad.[262] Reconoció que, hasta que se realizaron los allanamientos, la única evidencia directa que implicaba a Fontánez Carballo era la información que ofreció Rodríguez Vélez.[263]

En el redirecto, el agente Ramírez Medina atestó que no sospechó que Rodríguez Vélez fuese el dueño del punto de drogas por el estado en que se encontraba.[264] Sobre "el negro de Caguas", admitió que solo conocía su apodo y que no lo había visto anteriormente.[265]

### Agente Aurelio Jiménez Román

El agente Aurelio Jiménez Román (Jiménez Román), testificó que, el 17 de octubre de 2019, junto al agente Ramírez Medina, escuchó y recopiló información brindada por Rodríguez Vélez y, al día siguiente, lo entrevistaron formalmente. [266] Expresó que

---

[258] TPO, pág. 671.
[259] Íd., págs. 672-675.
[260] Íd., págs. 690-691.
[261] Íd., pág. 691.
[262] Íd., pág. 694.
[263] Íd., pág. 697.
[264] Íd., pág. 705.
[265] Íd., pág. 706.
[266] Íd., págs. 730-731.

Rodríguez Vélez les indicó que se había escapado de una residencia donde lo tenían secuestrado y les habló de dos personas en particular: Infante Rosa y "el negro de Caguas".[267] Relató que Rodríguez Vélez les describió tres residencias: la del punto de drogas, la de seguridad y la de Fontánez Carballo, conocido como "el negro de Caguas".[268] Mencionó que Rodríguez Vélez expresó que llegó hasta esa área para buscar trabajo vendiendo sustancias controladas, pero que luego lo secuestraron y lo encadenaron.[269] Declaró que Rodríguez Vélez pudo identificar las residencias en *Google Maps*.[270] A su vez, especificó que Rodríguez Vélez describió la casa del punto de drogas como una de dos niveles, color anaranjada y verde, con una reja al frente, un portón, y una cortina de baño en cristal.[271] Manifestó que Rodríguez Vélez detalló la segunda residencia como una construida en cemento, pintada de verde y anaranjado, con un balcón al frente, a mano derecha, una puerta en aluminio color blanca con dos ventanas en cristales al lado; en las puertas tenía dos contadores de luz y, a mano izquierda, llegando a la casa de al frente, se encontraba una marquesina con un portón en rejas color blanco.[272] Sobre la tercera casa, testificó que fue descrita por Rodríguez Vélez como una construida en madera, techada en zinc, con un toldo de FEMA color azul, pintada de crema y anaranjado, con una verja (*cyclone fence*) al frente, ventanas color negras y una puerta en madera.[273]

El Ministerio Público le mostró al agente Jiménez Román el Exhibit #21 del Ministerio Público y este señaló que se trataba del diligenciamiento de inventario y la autorización para solicitar la

---

[267] TPO, págs. 730-731.
[268] Íd., pág. 732.
[269] Íd.
[270] Íd., pág. 733.
[271] Íd., pág. 734.
[272] Íd.
[273] Íd., págs. 734-735.

orden de registro y allanamiento en cuestión.[274] Manifestó que la orden se solicitó en contra de una residencia en cemento, color verde y anaranjado, con balcón en cemento y rejas en tubo color blanca.[275] También, se le presentó el Exhibit #22 del Ministerio Público, que se componía del plan de trabajo para diligenciar la orden de registro y allanamiento dirigida contra "Carlos Flanero", "el negro de Caguas" y la tercera estructura descrita, así como de una foto de la residencia.[276] Explicó que en esa tercera residencia vivía "el negro de Caguas" con su esposa, y que se ocupó heroína y un revolver.[277] Añadió que en la casa del punto de drogas se ocuparon sustancias controladas, al igual que en la casa de madera, pero que, además, en esta última se ocupó un rifle, una pistola y parafernalia.[278]

En el contrainterrogatorio, el agente Jiménez Román declaró que no recordaba que Rodríguez Vélez le mencionara a un tirador llamado Marcos.[279] Luego, se le presentó la *Declaración Jurada* suscrita por Rodríguez Vélez el 14 de noviembre de 2019, marcada como Exhibit #2 de la Defensa.[280] Sobre ella, admitió que, de dicho documento, surgía que la casa descrita como el punto de drogas era de la abuelita de uno de los tiradores y que Marcos era uno de estos.[281] Afirmó que las pertenencias de Rodríguez Vélez estaban en la casa del almacén y en la casa del punto de drogas.[282] Respondió que no se pudo corroborar el vínculo entre Infante Rosa y las armas de fuego ocupadas o que este fuese dueño del punto de drogas.[283] Admitió que tampoco vio a Infante Rosa en ninguna de las tres propiedades.[284] Reconoció que no hubo vigilancia, o motivo que la

---

[274] TPO, pág. 739.
[275] Íd.
[276] Íd., pág. 743.
[277] Íd., págs. 743-744.
[278] Íd., pág. 744.
[279] Íd., pág. 749.
[280] Íd., pág. 752.
[281] Íd., pág. 753.
[282] Íd., pág. 756.
[283] Íd., pág. 757.
[284] Íd.

impidiera, para corroborar el vínculo de Infante Rosa con lo antes mencionado y que la única evidencia que tenían para vincularlo con Rodríguez Vélez era el testimonio de este último.[285] Sostuvo que no le constaba que se hubiera ocupado en ninguna de las tres residencias algún objeto personal o que perteneciera a Infante Rosa.[286] Declaró que Rodríguez Vélez le indicó que, cuando lo secuestraron, lo amarraron de una pierna, pero que no corroboró si tenía marcas causadas por la cadena presuntamente utilizada para ello.[287]

Por otro lado, durante el contrainterrogatorio, el agente Jiménez Román manifestó que Rodríguez Vélez vendía heroína, marihuana y *crack*.[288] Indicó que no vio al "el negro de Caguas" en el área de los hechos y que tampoco le ocupó drogas o armas de fuego.[289] A su vez, a pesar de que manifestó que Rodríguez Vélez le proveyó información verídica y exacta, admitió que este no le dijo que vendía drogas antes de trabajar en el lugar allanado.[290]

### Agente Edgardo Jusino Hilero

El agente Edgardo Jusino Hilero (Jusino Hilero) declaró que, el 6 de noviembre de 2019, participó en el diligenciamiento de unos registros y allanamientos que se efectuarían en la Calle Pou del barrio Pueblo Nuevo en San Sebastián.[291] Especificó que, por instrucciones del sargento Acevedo Valentín, le asignaron registrar la residencia #1, descrita como en cemento, de dos plantas, color verde y melocotón, con rejas, portones, candados, cadenas y un balcón que tenía un cristal grande que tapaba gran parte de la visibilidad de este.[292] Indicó, además, que la orden de registro y

---

[285] TPO, págs. 758-759, 766.
[286] Íd., pág. 767.
[287] Íd., pág. 773.
[288] Íd., pág. 781.
[289] Íd., pág. 782.
[290] Íd., pág. 785.
[291] Íd., págs. 800 y 804.
[292] Íd., págs. 800 y 802.

allanamiento iba dirigida en contra de Fontánez Carballo e Infante Rosa, a quienes identificó en sala.[293] Narró que, en horas de la tarde, llegó al lugar descrito, junto a varios agentes de la Policía, en un vehículo confidencial de la mencionada agencia.[294] Manifestó que, al bajarse del vehículo, a través del portón de rejas anchas de la casa que iba a registrar, observó a Infante Rosa sentado en un sillón dentro de la residencia.[295] Describió que Infante Rosa, a quien identificó nuevamente en sala, se asomó y, al ver a la Policía, salió corriendo por la parte posterior dentro de la residencia.[296] Explicó que, por seguridad, rompió el candado para entrar a la residencia y revisar si habían más personas.[297] Añadió que, al darse cuenta de que no habían otras personas en la residencia ni alrededor de esta, vio que Infante Rosa salió por una puerta ubicada en la parte posterior de la propiedad que daba acceso a una verja en cemento colindante a otro solar.[298]

Posteriormente, el agente Jusino Hilero relató que, al identificar que era "Flanero" –persona contra quien iba dirigido el registro y allanamiento–, quien había salido corriendo de la residencia, y luego de ver unas sustancias controladas en la propiedad, le gritó a sus compañeros de la División de Arrestos Especiales de la Policía para que lo pusieran bajo arresto.[299] Abundó que dichos agentes lograron arrestar a Infante Rosa en otro solar y se lo trajeron esposado a la residencia a ser allanada.[300] Describió que Infante Rosa se encontraba fatigado, sudado, vestía una *t-shirt* color negra, una gorra, un pantalón mahón corto color azul y expresó que esa era la misma persona que vio asomarse desde el

---

[293] TPO, págs. 800-801.
[294] Íd., págs. 804-805.
[295] Íd., págs. 806-807.
[296] Íd., págs. 807-808.
[297] Íd., págs. 808-809.
[298] Íd., pág. 809.
[299] Íd., págs. 810, 813-814.
[300] Íd.

interior de la residencia a ser registrada.[301] Comentó que, de momento, se había formado un "algarete" porque una persona salió corriendo, pero desconocía quién era.[302] Particularizó que, cuando le entregaron a Infante Rosa esposado, por seguridad, le realizó un cateo y encontró una bolsa con aparentes *decks* de heroína en uno de los bolsillos y dinero en efectivo en otro.[303] Atestó que, una vez ocupó lo anterior, le dijo las advertencias legales a Infante Rosa.[304]

Subsiguientemente, el agente Jusino Hilero declaró que entraron a la residencia y llevó a Infante Rosa a un sofá.[305] Describió el lugar como un "chiquero" lleno de basura, pestilencia, sobres usados de sustancias controladas en el suelo, jeringuillas, dron lleno de parafernalia de sustancias controladas usadas, un cuarto medio vacío, otro cuarto lleno de bolsas y basura, trapos tirados en el suelo, cucarachas en la cocina, no había servicio de agua ni luz, y era un lugar infrahumano.[306] Expuso que se le dieron instrucciones de esperar a que trajeran a Fontánez Carballo para empezar con el allanamiento de la residencia, ya que la orden iba dirigida a ambos imputados, aquí apelantes.[307] Señaló que se estaban dando otros diligenciamientos de órdenes de registro y allanamiento simultáneamente, pero que no tenía conocimiento de lo que pasó en las otras residencias.[308]

El agente Jusino Hilero manifestó que, cuando llegó Fontánez Carballo a la residencia, a quien identificó en sala y mencionó que le llamaban "el negro de Caguas", le entregó una copia de la orden de registro y allanamiento a ambos imputados, aquí apelantes.[309] Explicó que se le dio la oportunidad a que la leyeran.[310] Indicó que,

---

[301] TPO, pág. 813.
[302] Íd., pág. 811.
[303] Íd., págs. 812, 815, 831, 836.
[304] Íd., pág. 815.
[305] Íd., pág. 816.
[306] Íd., pág. 817.
[307] Íd., págs. 817 y 833.
[308] Íd., págs. 817-818.
[309] Íd., págs. 818 y 835.
[310] Íd.

luego, llegó el can de drogas de la Policía y comenzó el registro, marcando varios lugares dentro de la residencia.[311] Añadió que, posteriormente, inició el registro visual del lugar y ocupó lo siguiente: *crack*; unas bolsitas con marihuana; un pote de pastillas que tenía en su interior unas bolsitas con marihuana; un paquete de *phillip*, el cual se utilizaba para "enrolar" la marihuana para fumarla; y dos cargadores de un arma de fuego marca *Glock*, calibre .40, en una bolsa desechable que encontró en el segundo cuarto de la residencia.[312] Abundó que, dentro de una maleta –que el agente Ramírez le indicó que era propiedad de Rodríguez Vélez–,[313] ubicada en el segundo cuarto, [314] encontró y ocupó lo siguiente: unos cuchillos de hojas; unos cuchillos grandes como de cocina; dos balas de rifle AR15; otros cargadores de un arma de fuego marca *Glock*; parafernalia; unas bolsitas para "endecar"; sustancias; y un álbum de fotografías de un caballero, a quien luego identificó como Rodríguez Vélez. [315] Agregó que, en el segundo cuarto de la residencia, el cual tenía unas ventanas forzadas y con golpes, ocupó una cadena y un candado que eran pertinentes para la investigación.[316]

En particular, el agente Jusino Hilero detalló que ocupó lo siguiente: dieciséis bolsitas con picadura de marihuana; veintidós bolsitas con polvo de cocaína en su modalidad de *crack*; treinta y tres bolsitas con *decks*, envueltos en tonalidad color roja, en forma de pastel, con polvo de heroína en su interior; ciento cuarenta y un dólares en efectivo; dos cargadores; un porta cargador; parafernalia, específicamente dos bolsitas y papel para "enrolar"; un celular marca *Arcade*; dos cuchillos de hojas.[317] Reiteró que ocupó una

---

[311] TPO, págs. 818-819.
[312] Íd., págs. 819 y 837.
[313] Íd., pág. 843.
[314] Íd., pág. 834.
[315] Íd., págs. 819-820, 838, 843, 858-859, 861.
[316] Íd., pág. 843.
[317] Íd., págs. 846-848, 862.

maleta color negra y marrón que contenía efectos personales de Rodríguez Vélez, una cadena, un candado, varios potes de pastillas –entre los que había uno con el nombre de Rodríguez Vélez–,[318] bombillas, artefactos eléctricos y dos municiones.[319] Por otro lado, declaró que, el 6 de noviembre de 2019, realizó una prueba de campo a las sustancias que había ocupado, las cuales dieron positivo a marihuana, heroína y cocaína.[320]

En el contrainterrogatorio, el agente Jusino Hilero afirmó que Infante Rosa siempre mantuvo su derecho a no hablar y que, de la información que tomó de este, resultó que vivía con sus padres, en una casa al final de aquel callejón en Pueblo Nuevo.[321] Aseveró que la maleta se ocupó en el segundo cuarto de la residencia, la cual se utilizaba como punto de drogas, y la puerta de este no estaba cerrada.[322] Admitió que Infante Rosa no estuvo dentro de las habitaciones de la residencia mientras se diligenciaba el registro.[323] Reconoció que en la maleta había un frasco de pastillas con el nombre de Rodríguez Vélez, mas ninguno con los nombres de Infante Rosa y Fontánez Carballo.[324] Admitió que, inicialmente, no había ocupado la maleta ni el álbum de fotos, ni el frasco de pastillas con el nombre de Rodríguez Vélez, hasta que el agente Ramírez Medina dio instrucciones a esos efectos.[325] Afirmó que no estaba presente en el momento en que arrestaron a Infante Rosa, porque se encontraba dentro de la residencia objeto del registro.[326] Añadió que tampoco vio a Infante Rosa haciendo alguna venta o transacción relacionada a sustancias controladas.[327]

Durante el contrainterrogatorio, el agente Jusino Hilero

---

[318] TPO, págs. 864-865.
[319] Íd., págs. 858-859.
[320] Íd., págs. 848-849, 851.
[321] Íd., págs. 875-876.
[322] Íd., págs. 876-877.
[323] Íd., págs. 877-878.
[324] Íd., pág. 884.
[325] Íd., págs. 884-886.
[326] Íd., págs. 889-891.
[327] Íd., pág. 893.

mencionó que, en la etapa de Regla 6 de Procedimiento Criminal, 34 LPRA Ap. II, R. 6, celebrada al día después de los hechos en cuestión,[328] había testificado que, cuando llegó a la residencia objeto del registro, tuvo que soltar un portón que tenía un candado puesto, escucharon un "revolú" y, cuando miraron a Infante Rosa, este comenzó a correr junto a otro corredor.[329] Sobre ese particular, admitió que había otra persona dentro de la residencia, que se trataba de ese otro corredor previamente descrito durante el contrainterrogatorio.[330] Por otro lado, indicó que, cuando llegó a la residencia a ser allanada, Fontánez Carballo no se encontraba allí, sino que lo llevaron posteriormente sin esposas.[331] Especificó que no se le ocupó nada en la persona de Fontánez Carballo.[332] Asimismo, reiteró que en la maleta no se ocuparon pertenencias de Infante Rosa ni de Fontánez Carballo.[333]

En el redirecto, el agente Jusino Hilero aclaró que el muchacho que también estaba corriendo, salió de otro lugar, no del interior de la propiedad a ser registrada.[334] De otro lado, en el recontrainterrogatorio, el agente Jusino Hilero admitió que en el video que se tomó del diligenciamiento de la orden de registro y allanamiento, no aparecía Infante Rosa sentado en el sillón frente a la casa.[335] A preguntas de la defensa de si había mencionado en la etapa de Regla 6 de Procedimiento Criminal, *supra*, que Infante Rosa y otra persona salieron corriendo, respondió que así no fue que lo manifestó en aquella etapa y aseguró no haber dado dos versiones distintas sobre ese particular.[336]

---

[328] TPO, pág. 906.
[329] Íd., pág. 904.
[330] Íd., pág. 905.
[331] Íd., pág. 908.
[332] Íd., pág. 909.
[333] Íd., pág. 934.
[334] Íd., pág. 939.
[335] Íd., pág. 943.
[336] Íd., págs. 942 y 945.

**Agente Pedro López Molinari**

El agente Pedro López Molinari (López Molinari), adscrito a la División de Drogas de la Policía en Aguadilla, declaró que, el 6 de noviembre de 2019, el sargento Acevedo Valentín discutió en la comandancia de dicho pueblo tres planes de trabajo para diligenciar tres órdenes de registro y allanamiento, de las cuales le tocó diligenciar una de ellas. [337] Particularizó que las órdenes se diligenciarían simultáneamente y que la primera orden estaba asignada al agente Jusino Hilero, la segunda era la suya y la tercera era de la agente Carlo Rodríguez.[338] Especificó que dichas órdenes iban dirigidas en contra de unas estructuras y dos personas, a quienes identificó en sala como Fontánez Carballo o "el negro de Caguas" y a Infante Rosa.[339] Describió que la residencia que le tocó registrar era una en cemento, pintada de color verde y anaranjada, con dos ventadas en cristal al frente, un balcón, un portón de acceso en tubos con rejas color blanco, una puerta de aluminio, una marquesina con rejas y dos contadores de luz, ubicada en la calle Benito Fred en Pueblo Nuevo en San Sebastián.[340]

Al llegar al lugar en un vehículo confidencial de la Policía, el agente López Molinari señaló que observó la puerta delantera de la residencia que allanaría abierta.[341] Narró que se bajó del carro, caminó hacia la residencia, se identificó como Policía y observó, en el área de la sala, justo a la entrada de la propiedad, a una fémina sentada en un sofá color marrón, viendo televisión, a quien identificó como Magaly Rollet, la esposa de Fontánez Carballo.[342] Describió que en dos de los cuartos de la residencia se encontraban los hijos de Fontánez Carballo y este último estaba en la cocina.[343] Atestó que

---

[337] TPO, págs. 947-949, 951.
[338] Íd., pág. 953.
[339] Íd., págs. 949 y 1021.
[340] Íd., págs. 949-950, 952.
[341] Íd., págs. 953-954.
[342] Íd., págs. 954-955.
[343] Íd., pág. 955.

se identificó nuevamente como Policía, los pasó a todos al área de la sala y le explicó a Fontánez Carballo y a su esposa que había una orden de registro y allanamiento por presunta violación a la Ley de Armas, *supra*, y a la Ley de Sustancias Controladas, *supra*, en contra del "negro de Caguas", quien era Fontánez Carballo, y de Infante Rosa.[344]

Según declaró el agente López Molinari, el sargento Acevedo Valentín llegó a la propiedad y le indicó que la primera orden de registro y allanamiento que se diligenciaría sería la asignada al agente Jusino Hilero, por lo que había que llevar a Fontánez Carballo a esa residencia.[345] Expresó que el sargento Acevedo Valentín permaneció con la esposa e hijos de Fontánez Carballo en el balcón de la propiedad que registraría, mientras este llevaba a Fontánez Carballo a la primera residencia a ser allanada, la cual afirmó que quedaba cerca.[346]

Culminado el diligenciamiento por el agente Jusino Hilero, le trajeron a Fontánez Carballo de vuelta, así como a Infante Rosa, ambos esposados, a la residencia que le tocaba diligenciar la orden de allanamiento.[347] Testificó que le entregó copia de la orden de registro y allanamiento a ambos imputados, aquí apelantes, y luego pasaron los agentes de la División K-9 de la Policía con dos canes para registrar la propiedad.[348] Atestó que, mientras los canes pasaban por los cuartos, los imputados estaban detrás del agente observando dónde los canes estaban marcando.[349] Describió que los canes marcaron lo siguiente: unos bultos ubicados en unos cuartos; la cocina; el dormitorio de Fontánez Carballo; el gavetero; una canasta que se encontraba encima del gavetero; entre otros

---

[344] TPO, págs. 955-956.
[345] Íd., pág. 958.
[346] Íd.
[347] Íd., pág. 959.
[348] Íd., págs. 959-960.
[349] Íd., pág. 960.

lugares.[350]

Una vez pasaron a los canes por toda la propiedad, el agente López Molinari comenzó el registro por el área de la sala, específicamente por los muebles.[351] Indicó que, si bien en el área de la lavandería no encontró ningún material delictivo, en la alacena de la cocina ocupó un pote de avena que contenía una bolsa plástica transparente con cien envolturas de aluminio,[352] dobladas a manera de pastel en tonalidad roja, con aparente heroína.[353] Detalló que, dentro del mismo pote, encontró y ocupó otra bolsa plástica transparente con un nudo que contenía una piedra granulada de aparente cocaína en su modalidad de *crack*.[354] Comentó que, luego de ocupar esa evidencia, ante la presencia de aparentes sustancias controladas, leyó las advertencias de ley a Infante Rosa, a Fontánez Carballo y a la esposa de este.[355] Manifestó que, posteriormente, ocupó otro pote de avena que contenía una bolsa plástica transparente, con logo de manzana, con un sinnúmero de bolsitas para empacar sustancias controladas en su interior.[356] Narró que, además, ocupó un dinero en efectivo que encontró en el gavetero del cuarto que aparentaba ser de Fontánez Carballo y de la esposa de este;[357] acto seguido, procedió a ocuparle un dinero en efectivo que Fontánez Carballo tenía en su bolsillo.[358]

Posteriormente, el agente López Molinari relató que, dentro de una canasta plástica en el área de la coqueta en el mencionado cuarto, ocupó un revolver color negro con las cachas color marrón, cargado con tres municiones calibre 38.[359] Señaló que, en el mismo lugar, ocupó dos bolsas plásticas con un logo de manzana, las

---

[350] TPO, pág. 960.
[351] Íd., págs. 960-961.
[352] Íd., págs. 1022 y 2024.
[353] Íd., págs. 972, 987, 996, 998-999, 1017, 1023.
[354] Íd.
[355] Íd., págs. 972-973, 996.
[356] Íd., págs. 973 y 1000.
[357] Íd., págs. 977 y 986.
[358] Íd., págs. 977 y 1011.
[359] Íd., págs. 974, 1011-1012.

cuales contenían un sinnúmero de bolsitas para empacar sustancias controladas; además, ocupó un *magazine* color negro, calibre 380, con siete balas en su interior.[360] Añadió que, fuera de la canasta, en la misma coqueta, encontró una cajita de cartón cuadrada, color blanca, con aparente picadura de marihuana en su interior.[361] Indicó que en la coqueta también ocupó un envase cilíndrico de distintos colores, con la tapa color gris, con aparente picadura de marihuana en su interior.[362] Asimismo, atestó que ocupó dos balanzas digitales, color negras, en el área de la cortina del mencionado cuarto, las cuales, según explicó, se utilizaban para pesar la cantidad de drogas que se echarían en las bolsas.[363]

El agente López Molinari declaró que, diligenciadas las tres órdenes de registro y allanamiento, se llevaron a los imputados a la División de Drogas de la Policía en Aguadilla, en donde se le tomaron sus datos personales y, además, se hicieron las pruebas de campo a las sustancias ocupadas, las cuales arrojaron positivo a cocaína, heroína y marihuana.[364]

El Ministerio Público le mostró al agente López Molinari un video del diligenciamiento que llevó a cabo, marcado como Exhibit #30A del Ministerio Público, sobre el cual el agente describió que el can de armas cogió una almohada y varios peluches mientras realizaba la inspección por los cuartos de la residencia en cuestión.[365] Sobre dicha grabación, manifestó que, mientras registraba el área de la lavandería, Infante Rosa y Fontánez Carballo se encontraban parados en la puerta.[366] Según particularizó, al ocupar las primeras sustancias controladas en la residencia, después que le hizo las advertencias de ley a Fontánez Carballo, este

---

[360] TPO, págs. 974, 1011-1012.
[361] Íd., págs. 974-975, 1017, 1023.
[362] Íd., pág. 975.
[363] Íd., págs. 975, 1014-1015, 1024-1025.
[364] Íd., págs. 977, 997, 1018.
[365] Íd., págs. 985, 988-989.
[366] Íd., pág. 994.

expresó que eso era cocaína y heroína, y que su esposa no tenía conocimiento de ello.[367] Por otro lado, cuando le mostraron otro video del diligenciamiento, marcado como Exhibit #30D del Ministerio Público, el agente mencionó que en la grabación se podía escuchar que, cuando ocupó el arma de fuego, Fontánez Carballo le dijo, en varias ocasiones, que dicha arma era un revolver 38 y que ellos se lo habían puesto allí.[368] Sobre ese particular, el agente López Molinari expuso que, hasta ese momento, Fontánez Carballo no había radicado ninguna queja administrativa o incoado alguna demanda en su contra relacionada a ello.[369]

De otro lado, al mostrarle el Exhibit #33 del Ministerio Público, el agente López Molinari describió que se trataba de un revolver marca *Charter Arms* SLP, modelo *Undercover*, calibre 38, tal y como le había mencionado Fontánez Carballo durante el registro de su residencia, la cual no se encontraba inscrita.[370] Asimismo, al observar el Exhibit #6A, #6B y #6C del Ministerio Público, el agente manifestó que ninguna de las personas imputadas poseía una licencia de armas de fuego.[371] Especificó que dicha arma de fuego fue llevada al Instituto de Ciencias Forenses de San Juan para que le realizaran una prueba de funcionamiento.[372] En cuanto a dicha *Solicitud de Servicios Forenses*, marcada como Exhibit #37 del Ministerio Público, testificó que resultó que el arma de fuego antes descrita era funcional.[373]

En resumen, al mostrársele el Exhibit #21 del Ministerio Público, el agente López Molinari detalló que, como resultado del diligenciamiento de la orden de registro y allanamiento de la residencia en cuestión, ocupó lo siguiente: cien envolturas de

---

[367] TPO, pág. 997.
[368] Íd., págs. 1009, 1013-1014.
[369] Íd., pág. 1014.
[370] Íd., págs. 1028-1033, 1037-1038, 1045.
[371] Íd., pág. 1033.
[372] Íd., págs. 1028-1033.
[373] Íd., págs. 1046-1048.

aluminio dobladas a manera de pastel, de tonalidad roja, que contenían polvo de heroína; una envoltura plástica transparente que tenía en su interior piedra de cocaína; un envase cilíndrico color blanco con diseños azules, violetas y gris con tapa color gris que contenía picadura de marihuana; una cajetilla de cartón color blanca, con tapa de cartón color blanca, que contenía picadura de marihuana; un sinnúmero de bolsas para empacar con cierre a presión; dos balanzas digitales; un cargador 380 con 7 balas 380; un revolver marca *Charter Arms*, modelo de cobre, calibre 38, serie número 68622, cargada con tres municiones calibre 38; y unos envases cilíndricos, color blancos, con tapas blancas, con diseño y la palabra avena.[374]

Durante el contrainterrogatorio, el agente López Molinari admitió que, al inicio del diligenciamiento de la orden, el can de drogas movió una cajita que se encontraba en la coqueta ubicada en el cuarto catalogado como *master*, pero que dicha cajita no cayó al suelo porque el manejador del perro la aguantó con la mano y la acomodó donde estaba.[375] Sobre ese particular, indicó que dicho acto, unido con que el perro también se sentó, significaba que el can había marcado el mencionado objeto.[376] Afirmó que, cuando el can desplazó la caja, tanto Infante Rosa como Fontánez Carballo, al igual que él, se encontraban en el cuarto.[377] No obstante, admitió que, en la distancia en la que se encontraba, no podía observar para dentro de la canasta.[378] Añadió que tampoco escuchó a otro agente presente decir que había visto un arma de fuego en esa canasta.[379] Reconoció que otro can, específicamente el de armas de fuego, posteriormente, recorrió en ese mismo cuarto y no marcó nada.[380]

---

[374] TPO, págs. 1039-1040.
[375] Íd., págs. 1054-1055, 1060, 1071, 1074, 1084.
[376] Íd., págs. 1055 y 1085.
[377] Íd., págs. 1056-1057.
[378] Íd., pág. 1084.
[379] Íd., pág. 1058.
[380] Íd., págs. 1058-1059, 1075-1076, 1085-1086.

Particularizó que el can de armas solamente marcó un bulto que se encontraba en el cuarto de uno de los hijos de Fontánez Carballo, pero que, de ahí en adelante, lo que hizo fue comerse un peluche.[381] Reiteró que, durante el diligenciamiento de la orden, había encontrado un arma de fuego en esa misma cajita y la cogió con sus propias manos.[382]

A preguntas de la defensa de si había colocado el arma de fuego en ese lugar de la residencia, el agente López Molinari negó haber realizado tal actuación y aseguró que nunca pondría un arma ilegal ni sustancias controladas en una casa ajena.[383] Asimismo, atestiguó que dicha arma se encontraba justo donde la había ocupado.[384] Explicó que, cuando encontró la mencionada arma de fuego, tenía como una media por encima, por lo que la mitad de esta estaba tapada, pero se podía ver.[385] Por otro lado, admitió que, durante el diligenciamiento de la orden, no encontró nada que pudiera atar a Infante Rosa con esa residencia o que demostrara que él tenía el control y dominio sobre esa propiedad.[386]

En el redirecto, el agente López Molinari indicó que los canes de la Policía eran adiestrados en dos formas: armas y drogas, y que podían ser adiestrados en explosivos, pero que la Policía luego los certificaba para una sola cosa.[387] Reiteró que el can de armas marcó en el cuarto de uno de los hijos de Fontánez Carballo, pero que, acto seguido, se puso a jugar como con tres peluches y una almohada; mientras que, cuando el can de drogas pasó por el cuarto *master*, su reacción fue marcar en el área de la coqueta y sentarse.[388] Detalló que, previo a que el can de drogas se sentara, se puso como

---

[381] TPO, pág. 1086.
[382] Íd., págs. 1060-1062, 1078.
[383] Íd., pág. 1062.
[384] Íd.
[385] Íd., págs. 1091-1092.
[386] Íd., págs. 1094-1095.
[387] Íd., págs. 1102-1103.
[388] Íd., págs. 1103-1104.

hiperactivo y movió la canasta con la pata, lo cual ocasionó que lo se encontraba dentro de esta se moviera.[389] De otro lado, señaló que, de acuerdo a la investigación, quienes se dedicaban a la venta de sustancias controladas y poseían armas de fuego eran Infante Rosa y Fontánez Carballo.[390] En cuanto a ese asunto, aclaró durante el recontrainterrogatorio que no había realizado dicha investigación, sino que diligenció la orden de registro y allanamiento.[391]

### Agente Frances Carlo Rodríguez

La agente Frances Carlo Rodríguez (Carlo Rodríguez) indicó que, para finales del año 2019, estaba adscrita a la División de Inteligencia del Cuerpo de Investigaciones Criminales de la Policía.[392] Declaró que, el 6 de noviembre de 2019, llevó a cabo el diligenciamiento de una de tres órdenes de registro y allanamiento que se realizarían simultáneamente en el pueblo de San Sebastián.[393] Explicó que la orden de registro y allanamiento que se le entregó iba dirigida en contra de una estructura ubicada en el sector Pueblo Nuevo en San Sebastián y en contra de "el negro de Caguas", quien luego resultó llamarse Héctor, y a "don Carlos", a quienes identificó en sala.[394] Describió la estructura de color crema, con "petril" color naranja, ventanas tipo Miami de color negras, faroles, puerta de madera y balcón en cemento.[395] Narró que, junto a varios agentes de la Policía, llegaron al mencionado sector en la tarde y esta se dirigió a la residencia de color crema y naranja.[396] Relató que abrió el portón del inmueble, descrito como color negro sin candado, el cual se encontraba abierto.[397] Acto seguido, explicó que la puerta de madera de la casa estaba cerrada, por lo que tuvo

---

[389] TPO, págs. 1104-1105.
[390] Íd., pág. 1107.
[391] Íd., pág. 1115.
[392] Íd., pág. 1120.
[393] Íd., págs. 1120-1121.
[394] Íd., págs. 1122 y 1124.
[395] Íd.
[396] Íd., pág. 1126.
[397] Íd., págs. 1126-1128.

que forzarla para entrar y terminó rota.[398] Atestó que, luego de asegurarse de que la propiedad estaba vacía, cerró la puerta y el portón, se posicionó frente a este último y comenzó a hacer vigilancia junto al sargento Ángel Lugo hasta que llegaran los imputados.[399]

Luego que se diligenciaron las otras dos órdenes de registro y allanamiento en el mencionado sector, la agente Carlo Rodríguez testificó que agentes de la Policía llevaron a los imputados arrestados a la residencia donde ella se encontraba y esta comenzó a las 8:00pm, aproximadamente, el diligenciamiento de la orden que le asignaron.[400] Expresó que, al ver a los imputados, les preguntó sus nombres, les explicó las razones por las cuales se encontraba allí, les entregó una copia de la orden de registro y allanamiento a cada uno en sus manos y les explicó el proceso del registro.[401] Manifestó que el protocolo comenzó con la inspección de los canes de la Policía por la residencia, los cuales marcaron varias áreas de la propiedad en búsqueda de drogas y armas de fuego.[402] Enfatizó que el imputado Fontánez Carballo estuvo con ella en todo momento.[403]

Después que los canes realizaran su trabajo, la agente Carlo Rodríguez declaró que, en presencia de Fontánez Carballo e Infante Rosa, inició el registro de la residencia.[404] Sobre ese particular, especificó que, aunque estaba dentro de la residencia, Infante Rosa se encontraba sentado en una silla porque no lucía ni se sentía bien.[405]

Al comenzar el registro de la propiedad, la agente Carlo

---

[398] TPO, págs. 1127-1128.
[399] Íd., pág. 1127.
[400] Íd., pág. 1128.
[401] Íd., pág. 1129.
[402] Íd.
[403] Íd.
[404] Íd., pág. 1130.
[405] Íd.

Rodríguez señaló que ocupó una pistola marca *Kimar*, cromada con cachas color negras y un cargador en una butaca en la sala de la residencia.[406] Sobre esa arma, explicó que se trataba de una pistola de balas blancas, ocho (8) milímetros, la cual no constituía un arma de fuego, pero la ocupó por la seguridad de todos los presentes.[407] Cabe destacar que describió los sillones del hogar como pequeños, color marrón, forrados con plástico.[408] Testificó que comenzó el registro por el área de la cocina, descrita como pequeña, en donde ocupó una bolsa con picadura de marihuana, la cual encontró en el interior de una caja de herramientas color negra y roja que el can de la Policía había marcado previamente.[409] Puntualizó que se detuvo en ese momento a leerle las advertencias de rigor a Infante Rosa y a Fontánez Carballo.[410] Además, dentro de una maleta, ocupó una bolsa plástica transparente, con cierre a presión, con aparente marihuana en su interior.[411]

Luego de continuar la búsqueda, la agente Carlo Rodríguez señaló que ocupó un sinnúmero de bolsitas plásticas transparentes, utilizadas comúnmente para "endecar" distintas sustancias controladas, dentro de una lata plástica de galletas de soda que se encontraba en la cocina de la residencia.[412] En el área de la sala, en un sofá pequeño, ocupó una carterita pequeña de zipper que tenía unas manitas de colores con una cantidad de parafernalia en su interior.[413] Asimismo, sobre el sillón o en una mesita de noche, ocupó un candado color negro con una cerradura que tenía la llave.[414] Indicó que movió el sillón grande y detrás encontró un bulto de tela color negro, con letras en la parte de afuera, para guardar

---

[406] TPO, pág. 1132.
[407] Íd.
[408] Íd.
[409] Íd., págs. 1132-1133.
[410] Íd., pág. 1133.
[411] Íd.
[412] Íd.
[413] Íd., pág. 1134.
[414] Íd.

guitarras, el cual contenía un rifle marca *Aero Precision*, calibre multi, así como un cargador doble tipo caracol cargado con cien municiones, un cargador largo vacío, dos cargadores unidos con una cinta adhesiva cargados con veinte (20) y veintisiete (27) balas, respectivamente. [415] En el mismo bulto, añadió que ocupó otro cargador vacío, un kit para limpiar armas de fuego, una máscara color blanca y negra de un monstruo de Halloween, unos guantes y municiones, específicamente dos cajas de balas nueve (9) milímetros.[416]

De igual forma, la agente Carlo Rodríguez declaró haber ocupado lo siguiente: (1) bolsas de parafernalia en al área de la sala donde estaba la pistola marca *Kimar*; (2) residuos de marihuana sin empacar sobre una mesa en una de las habitaciones; (3) un casquillo de bala que se encontraba sobre una colcha tirada en el suelo; (4) dos bolsas plásticas transparentes selladas a presión con aparente marihuana que estaban en el interior de una bolsa de supermercado, ubicada dentro de una de las gavetas de la coqueta de uno de los cuartos; (5) un casquillo de bala calibre .38 encontrado encima de la cama; (6) una carterita de osito con parafernalia; (7) media caja de balas en el piso de una de las habitaciones; (8) una bolsa plástica que contenía otra bolsa transparente con picadura de marihuana, encontrada en el bolsillo de un pantalón de hombre color negro colgado de un gancho color rosa en el armario de una de las habitaciones; (9) una bolsa color negra que contenía, a su vez, una bolsa plástica transparente con picadura de marihuana en su interior, ubicada en el techo, entre el baño y una de las habitaciones; (10) una bolsa plástica transparente con municiones en su interior, encontrada dentro de una gaveta de una mesa de noche color roja y

---

[415] TPO, págs. 1134-1135.
[416] Íd., págs. 1135-1137.

azul.[417]

La agente Carlo Rodríguez testificó que, cuando dio por terminado el diligenciamiento de la orden, cerraron la propiedad y pasaron a la División de Drogas y Narcóticos de la Policía de Aguadilla.[418] Narró que allí le entregó la evidencia ocupada al agente Rosa Cortés, quien realizó las pruebas de campo correspondientes y le entregó una certificación de toda la evidencia entregada, la cual dio positivo a marihuana.[419]

En el contrainterrogatorio, la agente Carlo Rodríguez afirmó que no habían personas en la propiedad registrada y allanada, pero que se podía concluir que allí vivían personas, aunque no podía identificar quiénes residían en ella.[420] Sobre ese particular, indicó que Rodríguez Vélez pudo haber vivido allí, lo cual no descartaba.[421] Admitió que la ropa encontrada en la residencia no se tomó como evidencia, ni siquiera el pantalón donde encontró y ocupó una bolsa con sustancias controladas.[422] Sobre el referido pantalón, atestó que no podía decir a quién le pertenecía.[423] Asimismo, manifestó que no se le tomaron huellas dactilares al rifle ni al radio de comunicación ocupado, toda vez que estos tenían una superficie porosa que imposibilitaba el levantar huellas dactilares. [424] De igual forma, admitió que no tomó huellas dactilares en ninguna parte de la residencia.[425] Señaló que no ocupó nada en la residencia que se utilizara para amarrar a alguna persona, como una cadena. [426] También manifestó que desconocía si las pertenencias de Rodríguez Vélez se encontraban en alguna de las habitaciones de la residencia

---

[417] TPO, págs. 1136-1138.
[418] Íd., pág. 1138.
[419] Íd., págs. 1138-1139.
[420] Íd., págs. 1217, 1219-1221.
[421] Íd., pág. 1220.
[422] Íd., págs. 1218 y 1232.
[423] Íd., págs. 1233-1234.
[424] Íd., págs. 1222-1224.
[425] Íd., pág. 1254.
[426] Íd., págs. 1228 y 1244.

registrada y allanada.[427] Por otro lado, al ser confrontada con la *Declaración Jurada* suscrita por Rodríguez Vélez el 14 de noviembre de 2019, marcada como Exhibit #2 de la Defensa, comentó que el Ministerio Público únicamente le había preguntado la descripción de la residencia registrada y allanada contenida en ese documento durante el interrogatorio directo, por lo que desconocía el resto del contenido de la mencionada declaración.[428] Por otro lado, afirmó que no podía decir que el rifle y las sustancias controladas ocupadas en la residencia le pertenecieran a Infante Rosa.[429]

### Agente José R. Colón Rodríguez

El agente José R. Colón Rodríguez (Colón Rodríguez) declaró que, el 17 de diciembre de 2019, mientras laboraba para el Instituto de Ciencias Forenses, emitió una certificación de una prueba de funcionamiento de armas de fuego que realizó, marcada como Exhibit #38 del Ministerio Público. En específico, señaló que la certificación era sobre un revolver marca *Charter Arms*, modelo *Undercover*, calibre .38, color negro.[430] Indicó que, luego de realizar una prueba de disparo con dicha arma, concluyó que esta era capaz de disparar.[431] Por otro lado, testificó que, el mismo día, realizó otra prueba de funcionamiento a un rifle marca *Aero Precision*, modelo X15, color negro.[432] Especificó que dicha prueba consistió de tres disparos y concluyó que la referida arma de fuego era capaz de disparar, lo cual hizo constar en una certificación marcada como Exhibit #45 del Ministerio Público.[433]

Durante el contrainterrogatorio, el agente Colón Rodríguez admitió que, más allá de los nombres que aparecían en la *Solicitud de Servicios Forenses* que le entregaron, desconocía a quién o a

---

[427] TPO, pág. 1241.
[428] Íd., págs. 1245, 1252-1253.
[429] Íd., pág. 1241.
[430] Íd., págs. 1275-1276.
[431] Íd., pág. 1276.
[432] Íd., pág. 1279.
[433] Íd.

quiénes se les ocuparon las armas de fuego antes mencionadas.[434]

### Agente Moisés Valentín Miranda

El agente Moisés Valentín Miranda (Valentín Miranda), adscrito a la División Canina de la Policía, luego de explicar cuál era el rol de los canes y sus certificaciones al respecto, declaró que, el 6 de noviembre de 2019, lo llamaron para participar y cooperar con un can en el diligenciamiento de varias órdenes de registro y allanamiento que efectuaría la División de Drogas y Narcóticos de la Policía.[435] Narró que, durante los registros que se realizaron en varias residencias, cuyas direcciones no recordaba, pero estaban cercas unas de las otras, el can alertó la presencia positiva de sustancias controladas en distintas partes del interior de las propiedades.[436] En particular, aseveró que, dentro de uno de los cuartos de una de las residencias donde estaban realizando el patrón de búsqueda, el can tuvo interés en la zona alta del gavetero, al punto que tumbó una caja que se encontraba encima de esta.[437] Sobre ese particular, describió que tuvo que agarrar la caja para que no cayera al suelo y se percató de lo que catalogó como un arma de fuego.[438]

En el contrainterrogatorio, el agente Valentín Miranda expresó que se llevaron dos canes para dar apoyo en el mencionado diligenciamiento: uno para la búsqueda de sustancias controladas y otro para las armas de fuego.[439] Aclaró que el can patrullero que manejó estaba certificado especialmente en identificar los fuertes olores a sustancias controladas, pero no estaba certificado para buscar armas de fuego.[440] Durante el redirecto, aclaró que, aun cuando ese can no estaba certificado en la búsqueda de armas de

---

[434] TPO, pág. 1283.
[435] Íd., págs. 1303-1314.
[436] Íd., págs. 1314-1321.
[437] Íd., págs. 1319-1320.
[438] Íd., pág. 1320.
[439] Íd., pág. 1331.
[440] Íd., págs. 1331, 1334-1335.

fuego, podía alertar de la presencia de una si esta se encontraba contaminada con olor a una sustancia controlada.[441]

### Agente José R. Cortés

La defensa de Fontánez Carballo comenzó su desfile de prueba con el testimonio del agente José R. Cortés (Cortés).[442] El agente Cortés declaró que estuvo encargado de grabar el diligenciamiento de la orden de registro y allanamiento de la residencia de Fontánez Carballo, a quien identificó en sala.[443] Particularizó que comenzó a grabar desde que pasaron los dos canes por todo el inmueble, los cuales marcaron muchas áreas de la propiedad.[444] Relató que el can de drogas había marcado unas áreas y, durante la búsqueda, movió una caja, pero el manejador del can la aguantó para que no se cayera.[445] Señaló que, en el tiempo que estuvo en el cuarto con los canes, no vio un arma de fuego.[446]

En el contrainterrogatorio dirigido por la defensa de Infante Rosa, el agente Cortés reiteró que, en el momento cuando el can de drogas empujó la caja y el manejador la cogió, no vio un arma de fuego.[447] Añadió que el manejador del can tampoco le manifestó que había un arma de fuego en la caja.[448]

Por otro lado, en el contrainterrogatorio dirigido por el Ministerio Público, este le mostró al agente Cortés la grabación que realizó durante el registro de la propiedad de Fontánez Carballo, marcado como Exhibit #30A del Ministerio Público.[449] Al ver las imágenes, el agente Cortés admitió que no tenía visibilidad de la coqueta, ni pudo observar lo que estaba haciendo el perro, como tampoco pudo ver lo que había dentro.[450] Detalló que, en momento,

---

[441] TPO, pág. 1340.
[442] Íd., pág. 1357.
[443] Íd., pág. 1358.
[444] Íd., págs. 1358-1359.
[445] Íd., pág. 1361.
[446] Íd., pág. 1362.
[447] Íd., pág. 1366.
[448] Íd.
[449] Íd., pág. 1368.
[450] Íd., págs. 1368-1369.

tenía de frente a las personas arrestadas, aquí apelantes, y se mantuvo parado entre la cama y la puerta del cuarto.[451] Admitió que estaba pendiente al lente de la cámara cuando aquel suceso estaba ocurriendo.[452] Además, indicó que, en ningún momento, aparecía en la grabación acercándose a observar qué fue lo que había allí adentro, ni lo que estaba marcando el can.[453] De otro lado, en el redirecto, reiteró que había visto la caja, pero que no había visto armas de fuego.[454]

### Agente Daniel González Amador

Por último, la defensa de Fontánez Carballo sentó a testificar al agente Daniel González Amador (González Amador), quien estaba adscrito a la División Canina de la Policía, específicamente en el manejo de un can adiestrado para buscar cualquier tipo de armas de fuego.[455] Declaró que visitó tres propiedades con el can en San Sebastián con el fin de registrarlas en búsqueda de armas de fuego.[456] Expuso que, durante el diligenciamiento, el can marcó en varios lugares, pero no recordaba los sitios en específico.[457] Mencionó que Fontánez Carballo se encontraba en el lugar acompañado por otros agentes de la Policía.[458] Indicó que, entre las habitaciones que visitó, había una que tenía una coqueta, pero no recuerda cuál habitación era.[459] Explicó que estuvo en varios lugares haciendo la búsqueda, por lo que no podía especificar si el can alertó por un arma en específico.[460] Sobre la habitación que la defensa de Fontánez Carballo catalogó como "matrimonial", el

---

[451] TPO, págs. 1368-1369.
[452] Íd., pág. 1369.
[453] Íd., pág. 1370.
[454] Íd.
[455] Íd., pág. 1374.
[456] Íd., págs. 1375-1376.
[457] Íd., pág. 1377.
[458] Íd., pág. 1378.
[459] Íd., págs. 1379-1380.
[460] Íd., pág. 1380.

agente González Amador indicó que el can no alertó sobre la presencia de armas de fuego en ese cuarto.[461]

Durante el contrainterrogatorio dirigido por la defensa de Infante Rosa, el agente González Amador explicó que el entrenamiento que recibió el can que este manejó era uno dirigido a buscar armas de fuego, el cual era bien distinto al adiestramiento que le daban a un can de drogas.[462] De otro lado, especificó que, en la habitación catalogada como "matrimonial", el can no alertó sobre la presencia de armas de fuego.[463]

Por otro lado, en el contrainterrogatorio dirigido por el Ministerio Público, el agente González Amador admitió que a todos los canes los adiestraban inicialmente para todo tipo de búsqueda, incluyendo para armas de fuego, sustancias controladas, explosivos, entre otros.[464] Afirmó que, aunque el can tuviera una certificación de sustancias controladas, si a un perro también le enseñaban a detectar armas de fuego y explosivos, los iba a localizar.[465] Admitió que habían perros que necesitaban más guía durante la búsqueda que otros.[466] Atestó que, en el año 2019, cuando participó del registro en cuestión, recién estaba comenzando labores con ese can en particular.[467] Puntualizó que, en aquel momento, el can estaba juguetón y bastante hiperactivo, al punto que, durante el registro, estuvo jugando como en dos o tres ocasiones con almohadas y peluches que encontraba en el lugar.[468] Aclaró que, en el momento en que le dio el comando al can para que buscara en un área en particular este no lo hizo porque estaba bastante cansado.[469]

---

[461] TPO, pág. 1388.
[462] Íd., pág. 1390.
[463] Íd., pág. 1392.
[464] Íd., pág. 1393.
[465] Íd., pág. 1394.
[466] Íd.
[467] Íd., pág. 1395.
[468] Íd., págs. 1396-1397.
[469] Íd., pág. 1403.

Manifestó que el hecho de que el perro no marcara un área no significaba que en ese lugar no hubiera nada.[470]

Aquilatada la prueba desfilada ante sí, el Jurado emitió un veredicto unánime de culpabilidad en contra de Infante Rosa y Fontánez Carballo. Posteriormente, el Tribunal de Primera Instancia sentenció a Infante Rosa a ciento veintiún (121) años de prisión, mientras que a Fontánez Carballo lo sentenció a ciento diecinueve (119) años de prisión, por todos los cargos que pesaban en contra de estos.

Inconforme, el 29 de diciembre de 2021, Infante Rosa acudió ante esta Curia mediante el recurso KLAN202101076, señalando los siguientes errores:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CULPABLE AL APELANTE CUANDO DEBIÓ HABER TENIDO DUDA RAZONABLE.
>
> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CULPABLE AL APELANTE DE LOS DELITOS IMPUTADOS[,] A PESAR DE QUE LA PRUEBA DESFILADA POR [EL] MINISTERIO FISCAL NO ESTABLECIÓ SU CULPABILIDAD M[Á]S ALLÁ DE DUDA RAZONABLE FUNDADA.
>
> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CULPABLE AL APELANTE DE LOS DELITOS IMPUTADOS CUANDO LA PRUEBA PRESENTADA ERA CONTRADICTORIA E INVEROSÍMIL Y CON LA CUAL NO PODÍA ESTABLECER SU CULPABILIDAD M[Á]S ALLÁ DE DUDA RAZONABLE.
>
> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CULPABLE AL APELANTE CON UNA PRUEBA INSUFICIENTE EN DERECHO, PRIVANDO AL APELANTE DE UN JUICIO JUSTO E IMPARCIAL, CONTRARIO AL DEBIDO PROCEDIMIENTO DE LEY GARANTIZADO CONSTITUCIONALMENTE.
>
> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CON LUGAR LA PETICIÓN DEL MINISTERIO PÚBLICO DE QUE SE ADMITIERA EN EL JUICIO LO DECLARADO POR PETER RODRÍGUEZ VÉLEZ EN [LA] VISTA PRELIMINAR ANTE EL FALLECIMIENTO DE DICHA PERSONA, A PESAR DE LA OPOSICIÓN DE LA DEFENSA DE QUE NO TUVO LA OPORTUNIDAD PARA DESARROLLAR UN CONTRAINTERROGATORIO EFECTIVO, EN VIOLACIÓN

---

[470] TPO, pág. 1403.

AL DEBIDO PROCEDO DE LEY Y A SU DERECHO DE CONFRONTACIÓN.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR NO HA LUGAR LA MOCIÓN PRESENTADA POR LA DEFENSA DEL MINISTERIO PÚBLICO *[SIC]* DE QUE SE ADMITIERA EN EL JUICIO LO DECLARADO POR PETER RODRÍGUEZ VÉLEZ EN [LA] VISTA PRELIMINAR SE CIRCUNSCRIBIERA ÚNICAMENTE AL CASO DE SECUESTRO Y QUE SE EXCLUYERA DICHO TESTIMONIO EN LOS DE ARMAS Y SUSTANCIAS CONTROLADAS[,] *[SIC]* TODA VEZ QUE LA DEFENSA NO TUVO OPORTUNIDAD O MOTIVO SIMILAR PARA DESARROLLAR EL CONTRAINTERROGATORIO EN DICHOS CASOS, EN VIOLACIÓN AL DEBIDO PROCESO DE LEY Y A SU DERECHO DE CONFRONTACIÓN.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DETERMINAR QUE LOS TESTIGOS [QUE EL] MINISTERIO PÚBLICO PUSO A DISPOSICIÓN DE LA DEFENSA[,] POR SER PRUEBA ACUMULATIVA Y QUE EL COACUSADO PRESENTÓ SIN HABERLOS PRESENTADO EL APELANTE, PUDIERAN SER CONTRAINTERROGADOS POR EL MINISTERIO PÚBLICO DE MANERA SUGESTIVA.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DETERMINAR QUE LOS TESTIGOS [QUE EL] MINISTERIO PÚBLICO PUSO A DISPOSICIÓN DE LA DEFENSA[,] POR SER PRUEBA ACUMULATIVA Y QUE EL COACUSADO PRESENTÓ SIN HABERLOS PRESENTADO EL APELANTE, FUERAN CONTRAINTERROGADOS PRIMERAMENTE POR LA DEFENSA DEL APELANTE Y LUEGO POR EL MINISTERIO PÚBLICO, PRIVANDO AL APELANTE DE SU DERECHO A HACER PREGUNTAS SOBRE LO PREGUNTADO POR EL MINISTERIO FISCAL.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL IMPARTIR UNA INSTRUCCIÓN AL JURADO REQUIRIENDO UNANIMIDAD PARA DECLARAR AL ACUSADO NO CULPABLE[,] CONTRARIO A LO ESTABLECIDO EN LA CONSTITUCIÓN DE PUERTO RICO Y NO SIENDO FINAL Y FIRME LA OPINIÓN VERTIDA EN PUEBLO V. CENTENO, 2021 T.S.P.R. 133.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE AGUADILLA[,] AL DECLARAR CULPABLE AL APELANTE DE LOS DELITOS IMPUTADOS[,] A PESAR DEL EFECTO ACUMULATIVO QUE TUVO EN EL JURADO LOS ERRORES COMETIDOS DURANTE EL JUICIO QUE[,] AL CONSIDERARLOS EN CONJUNTO[,] PRIVARON AL APELANTE DE UN JUICIO JUSTO E IMPARCIAL EN VIOLACIÓN AL DEBIDO PROCESO DE LEY QUE POR DISPOSICIÓN CONSTITUCIONAL DEBE PROTEGER A TODO ACUSADO.

Igualmente insatisfecho, el 7 de febrero de 2023, Fontánez Carballo acudió ante nos mediante el recurso KLAN202300098 y señaló los siguientes errores:

ERRÓ EL TPI, SALA SUPERIOR DE AGUADILLA, AL DECLARAR CULPABLE AL APELANTE CUANDO DEBIÓ HABER TENIDO DUDA RAZONABLE[.]

ERRÓ EL TPI, SALA SUPERIOR DE AGUADILLA, AL DECLARAR CULPABLE AL APELANTE DE LOS DELITOS IMPUTADO[S][,] A PESAR DE QUE LA PRUEBA DESFILADA POR EL MINISTERIO PÚBLICO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE[.]

ERRÓ EL TPI AL DECLARAR CULPABLE AL APELANTE POR LOS DELITOS IMPUTADOS CUANDO [...] LA PRUEBA PRESENTADA ERA CONTRADICTORIA E INVEROSÍMIL Y CON LA CUAL NO SE PODÍA ESTABLECER SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE[.]

ERRÓ EL TPI AL DECLARAR CULPABLE AL APELANTE CON UNA PRUEBA INSUFICIENTE DE SU DERECHO A JUICIO JUSTO E IMPARCIAL[,] CONTRARIO AL DEBIDO PROCESO DE LEY.

ERRÓ EL TPI AL DECLARAR CON LUGAR LA PETICIÓN DEL MINISTERIO PÚBLICO DE QUE SE ADMITIERA EN EL JUICIO LO DECLARADO POR EL TESTIGO FALLECIDO PETER RODRÍGUEZ EN [LA] VISTA PRELIMINAR ANTE LA OPOSICIÓN DE LA DEFENSA POR NO HABER TENIDO LA OPORTUNIDAD DE DESARROLLAR UN CONTRAINTERROGATORIO EFECTIVO EN LA VISTA PRELIMINAR EN VIOLACIÓN AL DERECHO A LA CONFRONTACIÓN Y EL DEBIDO PROCESO DE LEY.

ERRÓ EL TPI AL DECLARAR CULPABLE AL APELANTE DE LOS DELITOS IMPUTADOS[,] A PESAR DE QUE EL EFECTO ACUMULATIVO QUE TUVO EN EL JURADO LOS ERRORES COMETIDOS DURANTE EL JUICIO QUE[,] AL CONSIDERARLOS EN CONJUNTO[,] PRIVARON AL APELANTE DE UN JUICIO JUSTO E IMPARCIAL EN VIOLACIÓN AL DEBIDO PROCESO DE LEY QUE PROTEGE A TODO ACUSADO[.]

Tras varios incidentes procesales, el 26 de febrero de 2024, Infante Rosa presentó el escrito intitulado *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*. El mismo día, Fontánez Carballo sometió su *Alegato Suplementario de la Parte Apelante*. Por su parte, el 11 de abril de 2024, el Pueblo de Puerto Rico compareció mediante *Alegato del Pueblo de Puerto Rico*.

Con el beneficio de la comparecencia de las partes, así como la transcripción estipulada de la prueba oral, los autos originales y

la prueba documental, nos disponemos a resolver el recurso que nos ocupa.

## II

## A

En nuestro ordenamiento jurídico, a toda persona acusada de delito le cobija una presunción de inocencia. La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico decreta que: "[e]n todos los procesos criminales, [la persona acusada] disfrutará del derecho a un juicio rápido y público, a ser notificad[a] de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado [o abogada] y a gozar de la presunción de inocencia". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Es por ello que, el Estado es quien tiene el peso de la prueba. *Pueblo v. Negrón Ramírez*, 2024 TSPR 41, resuelto el 23 de abril de 2024; *Pueblo v. Toro Martínez*, 200 DPR 834 (2018); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

En respuesta a tal decreto, en los casos penales permea el principio fundamental de que se deben probar más allá de duda razonable todos los elementos del delito, su conexión con la persona acusada y la intención o negligencia criminal de esta. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Resto Laureano*, 206 DPR 963 (2021) (sentencia), citando a *Pueblo v. Toro Martínez*, supra.

Para determinar que la prueba controvierte la presunción de inocencia, esta debe ser suficiente y satisfactoria; es decir, que produzca certeza o convicción moral en el juzgador. *Pueblo v. Resto Laureano*, supra, pág. 967, citando a *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974). Tal exigencia no significa que el Ministerio Público deba presentar evidencia dirigida a establecer la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Feliciano*

*Rodríguez,* 150 DPR 443, 447 (2000) (sentencia), citando a *Pueblo v. Cruz Granados,* 116 DPR 3, 21-22 (1984) (sentencia). Lo que se requiere es prueba suficiente, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Íd.*; *Pueblo v. García Colón I,* 182 DPR 129, 174-175 (2011).

En ese sentido, la prueba presentada por el Ministerio Público debe probar todos los elementos del delito y la conexión de la persona imputada con el referido delito. *Pueblo v. Negrón Ramírez,* supra. Por tal razón, la carencia de prueba sobre alguno de los elementos del delito implicaría el incumplimiento por parte del Estado con su carga probatoria y supondría la absolución de la persona acusada respecto al delito imputado. *Íd.*

Por su parte, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que la persona acusada se presumirá inocente. Además, dispone que, mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, esta será absuelta. Hay duda razonable cuando el juzgador siente insatisfacción con la prueba, una vez sopesados todos los elementos involucrados en el caso. *Pueblo v. Casillas, Torres,* 190 DPR 398 (2014).

Inicialmente, le corresponde al juzgador de hechos determinar si se satisfizo el estándar probatorio correspondiente y si, en su consecuencia, se probó la culpabilidad de la persona acusada más allá de duda razonable. *Pueblo v. Negrón Ramírez,* supra. Es decir, quien vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos es el juzgador de los hechos. *Pueblo v. Toro Martínez,* supra, pág. 858; *Pueblo v. Acevedo Estrada,* 150 DPR 84, 98 (2000); *Pueblo v. Torres Rivera,* 137 DPR 630, 641 (1994). En casos criminales con derecho a juicio por jurado, esta función le

corresponde al Jurado, el cual está constitucionalmente encomendado a recibir la prueba, adjudicar los hechos en base a esta y aplicar el derecho, según le instruya el tribunal. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Santa Vélez*, 177 DPR 61, 65-66 (2009); *Pueblo v. Negrón Ayala*, 171 DPR 406, 414 (2007).

En cuanto a la apreciación imparcial de la prueba, resulta harto conocido que la evaluación que de esta realicen los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Resto Laureano*, supra, pág. 968. Por ello, las determinaciones de hechos probados que haya hecho el juzgador primario no se deben descartar arbitrariamente, a menos que de la prueba admitida surja que no hay base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada*, supra, pág. 99. En ese sentido, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146-147 (2020), citando a *Pueblo v. Toro Martínez*, supra, pág. 857. Dicha deferencia emana del hecho de que los juzgadores de instancia se encuentran en una mejor posición para evaluar, aquilatar y adjudicar la prueba presentada ante ellos. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Toro Martínez*, supra, págs. 857-858; *Pueblo v. García Colón I*, supra, pág. 165; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). Lo anterior cobra mayor vigencia cuando se trata de la prueba testifical (oral) desfilada en el juicio. *Íd.* Ello debido a que son los juzgadores de hechos los que pueden oír y apreciar la forma de declarar de los testigos, así como su comportamiento. *Íd.*; *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991).

Por tanto, en las causas de acción de naturaleza criminal, la deferencia ante la apreciación de los foros primarios solo cederá si ha mediado prejuicio, parcialidad o pasión, o si la prueba no

concuerda con la realidad fáctica, resultare increíble o imposible. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Santiago et al.,* 176 DPR 133, 147-148 (2009). Debe entenderse, pues, que un Tribunal revisor solo podrá intervenir con las conclusiones de hecho del foro primario cuando la apreciación total de la prueba no represente su balance más racional, justiciero y jurídico. *Pueblo v. Resto Laureano,* supra, pág. 968, citando a *Miranda Cruz y otros v. S.L.G. Ritch,* 176 DPR 951 (2009); *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 DPR 702, 714 (1990).

Si bien la determinación de si se probó la culpabilidad de la persona acusada más allá de duda razonable es un asunto de hecho y derecho revisable en apelación, nuestro esquema probatorio está revestido de deferencia a las determinaciones que los juzgadores de primera instancia hacen sobre la prueba testifical, ya sea un juez, una jueza o un panel de jurados. Esto, debido a que dicho foro está en mejor posición de aquilatarla. *Pueblo v. Resto Laureano,* supra, pág. 969. Véase, además, *Pueblo v. Rodríguez Pagán,* 182 DPR 239 (2011); *Pueblo v. Irizarry,* supra, pág. 788; *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454 (1988).

Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha manifestado que la deferencia debida a los foros de instancia se extiende tanto a la adjudicación de credibilidad que estos realizan sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Toro Martínez,* supra, pág. 858; *Trinidad v. Chade,* 153 DPR 280, 291 (2001); *Pueblo v. Torres Rivera,* supra, págs. 640-641. Ahora bien, como excepción a este principio de deferencia, es norma conocida que, en cuanto a la apreciación de la prueba documental que se haya presentado en un juicio, los Foros apelativos están en las mismas condiciones que el tribunal de instancia para intervenir y apreciar *de novo* dicha prueba. *Íd.*; *Díaz*

*García v. Aponte Aponte*, 125 DPR 1, 13 (1989); *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 DPR 161, 166 esc. 1 (1989); *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975).

Cuando coinciden asuntos sobre la suficiencia de la prueba y la deferencia en cuanto a la prueba testifical, debe evaluarse si la determinación de credibilidad del juzgador de hechos rebasó los límites de la sana discreción judicial. *Pueblo v. Resto Laureano*, supra, pág. 969. Al entrelazar estos principios, se ha establecido que, aunque las determinaciones de hecho queden sostenidas por la prueba desfilada, podría revocarse un fallo condenatorio si de un análisis integral de la prueba los foros revisores no quedan convencidos. *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 551.

**B**

Surge de la Exposición de Motivos de la *Ley de Armas de Puerto Rico*, Ley Núm. 404-2000, según enmendada, 25 LPRA sec. 455 *et seq.* (derogada) (Ley de Armas),[471] que el propósito principal de la aprobación de dicho estatuto fue lograr una solución efectiva al problema del control de armas de fuego en manos de las personas delincuentes en Puerto Rico. *Cancio, Ex parte*, 161 DPR 479 (2004). Esta legislación responde al interés apremiante del Gobierno de Puerto Rico de ser más efectivo en la lucha contra el crimen. *Íd.* Por un lado, la Ley orienta a las personas autorizadas en Puerto Rico a manejar responsablemente sus armas de fuego. Por otro lado, apercibe a la persona delincuente de las serias consecuencias de incurrir en actos criminales utilizando armas de fuego. Por último, crea un sistema de registro electrónico con el fin de facilitar la inscripción de todas las transacciones de armas de fuego y

---

[471] La referida ley fue derogada mediante la aprobación de la Ley Núm. 168-2019, según enmendada, conocida como la *Ley de Armas de Puerto Rico de 2020*, 25 LPRA sec. 461 *et seq.* Para fines del presente dictamen, se hace referencia únicamente a la derogada Ley de Armas, toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia de la Ley Núm. 168-2019.

municiones que los concesionarios de licencias de armas realicen en Puerto Rico. *Íd.*

En lo aquí atinente, la posesión de armas de fuego sin licencia está regulada por el Artículo 5.06 de la Ley de Armas, 25 LPRA sec. 458e, el cual dispone que:

> Toda persona que tenga o posea, pero que no esté portando, un arma de fuego sin tener licencia para ello, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de cinco (5) años. De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.
>
> [...]

Con respecto a la posesión de municiones, el Artículo 6.01 de la Ley de Armas, 25 LPRA sec. 459, dispone que:

> Se necesitará una licencia de armas, de tiro al blanco, de caza o de armero, según sea el caso, para fabricar, solicitar que se fabrique, importar, ofrecer, comprar, vender o tener para la venta, guardar, almacenar, entregar, prestar, traspasar, o en cualquier otra forma disponer de, poseer, usar, portar o transportar municiones, conforme a los requisitos exigidos por este capítulo. Asimismo, se necesitará un permiso expedido por la Policía para comprar pólvora. Toda infracción a este artículo constituirá delito grave, y será sancionada con pena de reclusión por un término fijo de seis (6) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de doce (12) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de tres (3) años.
>
> Será considerado como circunstancia agravante al momento de fijarse la sentencia, incurrir en cualquiera de las conductas descritas en esta sección sin la licencia o el permiso correspondiente para comprar pólvora, cuando las municiones sean de las comúnmente conocidas como *armor piercing.* [...].

Por otro lado, el Artículo 5.07 de la Ley de Armas, 25 LPRA sec. 458f, tipifica el delito de posesión o uso legal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado. En particular, quien porte, posea o use sin autorización de este estatuto un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de estas o cualquiera otra arma que

pueda ser disparada automáticamente o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal, incurrirá en delito grave. *Íd*. La comisión de dicho delito conlleva la imposición de una pena fija de veinticuatro (24) años de reclusión. *Íd*. Además, la persona convicta no tiene derecho a sentencia suspendida ni a salir en libertad bajo palabra. *Íd*. Tampoco tiene derecho a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción. *Íd*. La pena impuesta se debe cumplir en años naturales en su totalidad. *Íd*. De mediar circunstancias agravantes, el Artículo 5.07 de la Ley de Armas, *supra*, establece que la pena fija podrá ser aumentada hasta un máximo de treinta y seis (36) años. *Íd*. Por el contrario, de mediar circunstancias atenuantes, el precitado artículo dispone que la pena fija podrá ser reducida hasta un mínimo de dieciocho (18) años. *Íd*.

## C

El Artículo 401 de la *Ley de Sustancias Controladas de Puerto Rico*, Ley Núm. 4 de 23 de junio de 1971, según enmendada, 24 LPRA sec. 2401 (Ley de Sustancias Controladas), tipifica como delito la posesión de sustancias controladas con la intención específica de distribuirlas. Ante una acusación bajo dicho artículo, el Ministerio Público viene obligado a probar, más allá de duda razonable, que la persona acusada: (1) a sabiendas o intencionalmente; (2) poseía una sustancia controlada; (3) con intención de distribuirla. Nuestro más Alto Foro judicial ha aclarado que, cuando se imputa una infracción al Artículo 401 de la Ley de Sustancias Controladas, *supra*, el Estado viene obligado a demostrar que la persona acusada tenía la intención específica de distribuir la sustancia controlada. *Fuentes Morales v. Tribunal Superior*, 102 DPR 705, 708 (1974). La intención de distribuir puede inferirse a partir de las circunstancias del caso, incluyendo la cantidad de droga envuelta. *Pueblo v. Lorio Ormsby I*,

137 DPR 722, 728-729 (1994); *Pueblo v. Rosa Burgos,* 103 DPR 478, 479 (1975). En ausencia de dicha intención, el delito cometido es el de una infracción al Artículo 404 de la Ley de Sustancias Controladas, 24 LPRA sec. 2404, que penaliza la posesión simple de sustancias controladas. *Íd.*; *Fuentes Morales v. Tribunal Superior,* supra.

La norma jurisprudencial ha enfatizado que el Artículo 401 de la Ley de Sustancias Controladas, *supra*, prohíbe tanto la posesión física como la posesión constructiva de drogas. La *posesión constructiva* se produce cuando, a pesar de que la persona no tiene la posesión inmediata o tenencia física del objeto, tiene el poder e intención de ejercer el control o dominio sobre el mismo. *Pueblo v. Meléndez Rodríguez,* 136 DPR 587, 621 (1994); *Pueblo en interés menor F.S.C.,* 128 DPR 931, 940 (1991); *Pueblo v. Rivera Rivera,* 117 DPR 283, 294 (1986); *Pueblo v. Cruz Rivera,* 100 DPR 345, 349 (1971); *Pueblo v. Cruz Rosado,* 97 DPR 513, 515-516 (1969). En estos casos se impone responsabilidad penal a todas las personas que tengan conocimiento, control y manejo del bien prohibido, aun cuando no lo tengan bajo su posesión inmediata. *Pueblo v. Meléndez Rodríguez,* supra; *Pueblo en interés menor F.S.C.,* supra. Al evaluar si existe posesión constructiva, deben tomarse en consideración los eventos anteriores, coetáneos y posteriores a la alegada posesión ilegal. *Pueblo en interés menor F.S.C.,* supra.

Por otro lado, se ha reconocido que la mera presencia física de una persona en el lugar de la comisión de un delito resulta insuficiente para imponerle responsabilidad criminal, en ausencia de prueba de que tenía la intención de participar en la posesión de las sustancias controladas. *Pueblo v. Meléndez Rodríguez,* supra; *Pueblo v. Agosto Castro,* 102 DPR 441, 444-445 (1974); *Pueblo v. Aponte González,* 83 DPR 511, 519-520 (1961). Es necesario establecer que la persona acusada ejercía, mantenía control o el

derecho al control del contrabando. *Pueblo v. Cruz Rivera*, supra; *Pueblo v. Cruz Rosado*, supra.

Es decir, la cercanía a un material ilícito no implica necesariamente la posesión constructiva del objeto. *Pueblo en interés menor F.S.C.*, supra. No obstante, este hecho puede considerarse en conjunto con otras circunstancias que rodean el hecho delictivo para determinar la responsabilidad de la persona acusada. *Pueblo v. Aponte González*, supra, pág. 519. "No es indispensable, pues, que [la persona acusada] ejecute personalmente el acto delictivo y basta con su presencia pasiva, siempre que su responsabilidad como *co-autor[a]* pueda establecerse por actos anteriores, o como el resultado de una conspiración en que participó, [...] o de un designio común [...]". *Íd.*, págs. 519-520. (Citas omitidas).

Finalmente, el Artículo 44 del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5067(a)(d), dispone que se consideran *autores*, entre otros, los que toman parte directa en la comisión del delito y los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo. La mera presencia durante la comisión de un delito es insuficiente por sí sola para establecer *coautoría* y sostener una convicción. *Pueblo v. Meléndez Rodríguez*, supra; *Pueblo v. Aponte González*, supra. La jurisprudencia del Tribunal Supremo de Puerto Rico ha limitado la aplicación del concepto de *coautor* a "aquellas personas que participan consciente e intencionalmente en la comisión de un delito". *Pueblo v. Sustache Sustache*, 176 DPR 250, 301 (2009). Consecuentemente, es necesario establecer "algún grado de consejo, incitación o participación directa o indirecta en el hecho punible". *Íd.*

**D**

Nuestro ordenamiento jurídico penal define el delito de *secuestro* como "[t]oda persona que mediante fuerza, violencia, intimidación, fraude o engaño, sustrae, o retiene y oculta, a otra persona privándola de su libertad [...]". 33 LPRA sec. 5223. La comisión de dicho delito es sancionada con una pena de reclusión por un término fijo de veinticinco (25) años. *Íd.* Por otro lado, cuando el secuestro se clasifica como agravado, la pena de reclusión es por un término fijo de cincuenta (50) años. 33 LPRA sec. 5224. Se entiende que el secuestro es agravado cuando medie cualquiera de las siguientes circunstancias:

> (a) Cuando se cometa contra una persona que no ha cumplido dieciocho (18) años de edad, o un discapacitado o persona que no pueda valerse por sí misma, o un enfermo mental.
>
> (b) Cuando se cometa contra el Gobernador de Puerto Rico, contra un legislador o Secretario del Gabinete o funcionario principal de una agencia o corporación pública, juez, fiscal especial independiente, o un fiscal o procurador del Departamento de Justicia de Puerto Rico, fuere [e]ste nombrado por el Gobernador de Puerto Rico o designado como tal por el Secretario de Justicia.
>
> (c) Cuando se cometa con el propósito de exigir compensación monetaria o que se realice algún acto contrario a la ley o a la voluntad de la persona secuestrada, o exigir al Estado la liberación de algún recluso cumpliendo sentencia o la liberación de una persona arrestada o acusada en relación con la comisión de algún delito.
>
> (d) Cuando el secuestro se inicie fuera de los límites territoriales del Estado Libre Asociado de Puerto Rico y se traiga o envíe a la persona a Puerto Rico. 33 LPRA sec. 5224.

**E**

La *prueba de referencia* es definida como toda aquella "declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". Regla 801(c) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 801(c). Como regla general, este tipo de evidencia es

inadmisible en los procesos judiciales. Regla 804 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 804. Su exclusión se debe a la falta de oportunidad de la parte adversa en contrainterrogar a la persona declarante, los riesgos que ella representa en cuanto a la narración del evento, percepción, recuerdo del acontecimiento y sinceridad de la declarante. *Pueblo v. Santiago Colón,* 125 DPR 442, 446 y 449 (1990) (sentencia).

Cuando se pretende utilizar prueba de referencia contra una persona acusada, se activa la protección constitucional del derecho a confrontación consagrado tanto en la Enmienda Sexta de la Constitución de los Estados Unidos, como en la Sección 11 de nuestra Constitución. Dicha protección constitucional no solo garantiza el derecho al careo, sino que también implica que cierta prueba de referencia, si es testimonial, será excluida a pesar de caer bajo alguna de las excepciones a la regla de exclusión codificadas en las Reglas de Evidencia. *Crawford v. Washington,* 541 US 36 (2004); *Pueblo v. Guerrido López,* 179 DPR 950 (2010). El derecho a la confrontación recoge el principio fundamental de que se ponga a la persona acusada en posición de poder enfrentar a sus acusadores. *Pueblo v. Cruz Rosario,* 204 DPR 1040, 1048 (2020). Este derecho tiene tres (3) vertientes procesales: (1) derecho al careo o confrontación cara a cara con los testigos adversos; (2) derecho a contrainterrogar; y (3) derecho a excluir la prueba de referencia que intente presentar el Ministerio Público. *Íd.*; *Pueblo v. Pérez Santos,* 195 DPR 262, 269–270 (2016).

En otras palabras, es claro que dicha prueba de referencia lesiona el derecho que tienen las partes a confrontarse con la evidencia que se presente en su contra. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* 123 DPR 1, 34-35 (1988). Sin embargo, cabe destacar que, si la parte adversa tiene o ha tenido la oportunidad de contrainterrogar a la persona declarante, se disipan los

inconvenientes que trae consigo la prueba de referencia y la declaración realizada debe admitirse en evidencia. *Pueblo v. Santiago Colón,* supra, pág. 449.

La regla de exclusión está esencialmente fundada en el hecho de que la misma no ofrece garantías circunstanciales de confiabilidad y exactitud. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra. El profesor Chiesa Aponte señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que, de ordinario, una declaración que constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte. Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorio de las partes que tengan a bien hacerlo. E. L. Chiesa Aponte, *Tratado de Derecho Probatorio (Reglas de Evidencia de Puerto Rico y Federales),* República Dominicana, Pubs. J.T.S., Tomo II, págs. 616-617.

Ahora bien, como todo principio general, el mismo no es absoluto, por lo que existen excepciones a la regla de exclusión de prueba de referencia y estas están reguladas por las Reglas 805 a la 809 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 805-809. Claro está, si ninguna de las circunstancias taxativamente enumeradas en los preceptos antes citados se configura, el foro de instancia deberá descartar la evidencia ofrecida.

Entre las excepciones a la regla de exclusión de la prueba de referencia se encuentran las declaraciones anteriores de un testigo no disponible. Sobre ello, la Regla 806 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 806, dispone lo siguiente:

(a) *Definición; no disponible como testigo.*—Incluye situaciones en que la persona declarante:

(1) Está exenta de testificar por una determinación del tribunal por razón de un privilegio reconocido en estas reglas en relación con el asunto u objeto de su declaración;

(2) insiste en no testificar en relación con el asunto u objeto de su declaración a pesar de una orden del tribunal para que lo haga;

(3) testifica que no puede recordar sobre el asunto u objeto de su declaración;

**(4) al momento del juicio o vista, ha fallecido** o está imposibilitada de comparecer a testificar por razón de enfermedad o impedimento mental o físico, o

(5) está ausente de la vista y quien propone la declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del tribunal.

No se entenderá que una persona declarante está no disponible como testigo si ello ha sido motivado por la gestión o conducta de quien propone la declaración con el propósito de evitar que la persona declarante comparezca o testifique.

**(b) Cuando la persona declarante no está disponible como testigo, es admisible como excepción a la regla general de exclusión de prueba de referencia lo siguiente:**

**(1)** *Testimonio anterior.*—**Testimonio dado como testigo en otra vista del mismo u otro procedimiento**, en una deposición tomada conforme a Derecho durante el mismo u otro procedimiento. **Ello si la parte contra quien se ofrece ahora el testimonio** —o un predecesor en interés si se trata de una acción o procedimiento civil— **tuvo la oportunidad y motivo similar para desarrollar el testimonio en interrogatorio directo, contrainterrogatorio o en redirecto**.

[…]. (Énfasis nuestro).

De una lectura de la citada Regla, podemos colegir que, antes de dar paso a la admisión de prueba de referencia por algunas de las excepciones allí establecidas, el tribunal debe hacer una determinación de que la persona testigo o declarante no está disponible para testificar por algunas de las situaciones recogidas en sus incisos. Luego de que se haya hecho la determinación de que la persona testigo no está disponible, se puede admitir la prueba de

referencia bajo alguna de las excepciones contenidas en la citada Regla. En otras palabras, la indisponibilidad del testigo es un requisito constitucional, al amparo de la Enmienda Sexta de la Constitución de los Estados Unidos y de la Sección 11 de nuestra Constitución, para admitir un testimonio anterior contra la persona acusada. Véase, E. L. Chiesa Aponte, *Tratado de Derecho Probatorio*, 1998, T. II, pág. 730.

Sobre el asunto de las declaraciones anteriores como prueba sustantiva, el Tribunal Supremo de Puerto Rico expuso en *Pueblo v. Zeno Torres*, 211 DPR 1, 21 (2022), lo siguiente:

> Ahora bien, la Regla 802(a) de Evidencia, *supra*, permite que se pueda traer prueba de declaraciones anteriores como prueba sustantiva, siempre que la declaración anterior fuera bajo juramento sujeto a perjurio, y sea inconsistente con el testimonio vertido en corte. Además, cabe señalar que una declaración anterior de un testigo será admitida como prueba sustantiva siempre y cuando pueda haber una confrontación con [la persona] declarante. En otras palabras, el testigo debe encontrarse presente al momento de ofrecerse en evidencia la declaración anterior en el tribunal sujeto a ser **contrainterrogado en relación con la declaración anterior** y en cuanto a sus declaraciones presentes. […]. (Énfasis original).

Por otro lado, la Regla 808 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 808, dictamina que, "[c]uando se admite una declaración que constituya prueba de referencia bajo las Reglas 805 a 809 de este apéndice, la credibilidad de la persona declarante puede ser impugnada -y si es impugnada, puede ser rehabilitada- por cualquier evidencia admisible para esos propósitos si la persona declarante hubiera prestado testimonio como testigo […]".

La Regla 109 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 109, establece lo relativo a las determinaciones preliminares de admisibilidad de evidencia. Durante el acto del juicio, dicha Regla es el vehículo procesal probatorio adecuado, como norma general, para dilucidar o determinar la admisibilidad de evidencia, así como el valor probatorio de esta. E. L. Chiesa Aponte, II *Derecho Procesal*

*Penal de Puerto Rico y Estados Unidos*, 1995, págs. 64-65. Ahora bien, sobre el valor probatorio y la credibilidad específicamente establece lo siguiente:

> [...]
>
> (E) *Valor probatorio y credibilidad.*—Esta regla no limita el derecho de las partes a presentar evidencia ante el Jurado que sea pertinente al valor probatorio o a la credibilidad de la evidencia admitida luego de la correspondiente determinación preliminar del tribunal.

A la luz de la normativa antes expuesta, procedemos a disponer de la controversia ante nuestra consideración.

### III

En ambos recursos, los apelantes señalan como primer error que el Tribunal de Primera Instancia, específicamente el panel de Jurados, incidió al declararlos culpables cuando debió haber tenido duda razonable para ello. Como segundo señalamiento de error, la parte apelante sostiene que el foro primario erró al declarar su culpabilidad, a pesar de que la prueba desfilada por el Ministerio Público en el juicio por jurado no estableció su culpabilidad más allá de duda razonable. En su tercer error señalado, los apelantes aducen que el foro *a quo* erró al declararlos culpables, toda vez que la prueba presentada era contradictoria e inverosímil y, mediante esta, no se podía establecer su culpabilidad más allá de duda razonable. Como cuarto señalamiento de error, la parte apelante plantea que el foro apelado incidió al declararla culpable basado en una prueba insuficiente, privándola así de su derecho a un juicio justo e imparcial; ello, en contravención al debido proceso de ley garantizado por nuestra Constitución. Por su parte, el apelante Fontánez Carballo argumenta como sexto señalamiento de error, de forma integrada a los mencionados errores, que el foro de instancia erró al declararlo culpable, a pesar de que el efecto acumulativo que tuvo en el Jurado los errores cometidos durante el juicio, considerados en conjunto, lo privaron de un juicio justo e imparcial

en violación al debido proceso de ley que le protege. Por estar relacionados entre sí, discutiremos los errores señalados en conjunto.

En particular, el apelante Infante Rosa sostiene que la correcta adjudicación del presente recurso requiere que se haga un análisis sobre la figura del autor y del coautor en nuestro ordenamiento jurídico. En ese contexto, argumenta que fue acusado y convicto como coautor de varios delitos, pero de la prueba admitida en evidencia no surge que se configure la coautoría, pues hay ausencia total de prueba sobre ello. En cuanto al delito de secuestro, plantea que el testigo en cuestión solo alegó que lo secuestraron, pero no señaló con especificidad cuándo, dónde y cómo se fraguó el plan de secuestrarlo. Sobre ese particular, abunda que el testimonio de dicho testigo fue general y no imputó la responsabilidad individual de cada cual en la planificación, ejecución y participación de quienes lo secuestraron. Aduce que el testimonio de Rodríguez Vélez al respecto es increíble e inverosímil.

Sobre los demás delitos, el apelante Infante Rosa alega que no se le pudo conectar como dueño o arrendatario de ninguna de las propiedades objeto de allanamiento y tampoco se le señala como la persona que podía ejercer el control del lugar, sino más bien como un compañero más. Especifica que no se demostró que fuera la persona con el poder para decidir sobre las operaciones del lugar en donde se alega que se cometieron los delitos. De otro lado, aduce que no se presentó un ápice de prueba independiente que corrobore el testimonio vertido por el testigo de cargo. Arguye que la prueba desfilada durante el juicio no alcanza a rebasar el *quantum* de prueba requerido de más allá de duda razonable, ni cumple con los criterios y requisitos necesarios para que se constituyan los delitos en cuestión. En cuanto al delito de armas de fuego, particulariza que

se le encontró convicto de varios cargos sobre dicho delito, aun cuando las armas no le fueron ocupadas a este.

Por su parte, el apelante Fontánez Carballo argumenta que el Jurado incidió al emitir los veredictos de culpabilidad en su contra, toda vez que mediante la prueba desfilada no se establecieron los elementos de los delitos más allá de duda razonable. En cuanto al delito de secuestro, arguye que la única prueba presentada por el Ministerio Público a esos efectos fue el testimonio de Rodríguez Vélez en la vista preliminar. Sostiene que dicho testigo no fue sustraído de ningún lugar mediante violencia, pues había llegado meses antes al sector Pueblo Nuevo en San Sebastián, donde solicitó trabajar como vendedor de drogas. Añade que Rodríguez Vélez no fue retenido ni ocultado por nadie, toda vez que de su propio testimonio surgió que todos los días salía a vender sustancias controladas. Plantea que la prueba desfilada sobre dicho delito, además de ser inverosímil y contradictoria, no establecía los elementos del delito más allá de duda razonable.

Sobre el delito de las sustancias controladas, el apelante Fontánez Carballo alega que de la prueba desfilada en el juicio en su fondo se desprende que el material delictivo no fue ocupado en los lugares en donde este tuviera pleno dominio o acceso. Abunda que todo lo ocupado en la residencia denominada como "el punto" fue ocupado en un lugar donde este no se encontraba y no hubo prueba que lo vinculara a esta. Aduce que, en los casos de autos, no existió una investigación o vigilancia por parte de las autoridades que lo conectaran con la evidencia delictiva que se ocupó en la mencionada residencia y en la residencia #3. Arguye que el Ministerio Público debía satisfacer los elementos de coautoría y posesión constructiva, pero incumplió con presentar prueba que satisficiera más allá de duda razonable los elementos jurídicos de las dos figuras. Sostiene que en el juicio no se probó que existiera

un designio común o un plan entre los coacusados para poseer las alegadas sustancias controladas con la intención de distribución. Alega que los lugares en donde se ocuparon las presuntas sustancias controladas no eran indicativos de control, dominio o acceso por su parte.

En cuanto al delito de las armas de fuego, el apelante Fontánez Carballo plantea que, en los casos de autos, no hubo un testigo que declarara haberlo visto con un arma de fuego, ya sea un rifle o un revolver .38. Particulariza que del testimonio de Rodríguez Vélez no surgió prueba que pudiera establecer más allá de duda razonable que poseía y ejercía control y dominio de las armas por las cuales resultó culpable. Añade que los testimonios vertidos en el juicio fueron profundamente contradictorios y confrontados por la defensa.

Los mencionados señalamientos de error presentados por los apelantes van dirigidos a atacar la apreciación de la prueba del Jurado durante la celebración del juicio en su fondo, la credibilidad que le adjudicó este a los testimonios vertidos en sala y la apreciación que realizara sobre el testimonio anterior de un testigo no disponible.

Como cuestión de umbral, reiteramos la norma que impera en nuestro ordenamiento jurídico de que el Foro apelativo no habrá de intervenir con la adjudicación de credibilidad que, en relación con la prueba testifical, haya realizado el juzgador de hechos, en este caso el Jurado, a nivel de instancia, a no ser que se demuestre error manifiesto, pasión, prejuicio o parcialidad. *Pueblo v. Viruet Camacho*, 173 DPR 563 (2008); *Pueblo v. Acevedo Estrada*, supra; *Pueblo v. Calderón Álvarez*, 140 DPR 627, 644 (1996).

Tras examinar los alegatos de los apelantes, la voluminosa transcripción de la prueba oral, así como los autos originales y la prueba documental a nuestro haber, podemos colegir que el Jurado

no incidió en la apreciación de la prueba presentada ante sí. Al evaluar toda la prueba que obra en autos, no cabe duda de que el Ministerio Público, a través de la evidencia documental, testifical y material admitida y desfilada durante el juicio, probó todos los elementos que configuran cada delito imputado a los apelantes más allá de duda razonable.Los apelantes se limitaron a atacar ciertas incongruencias en el testimonio de los testigos del Ministerio Público, pero al Jurado le mereció credibilidad todo lo vertido ante sí. Ninguna de las sutiles diferencias señaladas por los apelantes al comparar los testimonios en sala, con lo plasmado en sus declaraciones juradas, nos llevan a concluir que hubo error manifiesto, pasión, prejuicio o parcialidad de parte del juzgador de los hechos. Luego de un examen sosegado del expediente ante nos, contrario a lo propuesto por los apelantes, a la luz de la totalidad de la prueba, se demostró más allá de duda razonable la culpabilidad de estos, configurándose los elementos de los delitos imputados y la intención criminal de ellos en la comisión de dichos delitos.

Por otro lado, como quinto señalamiento de error, ambos apelantes plantean que el Tribunal de Primera Instancia incidió al declarar Ha Lugar la petición del Ministerio Público de que se admitiera en el juicio por jurado lo declarado por Rodríguez Vélez en la vista preliminar ante el fallecimiento de este. Sobre ese particular, alegan que la defensa se opuso oportunamente a dicho petitorio, ya que no tuvo la oportunidad para desarrollar un contrainterrogatorio efectivo en la vista preliminar; ello, en violación a su derecho a la confrontación y al debido proceso de ley.

En particular, el apelante Infante Rosa argumenta que permitir la declaración del testigo no disponible Rodríguez Vélez en la vista preliminar como prueba admisible en el juicio lo coloca en una posición de total indefensión. Aduce que, al considerar la *Declaración Jurada* suscrita por Rodríguez Vélez el 13 de abril de

2021, se plantean elementos nuevos que no tan solo contradicen las manifestaciones anteriores de ese testigo, sino que representan aspectos con los cuales no fue confrontado frente al Jurado. Sobre ello, añade que los miembros del Jurado no fueron expuestos a observar y adjudicar en vivo el *demeanor* del testigo. Admite que estamos ante un escenario donde, en efecto, se contrainterrogó al testigo en la etapa de vista preliminar, pero ante su falta de disponibilidad en el juicio, la defensa estaba impedida de confrontarlo con evidencia nueva que contradice su testimonio anterior. Señala que es una atrocidad el culparlo y confinarlo a base de una declaración anterior que está reñida con una declaración posterior con la que no estuvo presente el derecho de confrontación.

Por su parte, el apelante Fontánez Carballo argumenta que, admitir lo declarado por el testigo no disponible Rodríguez Vélez en la vista preliminar, sin mayor consideración, violenta el derecho a la confrontación y al debido proceso de ley. Arguye que el foro primario no evaluó de manera alguna el reclamo de la defensa sobre que las circunstancias en que se celebró la vista preliminar no permitieron que se llevara a cabo un contrainterrogatorio efectivo. Aduce que el foro apelado descartó el cuestionamiento de la defensa sobre la inefectividad del contrainterrogatorio y de manera automática aceptó sustituir el testimonio de Rodríguez Vélez, quien fue declarado testigo no disponible para el juicio por razón de su muerte, con lo declarado por este en la vista preliminar. Sostiene que la prueba presentada por el Ministerio Público descansó en el testimonio descarnado de Rodríguez Vélez. Alega que los agentes del orden público se limitaron a relatar lo llevado a cabo el 6 de noviembre de 2019, sin ningún tipo de conexión con él.

En los casos de autos, previo al juicio, el Tribunal de Primera Instancia tuvo ante sí una solicitud del Ministerio Público para presentar el testimonio completo de Rodríguez Vélez vertido en la

vista preliminar. Luego de celebrar una vista argumentativa sobre ello, y evaluar las posturas de las partes en corte abierta, así como sus planteamientos escritos, el foro primario declaró el mencionado petitorio Ha Lugar y, en su consecuencia, permitió la admisibilidad del testimonio anterior de Rodríguez Vélez. Fundamentó su decisión en que la evidencia que surgió durante el descubrimiento de prueba posterior a la vista preliminar era un asunto de impugnación de credibilidad del testimonio que iba dirigido al valor probatorio y no a la admisibilidad de este, lo cual no impedía que la defensa utilizara el mecanismo provisto por la Regla 808 de Evidencia de Puerto Rico, *supra*, para impugnar la credibilidad del testimonio de un testigo no disponible.

Al evaluar la transcripción de la prueba oral, así como los documentos que obran en el expediente y los autos originales, colegimos que el foro *a quo* actuó correctamente al admitir el testimonio anterior de Rodríguez Vélez. Somos del criterio que la determinación del foro primario no es contraria a derecho, ni se cometió un abuso de discreción al admitir dicho testimonio, por lo que no variaremos esa determinación. Del expediente se desprende que Rodríguez Vélez no estaba disponible por causa de muerte, lo cual le impedía testificar en el juicio en su fondo, al palio de la Regla 806(a)(4) de Evidencia de Puerto Rico, *supra*. Dicho hecho fue estipulado por las partes en la vista argumentativa a esos efectos.

No obstante, el testimonio de Rodríguez Vélez fue ofrecido en la vista preliminar de los casos de epígrafe, bajo juramento, y estuvo sujeto a la intervención de los letrados que representaban a los apelantes, quienes tuvieron oportunidad de contrainterrogarlo. Precisamente, lo que exige nuestro ordenamiento jurídico es que el declarante estuvo sujeto a la confrontación en otra vista del mismo u otro procedimiento, lo cual ocurrió en los casos de autos. Por consiguiente, su testimonio anterior es admisible como excepción a

la regla general de exclusión de prueba de referencia. En suma, concluimos que, mediante la presentación en el juicio en su fondo de la regrabación del testimonio anterior del testigo no disponible Rodríguez Vélez no se les violentó a los apelantes su derecho a la confrontación, pues en la vista preliminar tuvieron oportunidad de contrainterrogar al testigo sobre lo declarado por este.

Ahora bien, la defensa plantea que el testimonio anterior de Rodríguez Vélez debe ser limitado al delito de secuestro. Sobre ello, el foro *a quo* expresó que en la vista preliminar había determinado causa para juicio, no solo por el delito de secuestro, sino también por los delitos de sustancias controladas y posesión de armas de fuego. Indicó que en dicha vista se desfiló prueba en torno a los mencionados delitos y, a su juicio, la defensa tuvo oportunidad para contrainterrogar al testigo en cuestión, no solamente en torno al secuestro, sino también sobre los demás delitos. Por tal razón, el foro apelado no entendió procedente limitar el testimonio anterior de Rodríguez Vélez al delito de secuestro, ya que la defensa, en aquel momento, "dentro de su criterio, determinó limitar su contrainterrogatorio a dicho delito".[472]

Sin embargo, al revisar la transcripción de la prueba oral vertida en la vista preliminar, se desprende que el foro juzgador fue quien, según propuesto por la defensa, limitó en un principio el contrainterrogatorio al delito de secuestro. En particular, el contrainterrogatorio del testigo Rodríguez Vélez comenzó de la siguiente forma:

| JUEZ: | Bien, vamos. Este, empiece usted ahora licenciado Ramos o usted. |
|---|---|
| LIC RAMOS: | Bueno[,] no s[é] si, en qu[é] caso estamos, porque eh... |
| JUEZ: | **Estamos todavía en el caso de secuestro** por qu[e] es lo que da la información de, de, la información base, básicamente para que se pudieran |

---

[472] Anejo III del *Alegato del Pueblo de Puerto Rico*, pág. 38.

> expedir las otras órdenes de registro y allanamiento que[,] eventualmente[,] cuando se diligencian, **cuando testimonien los diligenciamientos[,] pues ya veremos qué pasa**.[473]

De lo anterior surge claramente que fue el tribunal de instancia y no la defensa quien limitó el contrainterrogatorio que esta última le hiciera al testigo Rodríguez Vélez en la vista preliminar. De hecho, culminados los turnos de contrainterrogatorio con dicho testigo, se desprende de la transcripción de la prueba oral el siguiente intercambio:

| | |
|---|---|
| FISCAL: | Falta el compañero. |
| LIC MORALES: | **En cuanto al secuestro no**, no. |
| FISCAL: | **Pues no le va a hacer preguntas, porque es que yo no puedo volverlo a traer para el caso de las armas y de las sustancias**. |
| JUEZ: | Con rela[…], con relación ah, ah la señora que es su cliente ¿no? |
| LIC MORALES: | Sí. |
| JUEZ: | Él lo, lo, lo, lo que declaró fue que ella vivía en la casa donde se endecaba la… |
| LIC MORALES: | Droga. |
| JUEZ: | Eso fue lo que dijo [é]l con relación a ella. ¿Estamos de acuerdo? |
| FISCAL: | Ujum. |
| JUEZ: | ¿Alguna pregunta con relación a esto? Se puede retirar caballero. |
| FISCAL: | **¡Eh, juez! Necesito hacerle tres preguntas para aclarar**… |
| JUEZ: | **¡No, no, ya!** |
| FISCAL: | …lo del candado. |
| JUEZ: | **No, no. Es que ya usted ha hecho preguntas horita**. |
| FISCAL: | Por eso yo jeje, derecho a… |
| JUEZ: | Esta bien, pero, no, no. ¡Yo esto[y] claro! Se puede retirar. |
| FISCAL: | Con, el… |
| JUEZ: | Este… |

---

[473] TPO, pág. 33. (Énfasis nuestro).

| | |
|---|---|
| FISCAL: | No, yo le voy a pedir si usted me lo permite que el agen, el sargento Feliciano tom[e] custodia del señor... |
| JUEZ: | A pues que se lo lleve. |
| FISCAL: | ...si es que usted lo permite, no sé... |
| JUEZ: | No, yo no tengo problema, **después si, dependiendo de lo que pase aquí, pues usted lo...** |
| FISCAL: | **Yo me encargo de citarlo...** |
| JUEZ: | ¡Okey! |
| FISCAL: | De hacer las gestiones con el... |
| JUEZ[:] | Okey. |
| FISCAL: | ...lo que pasa es que él no está en esta jurisdicción juez y hay que trasladarlo... |
| JUEZ: | Si, yo no... |
| FISCAL: | ...entonces para hacerlo lo más rápido posible. |
| JUEZ: | No tengo problema con eso.[474] |

[...]

Luego de examinar el intercambio anterior, no cabe duda de lo siguiente: (1) el contrainterrogatorio del testigo Rodríguez Vélez en la vista preliminar estuvo limitado por el tribunal de instancia al delito de secuestro y ello se reiteró en más de una ocasión; (2) al final del contrainterrogatorio, el Ministerio Público aclaró que no podía volver a traer a dicho testigo para testificar en el caso de las armas de fuego y de las sustancias controladas, aun cuando estaba claro que el contrainterrogatorio estuvo limitado únicamente al delito de secuestro, por lo que aparentaría que la defensa no tuvo la oportunidad de contrainterrogar sobre esos temas; (3) el foro primario no le permitió al Ministerio Público hacer un turno de redirecto, aun cuando este último expresó que quería hacer unas preguntas para aclarar un asunto relacionado a unas cadenas. Incluso, el tribunal apelado expresó que, dependiendo de lo que pasara con los demás testimonios relacionados al diligenciamiento

---

[474] TPO, págs. 46-48. (Énfasis nuestro).

de las órdenes de registro y allanamiento, el Ministerio Público podía citar nuevamente al testigo, a lo cual este se allanó y afirmó que se encargaría de citarlo. Sin embargo, de la transcripción de la prueba oral de la vista preliminar no surge que el testigo Rodríguez Vélez compareciera nuevamente a testificar.

Luego de un análisis sosegado de la transcripción de la prueba oral, así como de los autos originales, no cabe duda de que el testimonio de Rodríguez Vélez se centró en el delito de secuestro del cual alegaba haber sido víctima a manos de los aquí apelantes. Durante dicho testimonio en la vista preliminar, el testigo mencionó unas armas de fuego y unas sustancias controladas, lo que dio paso a las órdenes de registro y allanamiento que resultaron en la radicación de los cargos de epígrafe. Ahora bien, el testimonio del mencionado testigo en todo momento se circunscribió a probar el delito de secuestro, mas no el de armas ni el de sustancias controladas. Para probar tales delitos, el Ministerio Público recurrió al testimonio de los agentes a cargo del diligenciamiento de las órdenes de registro y allanamiento correspondientes. Sobre ello, desfiló amplia prueba durante el juicio en su fondo. Por tal razón, los argumentos de la defensa en cuanto a que a los apelantes se le violentaron sus derechos a un juicio justo, a la confrontación y al debido proceso de ley, carecen de méritos, pues esta tuvo la oportunidad de contrainterrogar al testigo Rodríguez Vélez en la etapa de vista preliminar de forma amplia y efectiva sobre lo que este declaró. Si bien el contrainterrogatorio se limitó al delito de secuestro, lo cierto es que fue sobre ese delito que el testigo en cuestión declaró y fue para ese propósito que el Ministerio Público lo sentó a testificar en aquel momento.

Una vez comenzados los turnos de contrainterrogatorio de la defensa, el juez a cargo de la sala en ningún momento interrumpió la línea de preguntas de la representación legal de los aquí apelantes

para limitar sus interrogantes en torno a un delito en específico. De una exhaustiva revisión de la prueba oral, tampoco surge que el Ministerio Público objetara alguna pregunta de la defensa bajo el argumento de que la interrogante era sobre otro delito que no fuera secuestro. Por el contrario, la defensa tuvo la oportunidad de dirigir su contrainterrogatorio con las preguntas que estimó atinentes. A modo ilustrativo, resulta indispensable reproducir ambos turnos de contrainterrogatorio para corroborar lo anterior. Veamos.

En su turno de contrainterrogatorio del testigo Rodríguez Vélez, la representación legal de Fontánez Carballo decidió limitarse a realizar las siguientes preguntas:

| | |
|---|---|
| LIC[.] RAMOS: | [S]eñor Peter[,] le pregunto[,] [¿]qué edad usted tiene? |
| T. RDZ: | 43[.] |
| LIC[.] RAMOS: | ¿Qué escolaridad usted tiene? |
| T. RDZ: | Noveno grado[.] |
| LIC[.] RAMOS: | ¿Cuánto usted pesa? |
| T. RDZ: | Como 190 libras[.] |
| LIC[.] RAMOS: | ¿Cuánto usted mide? |
| T. RDZ: | Seis uno[.] |
| LIC[.] RAMOS: | Usted indic[ó][,] a preguntas de la distinguida compañera[,] que cuando usted llegó, que se escapó del lugar, lleg[ó] al cuartel y usted había llegado endrogado, ¿es correcto? |
| T. RDZ: | Sí. |
| LIC[.] RAMOS: | ¿Sí? Eso es cuando usted llegó al cuartel. Usted indicó que usted estuvo secuestrado y esa pregunta la contest[ó] de diferentes formas[.] [E]n un momento habl[ó] de dos semanas, en otro momento habl[ó] de tres semanas. [V]erdaderamente[,][¿]qu[é] tiempo usted estuvo, bajo lo que usted entiende que es un secuestro? |
| T. RDZ: | Estuve tres semanas. |
| LIC[.] RAMOS: | ¿Qué alimentación usted tenía[,] si alguna? |
| T. RDZ: | Ninguna. Solamente refrescos y galletas. |

| LIC[.] RAMOS: | Bien, y le pregunto[,] usted indicó que usted vendía drogas, ¿es correcto? |
|---|---|
| T. RDZ: | Sí. |
| LIC[.] RAMOS: | ¿Y que usted estaba secuestrado al momento en que usted vendía drogas? ¿es correcto? |
| T. RDZ: | Sí[.] |
| LIC[.] RAMOS: | ¿Y cómo usted puede explicar que usted pueda hacer ambas funciones? |
| T. RDZ: | A mí me pasaban de 6 de la mañana a 12 de la noche a vender drogas. |
| LIC. RAMOS: | [P]ero[,] [¿]cómo es que usted[,] estando secuestrado[,] puede vender drogas? |
| T. RDZ: | Ese era el trabajo que me tenían. |
| LIC[.] RAMOS: | Y lo cierto es que todo ese tiempo que usted estuvo, estuvo bajo [el] efecto de sustancias controladas, ¿es correcto? |
| T. RDZ: | Sí[.] |
| LIC[.] RAMOS: | **No vamos a preguntar nada más[,] Vuestro Honor**.[475] |

Por otro lado, en su turno de contrainterrogatorio del testigo Rodríguez Vélez, la representación legal de Fontánez Carballo decidió realizar las siguientes preguntas:

| LIC[.] AÑESES: | Con el permiso del Tribunal. Testigo[,] buenas tardes. |
|---|---|
| T. RDZ: | Buenas tardes. |
| LIC[.] AÑESES: | Eh, señor Rodríguez[,] usted llegó a Pueblo Nuevo nos dice que, para el verano del año pasado, ¿para junio? |
| T. RDZ: | Yo vivía en San Sebastián hacen *[sic]* 7 años, pero llegu[é] allí en esa fecha porque yo consumía heroína y yo la compraba. |
| LIC[.] AÑESES: | Para, ¿en el verano? ¿en junio? |
| T. RDZ: | Un tiempo algo *[sic]*, como unos meses antes, llegu[é] a esa área buscando trabajo, en esa fecha. |
| LIC[.] AÑESES: | Mire, y el trabajo que consiguió ese verano[,] en junio[,] fue vendiendo droga[s]. |
| T. RDZ: | Sí[.] |

---

[475] TPO, págs. 33-34. (Énfasis nuestro).

| | |
|---|---|
| FISCAL: | No, no fue, dijo que había llegado meses antes de junio, so sería [m]isleading *[sic]*[.] |
| LIC[.] AÑESES: | No, él dijo que lleg[ó] buscando trabajo 7 años antes... |
| JUEZ: | No, no, no, no. Él dice que llegó a vivir los 7 años antes de que fuera allí[.] [E]n un momento dado comenzó a usar heroína y fue allí a buscar trabajo varios meses antes. |
| LIC[.] AÑESES: | La pregunta fue, [l]a pregunta fue si en junio [é]l comenzó a vender droga[s] allí[.] |
| FISCAL: | Y él dijo, varios meses antes, y él dijo varios meses antes[,] por eso objetamos y decimos que es [m]isleading al compañero. |
| JUEZ: | Está bien, pero estamos hablando de fechas aproximadas. |
| LIC[.] AÑESES: | Mire[,] desde junio[,] usted está vendiendo drogas allí, ¿verdad que sí? |
| T. RDZ: | Sí. |
| JUEZ: | ¿[J]unió [de] 2019? |
| LIC[.] AÑESES: | ¿Desde junio? |
| JUEZ: | ¿Junio? |
| T. RDZ: | Sí[.] |
| LIC[.] AÑESES: | ¿Y en junio a usted no lo secuestraron? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Y en julio usted continúa viviendo allá? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Y en julio tampoco lo secuestraron? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | Mire, ¿y en agosto usted contin[uó] vendiendo drogas allí, en ese sector? |
| T. RDZ: | Sí[.] |
| LIC[.] AÑESES: | ¿Es correcto? |
| T. RDZ: | Sí[.] |
| LIC[.] AÑESES: | ¿Y tampoco estaba secuestrado? |
| T. RDZ: | En el transcurso de... la fecha no me la sé como tal. |
| LIC[.] AÑESES: | ¿Fue [en] agosto que lo secuestraron? |

| | |
|---|---|
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Okey. Mire[,] ¿y cómo fue ese secuestro para usted estar seguro de que fue un secuestro? Ese momento del secuestro. |
| T. RDZ: | Cuando me cogen de a punta *[sic]* de pistola y me llevan a una casa, donde me encadenan de los pies a una ventana... |
| LIC[.] AÑESES: | Okey, mire[...] |
| T. RDZ: | Ellos me lo dicen también |
| LIC[.] AÑESES: | ¿C[ó]mo? |
| FISCAL: | ¿Qu[é]? |
| T. RDZ: | Que ellos me lo dicen. |
| LIC[.] AÑESES: | ¿Qué le dicen a usted? |
| T. RDZ: | Que voy a ser secuestrado. |
| LIC[.] AÑESES: | ¿Que va a ser secuestrado o que está siendo secuestrado? |
| T. RDZ: | O sea, siendo secuestrado. |
| LIC[.] AÑESES: | ¡Ajá!, ¿y eso usted lo dijo en la declaración jurada? ¿Verdad?, ese evento que lo pusieron [a] punta de pistola *[sic]* está siendo secuestrado, ¿verdad que usted no lo puso en la declaración jurada? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Tampoco aparece ninguna fecha de cu[á]ndo ocurrió ese evento que usted dice, de esa primera vez que le dicen a usted[,]que a punta de pistola[,] que est[á] secuestrado? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¡No! Mire, ¿y usted dice que eso fue en agosto? ¿Es correcto? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Y usted fue al cuartel de la Policía el 17 de octubre? ¿Eso es correcto[,] verdad? |
| T. RDZ: | ¡Ujum! |
| LIC[.] AÑESES: | Eh, ¿el tiempo que usted estuvo secuestrado[,] de acuerdo a usted[,] fue desde agosto hasta el 17 de octubre? |
| T. RDZ: | A principio de agosto. |
| LIC[.] AÑESES: | A principio de agosto lo secuestraron[,] ¿y en septiembre seguía secuestrado? |
| T. RDZ: | ¿Perdón? |

| | |
|---|---|
| LIC[.] AÑESES: | ¿En septiembre seguía secuestrado? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. En septiembre no estaba secuestrado. Mire ¿y en octubre no estaba secuestrado tampoco? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. ¡Donde estaba secuestrado fue en agosto[,] que usted menciona! |
| T. RDZ: | Agosto y octubre, fue el 17 de octubre. |
| LIC[.] AÑESES: | ¿Pero en septiembre no estuvo secuestrado? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | Mire y septiembre est[á] entre medio del mes de agosto y el mes de octubre ¿verdad? ¿Es correcto? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Sí, y ese mes usted nos indica que par..[.] [¿][E]n qué momento de agosto fue que usted dej[ó] de ser secuestrado, a principio de agosto, a finales de agosto que usted dej[ó] de ser secuestrado en agosto? |
| T. RDZ: | Perdón. Estoy confundido con la fecha. Con los, con los meses. |
| LIC[.] AÑESES: | Mire[,] don Peter, usted pregunta, ha habido varias respuestas en relación al término de su secuestro. Primero nos dijo dos semanas y después nos dijo tres semanas. ¿Eso es así? |
| T. RDZ: | Han sido tres semanas… |
| LIC[.] AÑESES: | ¿C[ó]mo? |
| T. RDZ: | Siempre han sido tres semanas. |
| LIC[.] AÑESES: | Tres semanas. Tres semanas. Mire[,] y entonces a usted lo secuestraron en agosto, lo dejaron de secuestrar en septiembre y lo volvieron a secuestrar en octubre. ¿Es lo que usted nos está diciendo? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Eso no fue lo que nos dijo hace un momento? |
| T. RDZ: | Si lo dije, lo dije mal. |
| LIC[.] AÑESES: | ¡Dijo! Mire[,] y lo cierto es que en septiembre también usted estaba vendiendo drogas allí, ¿verdad que sí? |

| | |
|---|---|
| T. RDZ: | Sí[.] |
| LIC[.] AÑESES: | ¿Y en octubre usted estaba vendiendo drogas allí también? |
| T. RDZ: | Sí[.] |
| LIC[.] AÑESES: | Y el 17 de octubre la Policía interviene en el punto de drogas, ¿verdad? Se tiran, gritan AGUA y la Policía se dirige hacia el punto de droga[s]. ¿Es correcto[,] verdad? De hecho, usted vio a los Policías venir, ¿verdad que sí? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. ¿Usted no describe en su declaración jurada el vehículo donde venían los Policías? |
| T. RDZ: | Yo, s[i] pu[d]e ver un carro, pero no fue que lo vi directamente. |
| LIC[.] AÑESES: | Okey. Pero mire usted, ¿usted prest[ó] declaraciones[,] verdad? ¿Es correcto[,] Peter? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Sí, mire[,] y en esas declaraciones fue una ante un juez[,] ¿verdad? ¿correcto? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Mire a ver si usted la describe, ¿que los agentes se tiraron allí y el vehículo en el que lo[s] agentes llegaron[,] usted los describió ese día ante el juez[,] o no? |
| T. RDZ: | ¿Perdón? |
| LIC[.] AÑESES: | ¿Usted describió eso ant[e] el juez o no? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Los vehículos que los agentes llegaron*[sic]* [,]verdad que sí? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Sí. ¿O sea que usted vio los vehículos de los agentes llegar? |
| T. RDZ: | Yo sé que era un vehículo[.] |
| LIC[.] AÑESES: | Okey. Y llegaron los agentes cuando llegó el vehículo[.] |
| T. RDZ: | ¡Ujum! |
| LIC[.] AÑESES: | Y[,] entonces[,] usted dice que había un tirador Marcos, ¿Marcos está aquí? |
| T. RDZ: | No. |

| | |
|---|---|
| LIC[.] AÑESES: | No. [M]arcos[,] [¿]usted dio información a la Policía de qui[é]n era Marcos? |
| T. RDZ: | No entendí la pregunta. |
| LIC[.] AÑESES: | ¿Usted no le dio información a la Policía de qui[é]n era Marcos? ¿Verdad que no? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Sí? |
| T. RDZ: | Un tirador. |
| LIC[.] AÑESES: | Un tirador. Mire[,] y usted dice que Marcos, que había otro tirador allí, s[í], de acuerdo a lo que yo escuché, hace, cuando usted le identific[ó] a la fiscal, ¿verdad? *[sic]* |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Eran dos tiradores? |
| T. RDZ: | Sí, pero hay uno que no estaba trabajando. |
| LIC[.] AÑESES: | Okey, habí[a] dos tiradores y usted dice que Marcos salió corriendo, ¿verdad que sí? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Y el otro tirador también salió corriendo, ¿verdad que sí? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿No? ¿Se qued[ó] allí? ¿El otro tirador se quedó en el lugar? |
| T. RDZ: | Donde estaba la parte de atrás de la casa. |
| LIC[.] AÑESES: | ¿Y los agentes de la Policía arrestaron al otro tirador? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. ¿Los agentes de la Policía arrestaron a Marcos? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. Mire[,] y usted salió corriendo, ¿usted no salió corriendo hacia el vehículo donde estaba[n] los agentes[,] verdad que no? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. [U]sted salió corriendo hacia el cuartel de San Sebastián[,] de acuerdo a lo [que] nos ha dicho, ¿verdad? |
| T. RDZ: | Sí. |

| | |
|---|---|
| LIC[.] AÑESES: | Bien. ¿Y le pregunto, si usted salió corriendo al cuartel de San Sebastián con Marco[s]? Perdón, perdón... |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ... ¿[C]u[a]ndo usted salió de allí[,] salió con Marcos corriendo? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. Y usted estaba vendiendo drogas ese día allí, ¿verdad que sí? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. Mire[,] y no había nada que impidiera que usted pudiera llegar hasta el carro de los agentes de la Policía que llegaron a Puerto Nuevo, ¿verdad que no? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. |
| FISCAL: | ¡Vuestro Honor, Pueblo Nuevo! |
| LIC[.] AÑESES: | ¡Pueblo Nuevo! ¡Pueblo Nuevo! ¿No había ningún impedimento [en] que usted pudiera llegar hasta ese automóvil?, ¿verdad que no? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | Mire, ¿y cuando usted salió de la casa, eh, nadie le estaba persiguiendo[,] verdad que no? |
| T. RDZ: | Bueno[,] que yo me haiga dado de cuenta[,] no. *[sic]* |
| LIC[.] AÑESES: | No. ¿Verdad? ¿Le pregunto si la Policía lo estaba persiguiendo a usted? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | Mire[,] y ese día no pudieron arrestar a nadie allí, ¿verdad? ¿A ningún tirador? |
| T. RDZ: | Que yo entienda[,] no. |
| LIC[.] AÑESES: | No. ¿Y la razón por la cual no pudieron arrestar a nadie fue por[que] salieron corriendo? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Y en todo ese periodo no había vecinos en el lugar?, ¿verdad? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | Ese Pueblo Nuevo es algo desolado, ¿verdad? ¿[N]o hay vecinos[,] solamente los que usted mención[ó]? |

| | |
|---|---|
| T. RDZ: | Hay personas, pero están apartadas del área donde yo me encontraba. |
| LIC[.] AÑESES: | Mire[,] ¿y las personas que compraban, que usted vendía droga[s][,] veían que usted estaba encadenado? |
| T. RDZ: | Yo no estaba encadenado en la casa del punto. |
| LIC[.] AÑESES: | Mire, ¿y la casa del punto es la que es del alero chinita? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Y allí usted de 12... |
| T. RDZ: | Perdón[,] no. Esa es del color quenepa por dentro. |
| LIC[.] AÑESES: | ¿La del color crema es la casa del punto? |
| T. RDZ: | Verde Azul con las franjas de color quenepa por dentro. |
| LIC[.] AÑESES: | ¡Disculpe! ¿La casa color, con las franjas color chinita, es la casa del punto o no es la casa del punto? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. ¿Usted dice que es la casa cuál? ¿Cuál es la casa del punto? ¿Dónde usted vendía las drogas? |
| T. RDZ: | Verde azul. |
| LIC[.] AÑESES: | Verde azul. ¿Y usted nos dice que en esa estaba de la media noche a seis de la mañana? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Usted vendía de día? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Y usted vendía solo allí de día? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | Okey. ¡Y usted podía irse de allí en cualquier momento dado! |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Lo estaban amenazando con un arma de fuego[,] en ese momento dado, cuando vendía droga[s]? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | ¿Estaba encadenado de alguna forma cuando estaba vendiendo drogas? |
| T. RDZ: | Yo directamente no, pero los portones sí. |

| | |
|---|---|
| LIC[.] AÑESES: | ¿Pero estaba encadenado? |
| T. RDZ: | No. |
| JUEZ: | ¡Déjame aclarar algo! ¿Dice que esa casa[,] que donde se operaba el punto[,] *[sic]* tenía una verja alrededor? |
| T. RDZ: | Ten[í]a [una] reja al frente y un portón a la parte [de] atrás. |
| JUEZ: | Okey, ¿y usted estaba dentro de la casa? |
| T. RDZ: | Dentro de la casa. |
| JUEZ: | Y el, y el comprador venía y se acercaba... |
| T. RDZ: | Compraba por el ba[l]cón. |
| JUEZ: | ¿Y ese portón estaba cerrado? |
| T. RDZ: | Con cadena. |
| JUEZ: | ¿Y el portón de atrás? |
| T. RDZ: | También. |
| JUEZ: | ¿Y qui[é]nes estaban dentro de esa casa? |
| T. RDZ: | Yo solo. |
| JUEZ: | ¿Usted solo? |
| T. RDZ: | Sí. |
| JUEZ: | Y, ¿y? ¿y los otros vendedores operaban de la misma forma que usted? |
| T. RDZ: | ¡No, no entiendo! |
| JUEZ: | ¿Los otros que vendían droga[s] igual que usted? |
| T. RDZ: | ¿Aj[á]? |
| JUEZ: | ¿Estaban dentro también o estaban fuera? |
| T. RDZ: | Unos a veces entraban[,] otros se quedaban afuera. Por el tiempo que yo estuve secuestrado[,] [u]nos estaban adentro si querían y otros trabajaban afuera. |
| JUEZ: | Está bien. |
| LIC[.] AÑESES: | Mire[,] ¿y a la media noche[,] entonces[,] a usted lo sacaban de esa casa del punto y lo envían, lo mandaban a otra casa? |
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿A punta de pistola, lo llevaban a punta de pistola allí? |

| | |
|---|---|
| T. RDZ: | Sí. |
| LIC[.] AÑESES: | ¿Los vecinos podían ver la, la, cuando lo llevaban a usted con encaño[na]do? *[sic]* |
| T. RDZ: | Yo diría que vecinos como tal así no[,] porque son casas solas que no viven mucha gente. |
| LIC[.] AÑESES: | Pero usted iba por la calle[,] ¿no? ¿Lo llevaban por la calle o habí[a] [un] subterráneo *[sic]* o algo subterráneo por debajo de la, de la casa pa[ra] poder llevarlo allá? |
| T. RDZ: | Por la calle. |
| LIC[.] AÑESES: | Por la calle, ¿verdad? ¡Por la calle! O sea que allí las personas que viven en el lugar pudieron haber visto que usted estaba encañonado, ¿verdad que sí? Durante las tres semanas que usted menciona… |
| FISCAL: | Si lo sabe[,] juez, porque no puede contestar lo que vieron… |
| LIC[.] AÑESES: | Sí, sí, digo si lo sabe, ¡que conteste! |
| T. RDZ: | No, no lo sé. |
| LIC[.] AÑESES: | ¿Había algo que impidiera que los vecinos vieran que usted estuviese transitando por la calle? |
| T. RDZ: | De que ellos me vieran[,] a que ellos quisieran hablar[,] son otros pesos… |
| LIC[.] AÑESES: | Pero le pregunto[,] ¿si había algo que impidiera que los vecinos pudieran observarlo a usted caminando por la calle? |
| FISCAL: | Juez[,] pues tenemos objeción porque esa es una pregunta que hay que hacérsela a los vecinos, porque no sabemos si estaban despiertos, si lo podían ver, eso es una percepción… |
| LIC[.] AÑESES: | No, pero… |
| FISCAL: | …que no la puede declarar el testigo. |
| JUEZ: | Está bien, pero, mire. |
| LIC[.] AÑESES: | Bueno, pero mire[,] ¿lo llevaban encapuchado, lo llevaban con algo cubriéndolo a usted, para que no lo vieran? |
| T. RDZ: | No. |
| LIC[.] AÑESES: | No. Se podía ver a simple vista de cualquier casa allí, ¿verdad que sí? |
| T. RDZ: | Sí. |

LIC[.] AÑESES:        No tengo más preguntas[,] juez.

JUEZ:                     Bien.[476]

Como bien fue ilustrado, el derecho a la confrontación y al debido proceso de ley de los apelantes no fue violentado. Por el contrario, según colegimos, la defensa tuvo la oportunidad de contrainterrogar de forma amplia y efectiva al testigo. Sin embargo, la defensa justifica su planteamiento de que el contrainterrogatorio no fue completo y efectivo en que, en la vista preliminar, solo se les había entregado una *Declaración Jurada* del testigo Rodríguez Vélez suscrita el 14 de noviembre de 2019, mientras que, posteriormente, este había emitido una *Declaración Jurada* el 13 de abril de 2021, sobre la cual no habían tenido la oportunidad de confrontarlo. Alegan que, en la declaración posterior, el mencionado testigo se contradice, pero que se vieron imposibilitados de impugnar al testigo con ella en el juicio por este no estar disponible. En virtud de ello, arguyen que el foro primario no debía permitir que el testimonio previo fuera presentado ante el Jurado. Por su parte, el Ministerio Público arguyó que la *Declaración Jurada* del 13 de abril de 2021 fue con relación a un caso de asesinato, el cual no era objeto del presente pleito.

Surge de la transcripción de la vista argumentativa al amparo de la Regla 109 de Evidencia de Puerto Rico, *supra,* que el foro de instancia instruyó a la defensa sobre la diferencia entre el valor probatorio y la admisibilidad de la prueba y determinó que lo argumentado por la defensa iba dirigido a atacar lo primero, mas no lo segundo. El foro *a quo,* además, le orientó a la defensa que aún contaba con el mecanismo provisto por la Regla 808 de Evidencia de Puerto Rico, *supra,* para impugnar la credibilidad del testigo no disponible en el juicio. Por su parte, la defensa presentó ambas

---

[476] TPO, págs. 34-46.

declaraciones juradas de Rodríguez Vélez en la vista argumentativa, marcadas como Exhibit #1 y #2 de la Defensa; ello, con la anuencia del Ministerio Público. Sin embargo, cabe destacar que, durante el juicio por jurado, la defensa únicamente presentó como Exhibit #2 la *Declaración Jurada* del 14 de noviembre de 2019, la cual tuvo disponible durante la vista preliminar y sobre la cual dirigió su contrainterrogatorio en aquel momento. En específico, la *Declaración Jurada* suscrita por el testigo Rodríguez Vélez el 14 de noviembre de 2019, lee como sigue:

FISCAL:     Levante su mano derecha, ¿jura usted decir la verdad de todo lo que se le pregunte y sepa, que le conste de propio y personal conocimiento?
TESTIGO:   Sí.

**F:          ¿Cuál es su nombre?**
T:            Peter Rodríguez Vélez.

**F:          ¿Cómo se siente usted hoy?**
T:            Bien.

**F:          Antes de venir aquí, ¿[h]izo usted uso de alguna sustancia controlada?**
T:            No. Desde el 17 de octubre no consumo.

**F:          ¿Hizo usted uso de alcohol antes de venir aquí a la Fiscalía?**
T:            No.

**F:          ¿Ha estado usted alguna vez en tratamiento en alguna institución mental o por problemas de índole emocional?**
T:            S[í]. En Centro Médico en Río Piedras.

**F:          ¿Y cómo se siente hoy emocionalmente?**
T[:]          Muy bien.

**F:          ¿Cómo ha sido tratado por la Policía de Puerto Rico [durante] la investigación de este caso?**
T:            S[ú]per bien.

**F:          Mientras ha estado ante esta fiscal[,] [¿]se le ha maltratado o se le ha coaccionado, intimidado, presionado o prometido algo [o] en alguna forma se le ha inducido a usted para que declare?**
T:            No.

**F:          ¿Ha tenido usted problemas anteriormente con la justicia, de adulto, ya sea aquí en Puerto Rico o fuera de Puerto Rico?**
T:            S[í].

**F:          ¿Alguien le ha ofrecido algo a cambio de que usted preste esta declaración?**
T:            No.

| | |
|---|---|
| **F:** | **¿Ha ingerido alguna sustancia o medicamento en el día de hoy?** |
| T: | No. |
| **F:** | **¿Se siente coaccionado o intimidado por alguna situación?** |
| T: | No. |
| **F:** | **¿Se siente bien emocionalmente?** |
| T: | S[í]. |
| **F:** | **[¿A]lguien le ha obligado a usted a declarar?** |
| T: | No. |
| **F:** | **¿Qué sucedió, si sucedió algo, ese día 17 de octubre de 2019[,] mientras usted se encontraba en el [á]re[a] de Pueblo Nuevo en San Sebastián?** |
| T: | Ese día se tiraron unos [a]gentes que llegaron con un carro color oro, y la gente empezó a gritar agua, agua y corrieron al tirador Marcos. Yo estaba dentro de la casa del punto y yo logr[é] salir de allí. |
| **F:** | **¿C[ó]mo usted llegó y porque *[sic]* al área de Pueblo Nuevo en San Sebastián?** |
| T: | Todo empezó porque yo iba a allí a capear *[sic]* y ellos me dieron trabaj[o] tirando droga[s]. Después de yo llegar[,] allí habí[a] pasado unas semanas o un mes, que habían pasado un tiroteo en la Loma y había[n] habido *[sic]* unos heridos, entre ellos[,] Carlos Flanero. Entonces[,] él y el Negro de Caguas estaban buscando [a] una tercera persona para que le guiaran un carro para cometer un delito, ellos quieren *[sic]* que yo fuera con ellos para guiarles y yo le[s] dije que no. |
| **F:** | **¿Porque *[sic]* usted se fue a vivir al Sector Pueblo Nuevo?** |
| [T:] | Porque yo no quería que mi pareja y mis hijos me vieran de la manera en [la] que yo estaba. Yo estaba en vicios. |
| **F:** | **¿Qu[é] usted se llevó para el área de Pueblo Nuevo?** |
| T: | Mis pertenencias, ropa, un microondas, herramientas, una maleta negra, un álbum de fotos de la familia y otras cosas. |
| **F:** | **¿En qué lugar usted se ubicó para vivir una vez usted se va de su hogar?** |
| T: | En una casa que el Negro de Caguas alquil[ó] para guardar las armas y la[s] droga[s]. |
| **F:** | **¿Cómo era esa casa y d[ó]nde estaba ubicada?** |
| T: | En Pueblo Nuevo[.] [E]ra una casa de madera[.] [E]n el balcón había unas cortinas de baño, la puerta era tipo antigua [b]rown y la casa era como color bon[e] [w]hite [y] los bordes color chinita. Esa casa era de la abuelita de uno de los tiradores. Al ella fallecer[,] la casa se quedó vacía y[,] entre el nieto y el Negro de Caguas[,] llegaron a un acuerdo y se la alquilaron. |

**F:** **[U]na vez usted se fue de su casa, [¿]qu[é] usted hizo con sus pertenencias, si algunas?**

T: Mis cosas se quedaron en la casa del punto que es otra casa. En el cuarto del medio.

**F:** **¿Cómo era esa casa que usted llama la casa del punto?**

T: Es color como verde azul, las franjas y el borde eran como color quenepa y el balcón era con rejas y portón[.] [P]ara que no se viera para adentro de la casa[,] habían puesto como unas puertas de baño de cristal en el balcón.

**F:** **[¿]Por qué usted dice que ese 17 de octubre de 2019 usted logró salir de allí?**

T: Yo me encontraba secuestrado[.] [N]o podía salir de allí[.] [E]staba en contra de mi voluntad[.] [T]en[í]a miedo.

**F:** **¿Cuándo específicamente fue que a usted empezaron a encadenarlo y a dejarlo sin poder moverse libremente?**

T: Fue aproximadamente para finales de agosto de este año.

**F:** **¿Cómo era la cadena que usaban para cerrar la casa?**

T: Gruesa, color níquel y un candado grande niquelado.

**F:** **¿C[ó]mo usted logró salir de allí?**

T: Ese día yo logr[é] salir porque se tiraron unos [a]gentes en un carro color oro y se encontraba el que le alquiló la casa al Negro de Caguas, que se llama Marcos. Marcos estaba saliendo de la casa del punto verde azul por la puerta de atrás. Para salir hacia afuera[,] hay que pasar por una ventana, por el hueco para caer al callejón del lado. Cuando se tiraron los [a]gentes, Marcos se fue y uno de los compañeros míos, que es usuario que estaba cerca de allí y ve que no están las cadenas puestas, va y le saca el tornillo. Allí yo salgo corriendo hacia el cuartel y al llegar le digo a un [t]eniente de la Policía que tenía que hablar con alguien porque había sido secuestrado y me pasan a un cuarto con un oficial calvito él. Yo le conté casi todo y luego llegaron los de Homicidios. De ahí me trajeron a Aguadilla y después me entrevistaron los de Drogas.

**F:** **[¿]Con qui[é]n de su familia usted se comunicaba mientras estuvo en Pueblo Nuevo?**

T: Con nadie por teléfono, después de que me secuestraron. La que era mi pareja al principio, cuando yo llegué al punto[,] me llevaba comida allí, pero después de que ellos empezaron a encerrarme no tuve comunicación con ningún familiar. Solamente con el Negro de Caguas y Magda La Rubia.

**F:** **¿Por qué usted no se comunicaba con su familia?**

T: Porque ellos me lo prohibieron[.] [É]l me dio un teléfono de minutos, pero me supervisaban y

verificaban el teléfono y me decían que, si yo llamaba a alguien, ya sabía lo que me esperaba.

**F:** **¿Porque *[sic]* usted dice que lo secuestraron?**

T: Porque ellos querían que fuera con ellos para hacer un delito, y como me negué[,] y como yo tenía conocimiento de todo porque yo siempre estaba con ellos, pues me montaron un tipo de presión para no dejarme irme *[sic]* de allí y lo que hacían era que por [las] noches me tenían amarrado con una cadena gorda en una casa.

**F:** **¿Cómo era la casa donde lo amarraban por las noches?**

T: Era de madera, color crema y franjas color chinita[.] [T]enía en el balcón dos cortinas de baño[.] [T]enía dos ventanas miami color negra[.] [E]l techo tenía un toldo color azul de F[EMA.] [E]n la puerta tenía un candado master color negro[.] [T]enía una verja en alambre ciclón al frente[.] [C]uando entras te encuentras con la sala, a la izquierda está la cocina, tiene una estufa con cuatro hornillas color blanco, fregadero y una barrita, gabinetes claros, luego el baño del estilo de los de antes, sencillo, no tenía losetas y luego el cuarto donde me amarraban con cadena de la ventana. Los muebles son cubiertos en plásticos, claritos con diseños en colores claros. [En] [e]sa casa había servicio de luz y de agua. Cuando entras est[á] un sillón de frente con un espejo[.] [N]o había[n] cuadros. En el cuarto donde yo me encontraba había un caucho, una mesita de noche como de niño porque era de Spiderman.

Había un rifle y una caja verde con cadenas que era donde estaba[n] la[s] droga[s]. En ese cuarto era donde estaban las armas y la[s] droga[s]. Ese día[,] 17 de octubre de 2019[,] a las 6:00 am[,] fue la última vez que vi droga[s] allí[:] marihuana, cocaína, heroína y crack. La guardaban en una caja de metal militar, color verde y le ponían con una cadena *[sic]*. Y allí mismo[,] al lado de un bulto de una guitarra[,] guardan una R15 Sport Pisto[l][,] con peine de tambor de 100 balas que le dicen Mick[e]y Mouse y dos peines de 30 amar[r]ados con tape, una 9mm Glock gris y negra, un peine adicional y un 38 color negro. Esas armas la utilizaron para cometer el delito que ellos querían que yo cooperara guiándoles.

Ahí me quitaban el teléfono para evitar que yo hiciera llamadas. Pasaba ahí la noche y[,] en las mañanas[,] me quitaban las cadenas y[,] a punt[a] de pistola[,] me pasaban a la casa del punto para que vendiera drogas para ellos. Ya ahí no me pagaban con dinero[;] me daban droga[s]. Ahí ten[í]a [un] teléfono y solo lo podía usar para llamar al dueño de la[s] droga[s], [e]l Negro de Caguas. Cuando se acaba[ba] la[s] droga[s,] [é]l mismo la traía o si no su esposa Magda. No podía llamar a ninguna otra persona y tenía personas que me vigilaban.

| | |
|---|---|
| **F:** | **¿Cómo era esa casa donde lo ubicaban por el día?** |
| T: | Esa casa del punto era la casa verde azul de cemento con las puertas de baño en el balcón. Eso lo hacían a punt[a] de pistola a pie, porque eso es cerca. Las casas que hay por allí[,] casi todas[,] están deshabilitadas y son como pasillos pequeños. |
| **F:** | **¿Qu[é] pasaba en esa casa verde azul de cemento, que usted llama la casa del punto?** |
| T: | Esa era la casa donde ubicaba el punto de droga[s]. Una vez llegábamos a la casa del punto[,] ellos encadenaban las puertas por afuera, en el balcón[,] con una cadena y un candado. La puerta de atrás metía la cadena por una franja que se habían roto y la trancaban con candado. Ellos me dejaban adentro encerrado y me ponían a tirarle droga[s] desde adentro hacia afuera. |
| **F:** | **¿Hasta qu[é] hora lo tenían en esa casa verde azul de cemento[,] que usted llama la casa del punto?** |
| T: | Por la noche[,] a las 12 de la noche[,] cuando se acaba[ba] el punto, trancaban la casa del punto y me pasaban de la misma forma a la otra casa donde guardaban las armas y la[s] droga[s] y allí me amarraban de la pierna izquierda a la ventana del cuarto que estaba después del baño[,] [en] un cuartito pequeño donde hay una mesita de [S]piderman. Allí estaban las armas, municiones y drogas, pero yo llegaba allí habiendo usado sustancias y me ponía a dormir. |
| **F:** | **[¿]Qu[é] comía usted durante esos días?** |
| T: | Ellos no me daban comida. Yo lo que consumía era lo que podía mandar a comprar con otro de los tiradores, pero eran dulces, sodas y lo que yo podía pagar de lo que me ganaba con la venta de la[s] droga[s] que me daban. |
| **F:** | **¿Qu[é] personas estaban presentes cuando lo llevaban de una casa a otra?** |
| T: | Yo nunca vi que alguna persona se diera cuenta de lo que estaba pasando. Yo no sé si llevaban el arma escondida o no porque yo estaba al frente siempre. Las casas son bien cerca. |
| **F:** | **¿Qu[é] armas habían allí?** |
| T: | Una AR15 Sport Pistol, un revolver 38 special y una pistola 9mm. |
| **F:** | **¿Quiénes eran los que lo llevaban de una casa a otra en contra de su voluntad?** |
| T: | Carlos Flanero y el Negro de Caguas[.] |
| **F:** | **¿C[ó]mo usted se sentía mientras usted estaba en ese lugar encadenado y mientras lo trasladaban de un lugar a otro en contra de su voluntad?** |
| T: | Triste y desesperado[;] loco por que *[sic]* iba pensando cómo me podía ir sin ponerme en riesgo. Preocupado de que no me fueran a matar. |

| | |
|---|---|
| **F:** | **[M]ientras usted estuvo en ese lugar, [¿]usted utilizaba sustancias controladas?** |
| T: | S[í]. Yo usaba cocaína[,] heroína y Percoset. |
| **F:** | **¿C[ó]mo la usaba?** |
| T: | Inyectada[;] me la inyectaba Carlos Flanero. |
| **F:** | **¿Todo lo que usted ha dicho en esta declaración jurada es la verdad?** |
| T: | S[í].[477] |

Si bien la defensa no sometió como exhibit la *Declaración Jurada* del 13 de abril de 2021 ante la consideración del Jurado en el juicio en su fondo, sí lo hizo durante la vista argumentativa bajo la Regla 109 de Evidencia de Puerto Rico, *supra*, por lo que el juez tuvo ante sí dicho documento y la defensa argumentó ampliamente sobre ello. Por tal razón, encontramos necesario transcribir lo declarado en dicho documento para contrastarlo con la declaración previamente esbozada. En particular, la *Declaración Jurada* suscrita por el testigo Rodríguez Vélez el 13 de abril de 2021, lee como sigue:

| | |
|---|---|
| FISCAL: | Levante su mano derecha, ¿jura usted decir la verdad de todo lo que se le pregunte y sepa, que le conste de propio y personal conocimiento? |
| TESTIGO: | Sí. |
| **[F]:** | **¿Cuál es su nombre?** |
| T: | Peter Rodríguez Vélez. |
| **F:** | **¿Cómo usted se siente en estos momentos?** |
| T: | Bien. |
| **F:** | **¿Usted sabe leer y escribir?** |
| T: | Sí. |
| **F:** | **¿Qué grado de escolaridad tiene?** |
| T: | Noveno grado. |
| **F:** | **¿Usted ha recibido tratamiento psiquiátrico en alguna ocasión?** |
| T: | Sí, hace unos meses empecé un tratamiento y estoy viéndome con una siquiatra y estoy bebiendo medicamentos. |
| **F:** | **¿Qué medicamentos está tomando?** |
| T: | Son para la depresión y los nombres no me los sé. |
| **F:** | **¿Qué efectos secundarios tienen en ti esos medicamentos?** |
| T: | Solamente me ponen tranquilo. |

---

[477] Anejo II del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 5-9. Véase, además, Exhibit #2 de la Defensa.

| | |
|---|---|
| **F:** | **¿Le pregunto si esos medicamentos influyen sobre su capacidad de entendimiento o de expresión?** |
| T: | No, porque yo solamente me tomo los que me tranquilizan. |
| **F:** | **¿Le pregunto si[,] al día de hoy[,] usted hace uso de sustancias controladas?** |
| T: | No. |
| **F:** | **¿Usted se encuentra aquí hoy de manera libre y voluntaria?** |
| T: | Sí. |
| **F:** | **¿Alguien le ha ofrecido algo a cambio para que usted comparezca hoy a esta [F]iscalía para prestarme esta declaración?** |
| T: | No. |
| **F:** | **¿Para el año 2019[,] dónde usted residía?** |
| T: | Residía en San Sebastián. Yo llegué a vivir en San Sebastián para el año 2014. Yo soy natural de Cabo Rojo. |
| **F:** | **¿A qué te dedicabas en ese momento?** |
| T: | A bregar un punto de drogas en Pueblo Nuevo. |
| **F:** | **¿Usted conoce a una persona que responde al nombre de Josué M. Reyes Vélez?** |
| T: | Sí, lo conozco porque compartía con él en un punto de drogas hace como tres años, pero yo lo conozco por Tres Pesetas y lo puedo identificar. Cuando trabajé con él fue en el residencial del punto Andrés Méndez Liciaga, que fue antes de empezar a trabajar en el punto de Pueblo Nuevo. |
| **F:** | **¿Usted conoce a una persona que responde al nombre de Héctor E. Fontánez Carballo?** |
| T: | Sí, lo conozco por el Negro de Caguas, él era el dueño del punto de Pueblo Nuevo. Lo conocí por algunos seis meses. Yo trabajaba para él. |
| **F:** | **¿Con qué frecuencias tú compartías con el Negro de Caguas?** |
| T: | Todos los días. |
| **F:** | **¿Usted conoce a una persona que responde al nombre de Carlos E. Infante Rosa?** |
| T: | Sí, lo conozco por Flanero. Porque él trabajó conmigo en el punto de drogas de Pueblo Nuevo. |
| **F:** | **¿Por cuánto tiempo conociste a Carlos E. Infante Rosa?** |
| T: | Yo lo conocí antes del Negro de Caguas[,] hacía como un año. |
| **F:** | **[L]e pregunto[,] [¿]qué conocimiento, si alguno, tiene usted de unos hechos ocurridos el día 18 de julio de 2019 en el Res. Andrés Méndez Liciaga[,] donde resultó muerto Jeremy Pérez Nieves?** |
| T: | Esa noche, como a las doce de la media noche, porque a esa hora es que trancaba el punto, yo me encontraba en el punto de drogas con el |

Negro de Caguas, con Flanero y Tres Pesetas, ellos estaban planeando la salida para ir a matar a Jochy, que es el sobrino del dueño del punto del Res. Méndez Liciaga.

Hacía una semana antes que Carlos Flanero me dijo que ellos estaban buscando [a] una persona para guiar un carro porque yo era piloto de carros de carreras y era confiable para ir a matar a Jochy. Al yo negarme[,] ellos siguieron buscando [a] otra persona, se hablaba de eso prácticamente todos los días. Solamente lo hablaban en presencia de mí y de Tres Pesetas. Yo me negué porque yo no vine a este mundo a matar a nadie, pero yo le dije a Carlos Flanero porque yo tenía una familia que proteger y que no me iba a meter en esos revoluces.

**F:** **¿Por qué razón[,] si usted tiene conocimiento[,] iban a matar a Jochy?**

T: Ellos tenían una guerra porque Jochy había tiroteado a Flanero en el punto de Pueblo Nuevo hacía como dos o tres meses atrás, porque yo no trabajaba en el punto todavía. Ahí hirieron a tres personas, entre ellos estaba Carlos Flanero, uno de ellos que conocían por Papo y el otro era un usuario.

**F:** **[C]u[a]ndo estaban planeando el asesinato de Jochy[,] [¿]en qu[é] condición usted se encontraba?**

T: Me encontraba bien porque[,] en ese momento[,] estaba empezando [a] hacer uso de esa droga[,] Fentanilo. A m[í] no me tumbaba, solamente tenía la necesidad de usar más.

**F:** **¿Cuántas horas llevaba trabajando en ese punto ese día?**

T: Estaba desde las seis de la tarde a doce de la noche.

**F:** **¿A qué distancia usted se encontraba cuando escuchó que estaban planeando el asesinato?**

T: Estábamos todos juntos en la sala de la casa que era el punto de drogas, esa casa está abandonada.

**F:** **¿Qué pasó, si algo, luego de planear el asesinato?**

T: Ellos salieron para el Caserío, no vi en qué salieron.

**F:** **¿Qué ropa vestía Carlos Flanero, el Negro de Caguas y Tres Pesetas?**

T: Todos estaban vestidos de negro. El Negro de Caguas tenía una máscara puesta, que era negra y blanca. Ellos tenían pantalones negros y sudaderas con "hooties". *[sic]*

**F:** **¿Qué pasó cuando salieron?**

T: Yo me mantuve en la casa del punto, que está en la Loma de Pueblo Nuevo, que tiene [un] balcón en rejas, es color como azul verde, era de cemento y estaba abandonada. A eso de la

una y algo de la madrugada[,] se escucharon una ráfaga de tiros *[sic]*. Unos minutos más tarde[,] ellos llegan[.] [L]lega Carlos Flanero, el Negro de Caguas y Tres Pesetas celebrando la muerte de Jochy.

**F:    ¿A qué distancia se encuentra la casa del punto de Pueblo Nuevo al Res. Andrés Méndez Liciaga?**

T:    No es tan cerca, pero tan poco tan lejos *[sic]*, pero en el silencio de la noche se escuchó clarito.

**F:    ¿En qué forma Carlos Flanero, el Negro de Caguas y Tres Pesetas se encontraban celebrando la muerte de Jochy?**

T:    Llegaron y entraron diciendo: "lo matamos"[.] Tres Pesetas decía: "le volé la cara". El Negro de Caguas decía: "se me trancó el rifle". Ellos guardaron las armas en una casa que está como a seis casas de distancia, que era donde yo me estaba quedando. Yo le pregunté que por dónde habían entrado[.] Carlos Flanero dijo que entraron por el portón pequeño de la parte de atrás del Caserío y se escondieron debajo de un palo. Que venía caminando Jochy y abren fuego contra él los tres *[sic]*. Cuando se desploma, detrás de un banquito de cemento, llega Tres Pesetas donde él, el que ellos creían que era Jochy[,] y le dijo: "no me mates[,] por favor" y le dispara en la cara[,] pero antes[,] según dijo Tres Pesetas, le apuntó con el arma [y] le dijo: "mira[,] cabrón" y le disparó.

**F:    Descríbame las armas.**
T:    Una R 15, una pistola 9 mm, quinta generación y un revólver 38.

**F:    Si lo recuerda, ¿quién tenía cada arma de fuego?**
T:    Carlos Flanero tenía [la] 9 mm, el Negro de Caguas tenía [la] R 15 y Tres Pesetas [la] 38.

**F:    ¿Qué pasó luego de guardar las armas?**
T:    Cada cual se fue para su casa.

**F:    ¿Qué, si algo, sucedió el día siguiente?**
T:    Al día siguiente[,] ellos se enteraron de que a quién habían matado no fue a Jochy, que era un tal Jeremy. Yo me entero porque yo me tengo que levantar temprano para abrir la casa donde guardaban las armas y las drogas. Quien entrega las drogas es el dueño del punto, las saca y se las entrega al tirador. Yo me quedaba durmiendo en esa casa. El dueño del punto era el Negro de Caguas. Después[,] ellos siguieron planeando c[ó]mo matar a Jochy.

**F:    ¿Le pregunto si usted conoce a Jeremy Pérez Nieves?**
T:    No.

**F:    ¿Una vez ya usted tiene conocimiento del [a]sesinato[,] a quién, si [a] alguien, usted le manifestó sobre estos hechos?**
T:    A nadie.

| | | |
|---|---|---|
| **F:** | | **¿Cuándo terminó su relación con el Negro de Caguas?** |
| T: | | En el mes de octubre de 2019[,] que fu[i] a la Policía de San Sebastián a buscar ayuda. |
| **F:** | | **¿Por qué terminó la relación?** |
| T: | | Al yo negarme a participar en el asesinato de Jochy[,] dejaron de confiar en mí y me secuestraron. Me tuvieron encadenado hasta que yo me escapé. Ese caso se está viendo todavía en el Tribunal y yo presté una declaración jurada ante la Fiscal Silda Rubio.[478] |

Al comparar ambas declaraciones juradas suscritas por el testigo Rodríguez Vélez, así como su testimonio en la vista preliminar, coincidimos con lo dictaminado por el foro primario, toda vez que, lo anterior, en efecto, constituye una valoración de la prueba que, en los casos de autos, le competía al Jurado realizar durante el juicio. Ello, no representaba un impedimento para la admisibilidad del testimonio anterior del mencionado testigo, quien se encontraba no disponible en el juicio por causa de muerte, pues lo expuesto en la *Declaración Jurada* del 13 de abril de 2021 va dirigido a otro caso que no era objeto del presente pleito. En vista de ello, es inmeritorio el argumento de la defensa de que, debido a que no tenía esa declaración disponible en la vista preliminar, su contrainterrogatorio fue incompleto e inefectivo. Por consiguiente, el error señalado al respecto no se cometió.

Por último, el apelante Infante Rosa señaló en su recurso de nomenclatura KLAN202101076 cinco errores adicionales citados en la primera parte de esta *Sentencia*. Ahora bien, el apelante no discutió ninguno de esos señalamientos de error. Sobre ello, expresó que: "[e]ntendimos adecuado, sin renunciar a los mismos[,] no discutir los restantes señalamientos de error".[479]

Sabido es que los foros apelativos no nos vemos obligados a considerar un señalamiento de error no discutido por el apelante en

---

[478] Anejo I del *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, págs. 1-4.
[479] *Alegato de la Parte Apelante Carlos E[.] Infante Rosa*, pág. 16.

su alegato. *Pueblo v. Rivera*, 75 DPR 425, 431 (1953). La simple alegación de un error, que luego no se fundamenta o discute por el proponente, no es motivo para revisar, modificar o, de alguna manera, cambiar la decisión de un tribunal. *Quiñones López v. Manzano Pozas*, 141 DPR 139, 165 (1996). En realidad, se trata de un error levantado, pero no discutido, por lo que se entiende renunciado. *Pueblo v. Dieppa Beauchamp*, 115 DPR 248 (1984) (sentencia). Ante ello, no estamos en posición de atender los reclamos esbozados en tales señalamientos de error y damos los mismos por renunciados.

Estudiada cuidadosamente la transcripción de la prueba oral, examinados los autos originales, así como la prueba documental, y habiendo dado la debida consideración a los alegatos de las partes de epígrafe, procede confirmar los dictámenes apelados.

**IV**

Por los fundamentos que anteceden, confirmamos las *Sentencias* apeladas, en todos sus extremos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones